**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

| | |
|---|---|
| RIGOBERTO VASQUEZ AND EVA GARCIA ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED : | Civil Action No. |
| : | |
| Plaintiffs, : | |
| : | |
| v.  : | |
| : | |
| HONG KONG AND SHANGHAI BANKING CORPORATION LTD., A FOREIGN COMPANY; HSBC BANK USA, N.A., A NATIONAL BANKING ASSOCIATION; AND DOES 1 THROUGH 100, INCLUSIVE, : | JURY TRIAL DEMANDED |
| : | |
| Defendants.  : | |

-------------------------------------------------------X

## CLASS ACTION COMPLAINT

1.      Lead Plaintiffs RIGOBERTO VASQUEZ and EVA GARCIA are among approximately

5,000 Ponzi scheme victims seeking nationwide class certification on behalf of victims of

WCM777, an internet-based scheme that falsely claimed to be a successful global merchant bank

into which you could invest and from which you could receive cloud computing services. When

individual state authorities began investigating WCM777 for fraud, it set up bank accounts at

HSBC Hong Kong, specifically to be beyond U.S. jurisdiction and ceased depositing investor

funds in U.S. banks.  The bulk of transfers to HSBC Hong Kong, went through a "nested"

[1]correspondent bank account at HSBC USA that served to launder monies from WCM777's

---

[1] Nested accounts occur when a foreign financial institution gains access to the U.S. financial system by operating through a U.S. correspondent account belonging to another foreign financial institution. If the U.S. bank is unaware that its foreign correspondent financial institution customer is providing such access to third-party foreign financial institutions, these third-party financial institutions can effectively gain anonymous access to the U.S. financial system. Unacceptable nested activity and other activity of concern may be characterized by transactions to jurisdictions in which the foreign financial institution has no known business activities or interests and transactions in which the total volume and frequency significantly exceeds expected activity for the foreign financial institution, considering its customer base or asset size. U.S. banks should also focus on nested account transactions with any entities the bank has designated as higher risk.  Source Bank Secrecy Act Anti-Money Laundering Examination Manual.  https://www.ffiec.gov/bsa_aml_infobase/pages_manual/olm_047.htm

illegal activity through correspondent banking services that converted foreign currencies into United States Dollars.  Each putative class member became victimized when they sent money to Hong Kong because HSBC USA and HSBC Hong Kong (the "Banks") knew early on that WCM777 was a Ponzi scheme targeting Hispanic and Asian immigrants, yet continued to conduct correspondent banking credit transfers to HSBC Hong Kong and took other actions in furtherance of the scheme, such as obstructing regulatory investigations.  When the United Securities and Exchange Commission shut WCM777down in March 27, 2014 the Plaintiffs lost their money.

2.      This is a class action brought by the named plaintiffs on behalf of approximately 5000 people and entities located in approximately 16 States and other country such as Peru, Columbia, Ecuador, Brazil Mexico, and Panama (the Class Representatives and the putative class members are hereinafter collectively referred to as the "Plaintiffs"). The Plaintiffs were victims of the WCM777 Ponzi scheme (the "Ponzi Scheme," as defined below), who lost approximately $45 million, which they invested in the Ponzi Scheme from 2013 to 2014 by sending money to HSBC Hong Kong.  The case is brought against the Banks that with prior knowledge of illegal activity substantially assisted the scheme to avoid United States regulatory actions, knew that investor deposits originated from high risk geographic areas and laundered those proceeds into United States Dollars, covered payments via direct communication between Bank employees and WCM777's employees, blocked and obstructed attempts by California regulators to access WCM777's transaction information, credited the Ponzi scheme with over 45 million dollars despite possessing clear and convincing evidence of no legitimate business purpose, and routed over 12 million dollars in distributions to investors back into the United States.

3.      Phil Ming Xu[2] and the companies he controlled represented themselves as a successful global merchant bank. World Capital Markets, Inc., and affiliates, WCM777 Inc., WCM777

---

[2] "Dr. Xu Ming, founder ofWCM777.com and a devout Christian, is an active angel investor, private equity fund investor, M&A expert and investment banker in China and the United States. He is a strategist in doing optimal allocation and integration of resources globally. He has successfully taken eight companies public and has sold one of his portfolio companies to a China state-owned large enterprise in China with a value of 400 million RMB. Dr. Xu has the proven ability and track records to do capital multiplication.
Dr. Xu Ming has a master's degree in communication management from the University of Southern California. He graduated from Harvard Business School PEVC (venture capital and private equity funds program). and also was

Ltd., dba WCM777 Enterprises, Inc., Kingdom Capital Market, LLC, Manna Holding Group, LLC, Manna Source International, Inc., WCM Resources, Inc., To Pacific, Inc., Agape Technology Ltd., and their subsidiaries and affiliates (collectively "WCM777"), perpetrated a Pyramid/Ponzi scheme that scammed victims out of millions of dollars worldwide.   HSBC Hong Kong opened up its first bank account for WCM777 in July of 2013, just seven months after its parent company entered into the Deferred Prosecution Agreement with the U.S. Government for money laundering.   Beginning in September of 2013, WCM777 diverted all of its "business" to the HSBC Hong Kong bank accounts and stated explicitly on its website and Facebook page that it was not in compliance with U.S. law and that it was moving to Hong Kong.   The HSBC Defendants knew this because they were constantly monitoring the WCM777 website as required by its internal you're your customer policies and due diligence.[3]



through or involving any correspondent account established, maintained, administered, or managed by the bank in the United States for a foreign financial institution112 ("foreign correspondent account").. Bank Secrecy Act/Anti-Money Laundering Examination Manual 2010 p. 120.

3

4.      The Ponzi scheme survived for over a year because Defendants HSBC Hong Kong and HSBC USA knowingly delivered, organized, converted and laundered proceeds from an illegal Ponzi scheme.  They were instrumental in helping WCM777 to continue its Ponzi scheme even as state, federal and overseas authorities were notifying HSBC USA of problems with WCM777. Defendant HSBC Hong Kong with knowledge gained under its Know Your Customer (KYC) program and account monitoring, knew that WCM777 was a fraud.

5.      In this case, HSBC USA covered payments for the scheme's credit at HSBC Hong Kong, in the absence of such a mechanism the scheme would have collapsed. Cover payments are used by a bank to facilitate funds transfers on behalf of a customer to a beneficiary, most often in another country, but also in the same country when a foreign currency is used. They typically involve both (i) a transaction in a currency other than that of the country in which the originator's or beneficiary's bank is domiciled, and (ii) the originator's and beneficiary's banks not having a relationship with each other that allows them to settle with each other directly. In this circumstance, the originator's bank may directly instruct the beneficiary's bank to effect the payment and advise that transmission of funds to "cover" the interbank obligation created by the payment order has been arranged through a separate channel. Settlement is often accomplished through the originator bank's correspondent in the country where the national currency is the currency of the payment. If the originator bank's correspondent has a relationship with the beneficiary's bank, it can settle the payment itself; otherwise, settlement generally takes place through an additional intermediary bank that has a relationship with the beneficiary's bank. In current practice, the beneficiary can have his account credited by its own bank before interbank settlement is completed, especially when there is a robust commercial relationship.  Source: Basel Committee on Banking Supervision, Due diligence and transparency regarding cover payment messages related to cross border wire transfers, May 2009, p.1.

6.      Defendant HSBC USA as HSBC Hong Kong's correspondent bank was the crucial link in substantially assisting from June 2013 through February 2014 the transfer of over 3,000 transactions and over $45,000,000 of U.S. dollars to WCM's multiple bank accounts held at HSBC Hong Kong.  Correspondent relationships between banks provide the electronic

4

pathway for funds moving from one jurisdiction to another. Through thousands of transactions via Fedwire, Clearing House Interbank Bank Payments Systems (CHIPS), and Bank to Bank, HSBC USA provided continued access to the global Financial System for WCM777.  This was essential to the schemes success because its worldwide investor base was instructed to make investments in United States dollars and investors were given the HSBC Hong Kong account number and address through its website, seminars and face to face meetings.  Consequently, money flowed into to HSBC's Hong Kong correspondent bank account in New York, prior to being credited to HSBC Hong Kong accounts controlled by the scheme.  HSBC USA knew this was taking place because it was required to monitor WCM777 as part of its KYC obligations and customer due diligence.  HSBC Hong Kong's KYC Program utilizes a Customer Risk Rating Methodology ("AMLCRR"). The AMLCRR enables all HSBC Business Units to gauge the potential money laundering or terrorist financing risks posed by their individual customers and customer base.  Upon information and belief HSBC utilized the kyc.com system to screen WCM777's following accounts:

658070248838

817677826838

817697816838

817697824838

817697832838

817697840838

817697857838

817697865838

7.      According to HSBC's website (all wholly owned or controlled HSBC Group of companies) is committed to implementing single global standards shaped by the most effective anti-money laundering standards available in any location where HSBC operates. Since 2012 HSBC has established a Global Anti-Money Laundering Programme ("AML Programme") for this purpose. The objective of the AML Programme is to ensure that money laundering risks

identified by HSBC are appropriately mitigated. http://www.hsbc.com/our-approach/risk-and-responsibility/financial-crime-risk/financial-crime-risk-policies.

8.      HSBC Hong Kong and HSBC USA employees associated themselves in fact with the WCM777 fraud. HSBC employees Carol Ma, Sunny Ho and Xu Xie where in constant interstate email and telephone communications with Ying Leung WCM777's Chief Financial Officer in California to coordinate the flow and volume of transactions and to verify the payment of funds when payments were late or missing.  This constant communication was further knowledge gained by HSBC Hong Kong about the fact that the only source of revenue for WCM777 consisted of transfers from investors.  HSBC assigned case numbers to such late or missing transactions and investigated the transactions providing further knowledge regarding WCM777'a source of revenue, their country origins, amounts and details. This communication was part of the regular way of doing business.  At its core, when a problem arose with a wire transfer, HSBC employees would make telephone calls tor email WCM777 employees in order to make sure that deposits were properly credited to the correct account.  HSBC employees would direct WCM777 employees to make the appropriate arrangements so that transactions would be properly processed.

> Date: Thu, 19 Dec 2013 10:36:00 +0800
> From: commercialbanking@hsbc.com.hk
> To: laodao@msn.com
> Subject: HKPI1324-12DEC13// CYB PIV
>
> Private & Confidential
>
> Dear Sir,
>
> RE OUR CREDIT ENTRY DATED 05DEC13 FOR USD 4,000.00 TO YOUR ACCOUNT UNDER
> REFERENCE HK1051230UUV87SW BEING PROCEEDS OF LANDESBANK BERLIN AG'S
> TELEX
> PAYMENT INSTRUCTION DATED 03DEC13 VAL 05DEC13 FOR USD 4,000.00 BY ORDER
> OF
> MARIA HERFURTH WITH PAYMENT DETAIL ' BERND LUBACH.'
>
> Kindly be informed that the above credit entry was effected to your
> account on
> 05DEC13 in accordance with the original payment instruction of the
> remitting bank.
>
> Unfortunately, we did not receive the relative cover funds for the above
> payment from the correspondent bank
>
> As a result, we are now in an out-of-pocket position.
>
> We would be grateful to have your arrangement in helping to return
> funds,
> USD4000.00 to us in order to reverse the above credit entry to recover
> our bank
> out-of-pocket position.

6

9.    WCM777 instructed its investors to send payments to its HSBC Hong Kong accounts:

| | |
|---|---|
| Beneficiary Bank Account Number: | 817 677826 838 |
| Local Bank Code: | 004 |
| Beneficiary Bank Name: | HSBC Hong Kong |
| Beneficiary Bank Address: | 1 Queen's Road Central, Hong Kong |
| International Swift Code: | HSBCHKHHHKH |
| Beneficiary Company Name: | WCM777 LIMITED |
| Beneficiary Company Address: | WCM777 LIMITED RM 1204 12/F Greenfield Tower of Concordia Plaza, No. 1 Science Museum Road, Kowloon, Hong Kong |

10.    HSBC USA's own legal department, was served with a subpoena from California on or
about S   The undersigned is a representative authorized to conduct this investigation and examination who alleges that
the following records are in the possession, custody or control of:

The Custodian of Records for HSBC BANK

Any and all bank records concerning WCM777 and World Capital Market Inc. bank accounts with
HSBC BANK, including, without limitation, account number 817677826838.  The production of
requested bank records shall include, without limitation, monthly account statements, cancelled
checks (front and back), deposit items (front and back), including wires, deposit tickets and signatures
cards, for period of January 1, 2012, through the date of production.

These records are to be produced for the period of January 1, 2012 to the date of production.

These records are deemed relevant or material to the proper conduct of this investigation and examination of
possible violations of laws and/or rules under the jurisdiction of the Commissioner of Business Oversight.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and
correct.

Dated on September 25, 2013 at Los Angeles, California

ADAM WRIGHT
Corporations Counsel
Enforcement Division

11.     HSBC USA lied to California in the mailed response to the subpoena, HSBC had already commenced an investigation of WCM777 prior to receiving the California subpoena and knew it was a fraud based on that review.  Prior to the California subpoena HSBC USA already was processing a large volume of transfers originating from high risk countries for the benefit of HSBC Hong Kong's WCM777 817677826838 account.  The account was a foreign currency business vantage account and under the terms and conditions of the account customer disclosures could be made where:



October 2, 2013

Adam Wright
Corporations Counsel, Enforcement Division
Department of Business Oversight
320 West 4th West Street, Suite 750
Los Angeles, CA 90013
212-576-7523

Subject: WORLD CAPITAL MARKET INC, WCM 777
Our Case #: 214764

Dear Adam Wright:

I am writing in response to the above referenced Subpoena, which was received by HSBC Bank USA, N.A.

After reviewing our records, HSBC Bank USA, N.A. was unable to locate any accounts with the information stated on the subpoena.

Should you have questions, please contact us at 877-874-2403.

Sincerely,

Legal Processing Department
HSBC Bank USA, N.A.


•       the Bank is legally required to disclose;

•       the Bank has a public duty to disclose; and

8

•   the Bank's legitimate business purposes require disclosure

This deliberate suppression of California's investigations resulted in HSBC not properly monitoring, investigating, and reporting potentially suspicious transactions that were identified by Defendant's electronic monitoring software.  No later than June 2013, HSBC had deemed WCM777 a high-risk entity, yet it continued to process bulk wire transfers, convert foreign currency to dollars, and service the 658070248838, 817677826838, 817697816838, 817697824838, 817697832838, 817697840838, 817697857838 and 817697865838 accounts held by WCM777 in Hong Kong.  As a result of its ongoing BSA/ AML program failures, Defendant failed to adequately monitor and conduct adequate investigations into these transactions and submit SARs to the Financial Crimes Enforcement Network ("FinCEN"), as required by the BSA.

12.    A statement for the 817677826838 account indicates that for the period July 22, 2013 to August 14, 2013 there had already been over 3.5 million in United States Dollars credited to WCM777 limited by over 174 deposits:



HSBC ⟨X⟩ 滙 豐

BusinessVantage Statement
「商業」理財賬戶結單

| Number 賬戶号码 | 817-677826-838 | Branch 分行 | TSIM SHA TSUI CVC | | Page 5 of 5 |
| | | | | | 14 August 2013 |

BusinessVantage Foreign Currency Savings 「商業」理財賬戶 – 外币储蓄

| CCY 货币 | Date 日期 | Transaction Details 过支详情 | | Deposit 存入 | Withdrawal 揭取 | Balance 结余 |
|---|---|---|---|---|---|---|
| EUR | 31 Jul | DEPOSIT | 存款 | 274.41 | | 274.41 |
| | 2 Aug | DEPOSIT | 存款 | 1,513.64 | | 1,788.05 |
| | 7 Aug | DEPOSIT | 存款 | 1,482.18 | | |
| | | DEPOSIT | 存款 | 1,453.67 | | 4,723.90 |
| | 8 Aug | DEPOSIT | 存款 | 1,514.08 | | |
| | | DEPOSIT | 存款 | 1,523.70 | | |
| | | DEPOSIT | 存款 | 4,482.20 | | 12,223.88 |
| | 9 Aug | DEPOSIT | 存款 | 3,980.22 | | 16,204.10 |
| Total No. of Deposits: 存入次数合计 | USD EUR | | 174 8 | Total No. of Withdrawals: 揭取次数合计 | USD EUR | 2 0 |
| Total Deposit Amount: 存入总额 | USD EUR | | 3,534,351.57 16,204.10 | Total Withdrawal Amount: 揭取总额 | USD EUR | 500,070.61 0.00 |

13.    A critical component of the Ponzi Scheme that HSBC substantially assisted was to make lulling payments to Plaintiffs in the form of returns for their investments so they would be assured that their investment was sound and secure. HSBC Hong Kong made repeated transfers totaling over 12 million United States Dollars to a United States based entity Global Payouts

9

Inc., a payments processor for eventual distribution to WCM777's investor base in the following

manner:

| HSBC | After bank fees | | |
|------|-----------------|---|---|
| 10/2/2013 | $100.00 $100.00 | 10/2/2013 | in payment credit Global Payout |
| 10/7/2013 | $30,000.00 $29,860.00 | 10/7 & 10/18 | In payment credit WCM777 |
| 10/21/2013 | $70,000.00 $69,910.05 | 10/24/2013 | in payment credit Global Payout |
| 10/23/2013 | $100,000.00 $99,910.02 | 10/28/2013 | in payment credit WCM777 |
| 10/28/2013 | $500,000.00 $499,910.09 | 10/30/2013 | in payment credit WCM777 |
| 10/29/2013 | $300,000.00 $299,910.28 | 11/4/2013 | in payment credit WCM777 |
| 10/31/2013 | $200,000.00 $199,910.33 | 11/4/2013 | in payment credit WCM777 |
| 11/1/2013 | $200,000.00 $199,910.36 | 11/5/2013 | in payment credit WCM777 |
| 11/6/2013 | $200,000.00 $199,910.29 | 11/11/2013 | in payment credit WCM777 |
| 11/7/2013 | $200,000.00 $199,910.27 | 11/12/2013 | in payment credit WCM777 |
| 11/8/2013 | $200,000.00 $199,910.37 | 11/15/2013 | in payment credit WCM777 |
| 11/8/2013 | $200,000.00 $199,910.37 | 11/18/2013 | in payment credit WCM777 |
| 11/11/2013 | $200,000.00 $199,910.39 | 11/18/2013 | in payment credit WCM777 |
| 11/12/2013 | $200,000.00 $199,910.44 | 11/18/2013 | in payment credit WCM777 |
| 11/14/2013 | $200,000.00 $199,910.42 | 11/18/2013 | in payment credit WCM777 |
| 11/16/2013 | $200,000.00 $199,910.40 | 11/18/2013 | in payment credit WCM777 |
| 11/16/2013 | $200,000.00 $199,910.36 | 11/18/2013 | in payment credit WCM777 |
| 11/18/2013 | $200,000.00 $199,910.39 | 11/18/2013 | in payment credit WCM777 |
| 11/18/2013 | $200,000.00 | | |
| 11/20/2013 | $200,000.00 $399,820.65 | 11/21/2013 | in payment credit WCM777 |
| 11/21/2013 | $200,000.00 $199,910.52 | 11/25/2013 | in payment credit WCM777 |
| 11/22/2013 | $200,000.00 $199,910.45 | 11/25/2013 | in payment credit WCM777 |
| 11/23/2013 | $200,000.00 $199,910.56 | 11/26/2013 | in payment credit WCM777 |
| 11/26/2013 | $200,000.00 $199,910.59 | 11/26/2013 | in payment credit WCM777 |
| 11/27/2013 | $200,000.00 $199,910.69 | 12/2/2013 | in payment credit WCM777 |
| 11/28/2013 | $200,000.00 $199,910.69 | 12/2/2013 | in payment credit WCM777 |

| | | | | |
|---|---|---|---|---|
| 11/29/2013 | $200,000.00 $199,910.62 | | 12/2/2013 | in payment credit WCM777 |
| 11/30/2013 | $200,000.00 $199,910.62 | | 12/4/2013 | in payment credit WCM777 |
| 12/3/2013 | $200,000.00 $199,910.65 | | 12/4/2013 | in payment credit WCM777 |
| 12/4/2013 | $200,000.00 $199,910.65 | | 12/4/2013 | in payment credit WCM777 |
| 12/5/2013 | $200,000.00 $199,910.70 | | 12/6/2013 | in payment credit WCM777 |
| 12/6/2013 | $200,000.00 $199,910.66 | | 12/6/2013 | in payment credit WCM777 |
| 12/7/2013 | $200,000.00 $199,910.60 | | 12/9/2013 | in payment credit WCM777 |
| 12/9/2013 | $200,000.00 $199,910.62 | | 12/10/2013 | in payment credit WCM777 |
| 12/10/2013 | $200,000.00 $199,910.58 | | 12/11/2013 | in payment credit WCM777 |
| 12/11/2013 | $200,000.00 $199,910.67 | | 12/15/2013 | in payment credit WCM777 |
| 12/12/2013 | $200,000.00 $199,910.79 | | 12/15/2013 | in payment credit WCM777 |
| 12/13/2013 | $200,000.00 $199,910.76 | | 12/15/2013 | in payment credit WCM777 |
| 12/16/2013 | $200,000.00 $199,910.79 | | 12/17/2013 | in payment credit WCM777 |
| 12/17/2013 | $200,000.00 $199,910.83 | | 12/18/2013 | in payment credit WCM777 |
| 12/18/2013 | $200,000.00 $199,910.87 | | 12/18/2013 | in payment credit WCM777 |
| 12/19/2013 | $200,000.00 $199,910.87 | | 12/19/2013 | in payment credit WCM777 |
| 12/20/2013 | $200,000.00 $199,910.79 | | 12/23/2013 | in payment credit WCM777 |
| 12/23/2013 | $200,000.00 $199,910.50 | | 12/30/2013 | in payment credit WCM777 |
| 12/24/2013 | $200,000.00 $199,910.50 | | 12/30/2013 | in payment credit WCM777 |
| 12/28/2013 | $200,000.00 $199,911.21 | | 1/2/2014 | in payment credit WCM777 |
| 12/31/2013 | $200,000.00 $199,911.19 | | 1/2/2014 | in payment credit WCM777 |
| 1/2/2013 | $200,000.00 $199,910.77 | | 1/3/2014 | in payment credit WCM777 |
| 1/3/2013 | $200,000.00 $199,910.81 | | 1/6/2014 | in payment credit WCM777 |
| 1/6/2014 | $200,000.00 $199,910.78 | | 1/7/2014 | in payment credit WCM777 |
| 1/7/2014 | $200,000.00 $199,910.76 | | 1/8/2014 | in payment credit WCM777 |
| 1/8/2014 | $200,000.00 $199,910.80 | | 1/12/2014 | in payment credit WCM777 |
| 1/15/2014 | $173,940.27 $170,512.29 | HKD wires | 1/16/2014 | in payment credit WCM777 |
| 1/15/2014 | $97,000.00 $96,910.81 | | 1/16/2014 | in payment credit WCM777 |
| 1/15/2014 | $34,000.00 $33,965.75 | | 1/16/2014 | in payment credit WCM777 |

11

| | | | | | |
|---|---|---|---|---|---|
| 1/15/2014 | $4,980.00 | | 1/16/2014 | in payment credit WCM777 | |
| | $4,945.75 | | | | |
| 1/24/2014 | $200,000.00 | | 1/28/2014 | in payment credit WCM777 | |
| | $199,935.99 | | | | |
| 1/24/2014 | $773,926.41 | HKD wires | 1/28/2014 | in payment credit WCM777 | |
| | $770,253.31 | | | | |
| 1/29/2014 | $200,000.00 | | 1/31/2014 | in payment credit WCM777 | |
| | $199,935.09 | | | | |
| 2/1/2014 | $773,926.41 | HKD wires | 2/4/2014 | in payment credit WCM777 | |
| | $770,166.28 | | | | |

TTL:    $12,457,873.09   TTL:    $12,442,113.64 (after bank fees)

The transactions described above constitute the predicate act of money returning to the United States and derived only from investor deposits into the HSBC 817677826838 Hong Kong accounts.  By agreement the money was transferred by HSBC Hong Kong to an entity named Global Payouts Inc. at an account it held with Bank of America, HSBC Hong Kong knew through its account monitoring that the only source of payment back into the United States originated from WCM777 investor deposits.  Global Payouts would then distribute the money to WCM777 investors as agreed upon.

14.    On or about September 30, 2013 HSBC USA internal investigation had expressly determined WCM777 was a fraud:

**"BENE – WCM777 LIMITED though identified by its website and no adverse information on RDC, internet research however shows that the BENE is alleged as a pyramid/Ponzi scheme (sample google results attached) … Review of the products posted on BENE website reasonably appeared that they are engaged in pyramid/ponzi scheme as they offer no concrete underlying products/services while offering guaranteed "daily" profit/returns by buying multi-level shares"** 2
(emphasis added).

15.    On or before September 30, 2013, the U.S. ANTI MONEY LAUNDERING (AML) Compliance Department at HSBC USA discovered that WCM777 was a Ponzi scheme. In response to wire transfers for which HSBC USA was to serve as the correspondent account for transfers to HSBC Hong Kong, the US AML Compliance Department conducted internet research on its customer's customer. The US AML Compliance Department discovered a

Product Review of WCM777 that, in no uncertain terms, called it a Ponzi scheme.

16.     WCM777 was never restricted from the HSBC accounts. Instead, on November 16, 2013, the State of Massachusetts shut down WCM777's operations in that state. On January 8, 2014, the California Department of Business Oversite shut down WCM777 in California.  On January 17, 2014, the Securities Commissioner for the State of Colorado shut down WCM777 in that state. On March 3, 2014, the State of Alaska shut down WCM777 in that state. Finally, on March 27, 2014, the SEC shut down WCM777 in Federal District Court. Between October 1, 2013 and March 27, 2014, WCM777 investors transferred approximately $37 million in United States dollars to HSBC Hong Kong. HSBC USA internal documents recognize over $15 million went through its correspondent account for HSBC Hong Kong in the 817677826838 account.

17.     International correspondent banking is a major banking activity in the United States in part due to the popularity of the U.S. dollar. U.S. dollars are one of a handful of major currencies accepted throughout the world. They are also viewed as a stable currency, less likely to lose value over time and, thus, a preferred vehicle for savings, trade and investment. Since U.S. dollars are also the preferred currency of U.S. residents, foreign companies and individuals seeking to do business in the United States may feel compelled to use U.S. dollars. In the money laundering world, U.S. dollars are popular for many of the same reasons. In addition, U.S. residents targeted by financial frauds often deal only in U.S. dollars, and any perpetrator of a fraud planning to take their money must be able to process U.S. dollar checks and wire transfers. The investigation found that foreign offshore banks often believe wire transfers between U.S. banks receive less money laundering scrutiny than wire transfers involving an offshore jurisdiction and, in order to take advantage of the lesser scrutiny afforded U.S. bank interactions, prefer to keep their funds in a U.S. correspondent account and transact business through their U.S. bank. In fact, all of the foreign banks examined in the Minority Staff investigation characterized U.S. dollars as their preferred currency, all sought to open U.S. dollar

13

accounts, and all used their U.S. dollar accounts much more often than their other currency accounts.[4]

18.     As part of the Deferred Prosecution Agreement HSBC USA entered into with the United states it vouched that it had already implemented a new automated monitoring system. The new system monitors every wire transaction that moves through HSBC USA. The system also tracks the originator, sender, and beneficiary of a wire transfer, allowing HSBC USA to look at its customer's customer. HSBC USA also implemented a new customer risk-rating methodology based on a multifaceted approach that weighs: (1) the country where the customer is located, (2) the products and services utilized by the customer, (3) the customer's legal entity structure, and (4) the customer and business type. Transactions that meet a threshold for suspicious activity were flagged for additional review by HSBC USA's anti-money laundering department.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(a) and 1332(d), because there are more than 100 class members nationwide, at least one class member is of diverse citizenship from one Defendant, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs. Jurisdiction is proper under This Court also has subject matter jurisdiction pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.

20.     Venue is proper in this jurisdiction under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims in this action occurred in this Judicial District, and the Defendants may be found within this judicial District and conduct business within this Judicial District.

21.     This Court has personal jurisdiction over Defendants because certain of them have business operation in this state, while others have sufficient minimum contacts with the state, and

---

[4] ROLE OF U.S. CORRESPONDENT BANKING IN INTERNATIONAL MONEY LAUNDERING HEARINGS BEFORE THE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS OF THE COMMITTEE ON GOVERNMENTAL AFFAIRS UNITED STATES SENATE ONE HUNDRED SEVENTH CONGRESS FIRST SESSION MARCH 1, 2, AND 6, 2001 VOLUME 1 OF 5, p. 288 fn.12.

otherwise intentionally avail themselves of the markets of this state so as to render this Court's

exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

## **PARTIES**

22.     Plaintiff RIGOBERTO VASQUEZ is an individual who resides in San Mateo, California.

23.     Plaintiff EVA GARCIA is an individual who resides in Live Oak, California.

The Plaintiffs identified above, who are the putative Class Representatives, have

each agreed to serve as Class Representatives and to act for the benefit of all net losers in the

Class who sent money to HSBC Hong Kong. Each of the Plaintiffs received the uniform

statements and reasonably relied on the false statements, and were defrauded into

investing in a fraudulent company. Plaintiffs have collectively lost substantial funds due to the

Defendant's misconduct. The Class Representatives reasonably relied on the same false

agreements relied upon by all members of the putative Class.

24.     Defendant HONG KONG AND SHANGHAI BANKING CORPORATION LIMITED

"HSBC Hong Kong"), is a Hong Kong Corporation with its principal place of business in Hong

Kong, China. From approximately September 2013 through February 2014, HSBC Hong Kong

was the primary, if not the sole, banking institution used to carry out the Ponzi scheme at issue in

this matter. These same accounts, with the full knowledge and participation of

HSBC Hong Kong, were then used to make the approximately $12 million in Ponzi-style

payments to investors for the sham profits generated by the non-existent business,

as well as to divert millions of dollars of stolen funds to purchase real estate, hold lavish

seminars and transfer millions of dollars to the fraudsters friends and family.

25.     Defendant HSBC BANK USA, N.A., ("HSBC USA") is a federally chartered bank, with

its headquarters in Mclean, Virginia, and its principal place of business located in New York,

NY.  Defendant HSBC USA is the correspondent bank for HSBC Hong Kong.

26.     Defendants DOES 1 through 100, inclusive, whether individual, corporate, associate,

alter ego, or otherwise, are fictitious names of Defendants whose true names and capacities, at

this time, are unknown to Plaintiffs; Plaintiffs are informed and believe and thereupon allege that

at all times herein mentioned, each Defendant sued herein as a DOE was acting for itself or its

15

agent, servant, employee, and/or alter ego of its Co-Defendants, and in doing the things hereinafter mentioned, was acting in the course and scope of its authority as such agent, servant, employee, and/or alter-ego, and with the permission and consent of its Co-Defendants; and that each of said fictitiously named Defendants, whether acting for itself or as agents, corporations, associations, or otherwise, is in some way liable or responsible to Plaintiffs on the facts hereinafter alleged, and caused injuries and damages proximately thereby, as hereinafter alleged, and at such times as Defendants' true names and capacities become known to Plaintiffs, Plaintiffs will ask leave of this court to amend this Complaint to insert said true names and capacities.

27.     Plaintiffs are informed and believe and thereupon allege that at all times herein mentioned, Defendant and DOES 1 through 100, inclusive, and each of them, were acting as agents, servants, alter egos, and employees of each other, and were acting within the full course and scope of their agency, servancy, and employment, with the full knowledge and consent, either expressed or implied, of either of the other Defendants and DOES 1 through 100, inclusive, and each of them. (Defendants and DOES 1-100, inclusive, and each of them are hereinafter collectively referred to herein as "Defendants").

28.     Plaintiffs are informed and believe and thereupon allege that at all times relevant herein, Defendants and each of them were and are inadequately capitalized and have no genuine or separate existence, but were and are used and are existing for the sole purpose of permitting the other Defendants to transact a portion of their business under a separate guise.

29.     At all times mentioned herein, Defendants and each of them completely controlled, dominated, managed, and operated the other Defendants and intermingled their assets with the assets owned by the other Defendants to suit their convenience, such that the individuality or separateness of the Defendants did not exist.

30.     The acts of Defendants and each of them were and are the acts of the other Defendants. Failure to pierce the corporate veil would promote injustice and, based thereon, Defendants and each of them are jointly and severally liable with the other Defendants.

## FACTS

31.     This matter concerns a Ponzi scheme that targeted members of the Asian-American and Hispanic-American communities as well as foreign investors. The Securities and Exchange Commission shut down on March 27, 2014 in an action entitled *Securities and Exchange Commission v. World Capital Market Inc., WCM777 Inc., WCM777 Ltd. And Ming Xu,* 2:14-CV-02334 in the Central District of California.

32.     WCM777 is the umbrella name used for a multi-level marketing scheme that was at the heart of the SEC action.

33.     World Capital Market Inc., is a Delaware Corporation headquartered in Pasadena, California.  Phil Ming Xu (Ming Xu) is the founder and chairman of World Capital Market Inc. World Capital Market Inc., is also a corporation organized under the laws of the British Virgin Islands.

34.     At all relevant times, Ming Xu resided in California and World Capital Markets, Inc., WCM777 Inc., and WCM777 Ltd., had offices in or did business in the United States and specifically California.

35.     On March 27, 2014, the Court in the Central District of California Ordered the seizure of all WCM777 assets, the appointment of a receiver, and other provisional relief pursuant to an Ex Parte application by the Securities and Exchange Commission.

36.     On July 30, 2014, the Court entered a Judgment against Ming Xu pursuant to a consent by him.  As part of the Judgment Xu consented to disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty.  In a nutshell, the scheme operated in the following manner:

   a.   World Capital Markets, Inc., described itself as a global merchant investment bank with branch offices in the United States, China and Japan.  World Capital Markets, Inc., purported to be in partnership with over 700 investment organizations including, among others, Siemens, Denny's, and Goldman Sachs.  On the WCM777.com website, World Capital Markets, Inc., was shown to be a corporation registered with the Registrar of Corporate Affairs of the British Virgin Islands.

17

b.  WCM777 solicited investors through the website at WCM777.com, in-person seminars and presentations, webinars, and through the Internet such as through posts on Facebook and other message boards.  WCM777 solicited investors in the United States and abroad.

c.  At all material times, the terms of the offering on the WCM777 website have remained constant.  WCM777 prepared and distributed a PowerPoint presentation that explains the WCM777 offering.  This presentation has been translated into Chinese and Spanish.

d.  WCM777 offered and sold five different levels of packages of cloud-based computing services.  In addition to the computing services, each package level promised returns in the form of cash and points.

e.  WCM777 said investors could earn the cash and points by referring new members, or by simply being passive.  The points were said to have two uses: (a) they could be redeemed for goods and services to be offered by WCM777 and its affiliates, or (b) they could be also converted into equity in an initial public offering of a company named WCM7.com, or other unidentified high tech company that WCM777 claimed they would bring public.

f.  Each of the five different levels of membership units purported to provide purchasers with some combination of cloud computing services, with more services being provided to members who purchased higher levels.  There were seven types of World Cloud Media Products: a) videos, b) books, c) music, d) games, e) space, f) social and g) Lucky Cloud.  The five levels of membership units provided different combinations of World Cloud Media Products for different terms of from one to five years.

g.  Each of the five levels of packages promised to pay a return in 100 days which was called the Global Business Bonus.  The first four levels of packages promised to pay a total return of approximately 100% of the amount invested, with half paid in cash and half paid in points.  The fifth, or highest level offered to pay a total return of 160% of the amount invested, with half paid in cash and half paid in points.  Thus, the fifth level offered to pay an 80% return in cash in 100 days.

h.  WCM777 did not realize any appreciable revenue other than from the sale of "packages" of cloud services to investors.  WCM777 was not profitable and was a pyramid scheme.

18

WCM777 used some of the investor funds to make Ponzi payments of returns to investors.  The bulk of the investor funds were used to pay cash for real property purchased in the United States.

i.   WCM777 sold its products exclusively to investors and had no apparent source of revenues other than money received from new investors.  WCM777 did not offer to sell any of the so-called World Cloud Media Services other than as part of a package to investors who received points.

j.   The WCM777 offering and operation depended almost entirely on the recruitment of new investors and purchases by existing investors to provide funds to pay any returns to investors.

37.   Around October 2013, at the same time that state regulators began investigating WCM777's offering, it stopped depositing investor funds into the United States bank accounts, although the WCM777 offering in the United States continued.  Since October 2013, WCM777 raised more than $37 million from investors, which has been deposited into its Hong Kong bank accounts at Defendant HSBC Hong Kong.  Since October 2013 approximately 38% of investor funds raised came from persons residing in the United States.

38.   In September of 2013, the Securities Division of the Commonwealth of Massachusetts began investigating World Capital Markets, Inc., and WCM777, Inc.

39.   Also starting in July, 2013, WCM777 began directing all investors to wire transfer their investments to Defendant HSBC Hong Kong.  WCM777 explicitly stated on its website and Facebook page and other social networks that the reason it was shifting its operation to Hong Kong was because its continued operation in the United States was illegal.

40.   From at least September 29, 2014, the WCM777.com website changed the contact information for WCM777 from an address and phone number in the City of Industry in California to an address and phone number in Hong Kong.

41.   On or about October 4, 2013, the WCM777.com website announced that the WCM777 operation in the United States had closed.  It said its "global legitimacy strategy is to set up different system [sic] in each county to abide by local laws."

19

42.     Since at least January 23, 2014, the WCM777.com website announced that "Kingdom 777 acquired the asset of WCM777 on December 30th, 2013 from World Capital Market (BVI). WCM777 is renamed "Kindom777'. Kingdom777 is founded by a group of visionaries with faith.  They share the same vision of 'United by love and Build a City upon a Hill's the founders, Dr. Phil Ming Xu and Tiger Liu.  After the acquisition, Dr. Phil Ming Xu and Tiger will not be officers but are given the honorary title of 'Founders'. Kingdom777 will transform WCM777 and stop the existing promotion and change the system to be legal globally.  The payout ratio will be reasonable after the restricting period and also the company is planning to register its stock with SEC and launching 777 Points Trading, collaterized by the company's stock.  It is like secondary market trading before the IPO."

43.     On November 11, 2013, the Securities Division of the Commonwealth of Massachusetts issued a Consent Order in the Matter of World Capital Markets, Inc. & WCM777, Inc.  The Consent Order stated that Massachusetts opened an investigation in September 2013, and in November 2013 the respondents submitted to an offer of settlement.  The Order was made publicly available through the internet.

44.     On or about November 20, 2013, the WCM777.com website announced the WCM777 Response to Massachusetts Consent Order.  It said "because the sale of securities failed to fully comply with laws and regulations in the United States, our operations in the U.S. will be on hold until further notice; WCM Limited will continue operations."

45.     WCM777 continued to be publicly shut down by state after state.

46.     On January 8, 2014, the State of California, Business, Consumer Services and Housing Agency, Department of Business Oversight, issued a Desist and Refrain Order against WCM, WCM777, Inc., WCM777 Limited, Ming Xu, and others, which found that the named parties had unlawfully sold unregistered securities, and had made untrue statements of material fact and omissions of material facts necessary to make statements not misleading in the offer and sale of securities, and ordered them to desist from such conduct.  The Order was made publicly available through the internet.

47.     On January 21, 2014, the Securities Commissioner for the State of Colorado issued a Stipulation for consent Cease and Desist Order Concerning World Capital Markets, Inc., WCM777, Inc. and Ming Xu.  The Order was made publicly available through the internet.

48.     On March 3, 2014, the State of Alaska, Department of Commerce, Community & Economic Development issued an Investor Fraud Alert concerning World Capital Market, Inc., WCM777, Inc. and WCM777 Limited.  The Alert was made available through the world wide web.

49.     The WCM777 scheme could not have continued to scam victims of millions of dollars after getting shut down in state after state if it were not for the accounts at Defendant HSBC Hong Kong.  Because of the HSBC Hong Kong account WCM777 was still able to collect United States dollars through the correspondent bank account HSBC Hong Kong held with HSBC USA.

50.     Defendant HSBC Hong Kong provided WCM777 a "nest" whereby WCM777 could nest its operations within its correspondent bank held at Defendant HSBC USA.[5]

51.     On or about December 11, 2012, Defendant HSBC USA, entered into a Deferred Prosecution Agreement relating to its willful failure to maintain an effective anti-money laundering program, among other things.  Also a party to the agreement was HSBC Holdings plc, a financial institution holding company organized under the laws of England and Wales. Defendant HSBC Hong Kong is a subsidiary of HSBC plc.

---

[5] Another practice in U.S. correspondent banking which increases money laundering risks in the field is the practice of foreign banks operating through the U.S. correspondent accounts of other foreign banks. The investigation uncovered numerous instances of foreign banks gaining access to U.S. banks—not by directly opening a U.S. correspondent account—but by opening an account at another foreign bank which, in turn, has an account at a U.S. bank, In some cases, the U.S. bank was unaware that a foreign bank was ''nested'' in the correspondent account the U.S. bank had opened for another foreign bank; in other cases, the U.S. bank not only knew but approved of the practice. In a few instances, U.S. banks were surprised to learn that a single correspondent account was serving as a gateway for multiple foreign banks to gain access to U.S. dollar accounts, U.S. wire transfer systems and other services available in the United States.  Source ROLE OF U.S. CORRESPONDENT BANKING IN INTERNATIONAL MONEY LAUNDERING HEARINGS BEFORE THE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS OF THE COMMITTEE ON GOVERNMENTAL AFFAIRS UNITED STATES SENATE ONE HUNDRED SEVENTH CONGRESS FIRST SESSION MARCH 1, 2, AND 6, 2001 VOLUME 1 OF 5, p. 310.

52.     As part of the Deferred Prosecution Agreement HSBC USA acknowledged that one of its high-risk products was its correspondent banking practices and services.  Correspondent accounts are established at banks to receive deposits from, make payments on behalf of, or handle other financial transaction for foreign financial institutions.  In essence correspondent banking involves the facilitation of wire transfers between foreign financial institutions and their customers, and other financial institutions with which the foreign financial institution does not have a direct relationship.  Such correspondent accounts are generally considered high risk because the U.S. bank does not have a direct relationship with, and therefore has no diligence information on, the foreign financial institution's customers who initiated the wire transfers.

53.     Defendant HSBC USA, at all times relevant, maintained a correspondent account for HSBC Hong Kong.

54.     As part of the Deferred Prosecution Agreement HSBC USA admitted its failure to adequately monitor over $200 trillion in wire transfers between 2006 and 2009 from customers located in countries that it classified as "standard" or "medium" risk, including over $670 billion in wire transfers from HSBC Mexico.

55.     As part of the Deferred Prosecution Agreement HSBC USA acknowledged that another way for financial institutions to mitigate the risk associated with correspondent banking is monitoring the wire transfers to and from these accounts.  From 2006 to 2009, wire HSBC USA monitored wire transfers using an automated system called the Customer Account Monitoring Program ("CAMP"). The CAMP system would detect suspicious wire transfers based on parameters set by HSBC USA.  Under the Camp system, various factors triggered review, in particular, the amount of the transaction and the type and location of the customer.  During this period HSBC USA assigned each customer a risk category based primarily on the country in which it was located.  Countries were placed into one of four categories based on the perceived anti money laundering risk of doing business in that country (from lowest to highest risk): standard, medium, cautionary, and high.  Transactions that met the thresholds for review and the parameters for suspicious activity were flagged for additional review by HSBC USA' anti money laundering department.  These were referred to as alerts.

22

56.    As part of the Deferred Prosecution Agreement HSBC USA implemented a new customer risk-rating methodology based on a multifaceted approach that weighs the following factors: (1) the country where the customer is located, (2) the products and services utilized by the customer, (3) the customer's legal entity structure, and (4) the customer and business type.

57.    As part of the Deferred Prosecution Agreement HSBC USA agreed that it had implemented a new automated monitoring system.  The new system monitors every wire transaction that moves through HSBC USA.  The system also tracks the originator, sender and beneficiary of a wire transfer, allowing HSBC USA to look at its customer's customer.

58.    Plaintiffs allege that the wire transfers for which Defendant HSBC USA served as the intermediary bank resulted in multiple alerts resulting in greater scrutiny of the transaction.

59.    Plaintiffs allege that as part of the scrutiny performed by Defendant HSBC USA it conducted an internet search of WCM777.  Through these internet searches HSBC USA became aware that WCM777 had no legitimate business purpose other than to solicit funds from investors for its illegal scheme.  Through the internet searches HSBC USA became aware that WCM777 was in regulatory trouble.

60.    Plaintiffs allege that Defendant HSBC USA knew that WCM777 was receiving millions of United States Dollars wire transferred into its accounts at HSBC Hong Kong from an illegal Ponzi scheme.

61.    As part of the Deferred Prosecution Agreement HSBC Holdings plc agreed that it had "undertaken to implement a single global standard shaped by the highest or most effective anti-money laundering standards available in any location where the HSBC Group operates.  This new policy will require that all HSBC Group Affiliates will, at a minimum, adhere to U.S. anti-money laundering standards."

62.    As part of the Deferred Prosecution Agreement HSBC Holdings plc agreed: "To the extent HSBC Holdings plc's compliance with this Agreement requires it.  HSBC Holdings plc agrees to ensure that its wholly-owned subsidiaries, and any successors and assigns comply with the requirements and obligations set forth in this Agreement, to the full extent permissible under locally applicable laws and regulations, and the instruction of local regulatory agencies."

23

63.     As part of the Deferred Prosecution Agreement HSBC admitted that "Congress enacted the Bank Secrecy Act, Title 31, United States Code, Section 5311 et seq. (the "BSA"), and its implementing regulations to address an increase in criminal money laundering activity through financial institutions.  Among other things, the BSA requires domestic banks, insured banks, and other financial institutions to maintain programs designed to detect and report suspicious activity that might be indicative of money laundering, terrorist financing, and other financial crimes, and to maintain certain records and file reports related thereto that are especially useful in criminal, tax, or regulatory investigations or proceedings."

64.     Plaintiffs that pursuant to the Deferred Prosecution Agreement of December 11, 2012, Defendant HSBC Hong Kong at all relevant times had in place a Know Your Customer ("KYC") procedure that, at a minimum, adhered to U.S. anti-money laundering standards.

65.     In or about July of 2013, Defendant HSBC Hong Kong opened an account ending in 7826 for WCM777 Ltd.  The account was a Business Vantage foreign currency account that allowed for deposit of United States Dollars.

66.     WCM777 Ltd., is a Hong Kong corporation that was registered in July of 2013. WCM777 Ltd, is a subsidiary of World Capital Markets, Inc., from the British Virgin Islands, with partial ownership in Ming Xu and Suo Zhong Xu.  On February 21, 2014, WCM777 Ltd., registered with the California Secretary of State, stating that it was doing business as WCM777 Enterprises, Inc., and was located in the City of Industry in California.

67.     Plaintiffs allege that by virtue of its KYC account opening procedures Defendant HSBC Hong Kong knew that WCM777 Ltd., had just been incorporated in China and that it represented itself as a global merchant bank.

68.     Plaintiffs allege that by virtue of its KYC account opening procedures Defendant HSBC Hong Kong knew that the parent company of WCM777 Ltd., was World Capital Markets, Inc., a corporation of the British Virgin Islands.

69.     The British Virgin Islands is, and, at all relevant times, was listed by the U.S. Department of State as a Jurisdiction of Primary Concern among known money laundering countries.

70.     Plaintiffs allege that Defendant HSBC Hong Kong knew that the British Virgin Islands was listed by the U.S. Department of State as a Jurisdiction of Primary Concern among known money laundering countries.

71.     Plaintiffs allege that by virtue of its KYC account opening procedures Defendant HSBC Hong Kong knew that Ming Xu was a shareholder and director of WCM777 Ltd.

72.     Plaintiffs allege that by virtue of its anti-money laundering procedures Defendant HSBC Hong Kong required WCM777 Ltd., to agree that all data relating to it, its directors, shareholders, partners, members or other officers, employees, proposed guarantors or security providers and/or related individuals which are provided by it from time to time at HSBC Hong Kong's request or collected in the course of dealings between it and HSBC Hong Kong ("Data") may be used and retained by HSBC Hong Kong and disclosed to any agent, contractor or service provider of HSBC Hong Kong, any actual or proposed transferee of the requested facility, any member of the HSBC Group and such other third parties as HSBC Hong Kong considers reasonably necessary (in each case whether within or outside Hong Kong) (collectively, "permitted disclosures") for the purpose of complying with laws, regulations or judicial process."

73.     Plaintiffs are informed and believe and, on such information, and belief allege that by virtue of its KYC account opening procedures Defendant HSBC Hong Kong knew that WCM777 Ltd., offered investments in its cloud computing services.

74.     Plaintiffs allege that by virtue of its KYC account opening procedures Defendant HSBC Hong Kong knew that the source of funds for WCM777 Ltd., would largely consist of U.S. Dollars from the United States.

75.     Plaintiffs are informed and believe and, on such information, and belief allege that in or about August of 2013, Defendant HSBC Hong Kong opened an account for Agape Technology Ltd.  The account was a Business Vantage foreign currency account that allowed for deposit of United States Dollars.

76.     Agape Technology Ltd., is a Hong Kong corporation that was registered in August of 2013.  Agape Technology Ltd, is a subsidiary of World Capital Markets, Inc., from the British Virgin Islands, with partial ownership in Ming Xu and Suo Zhong Xu.

25

77.     Plaintiffs are informed and believe and, on such information, and belief allege that by virtue of its KYC account opening procedures Defendant HSBC Hong Kong knew that Agape Technology Ltd., had just been incorporated in China.

78.     Plaintiffs are informed and believe and, on such information, and belief allege that by virtue of its KYC account opening procedures Defendant HSBC Hong Kong knew that the parent company of Agape Technology Ltd., was World Capital Markets, Inc., a corporation of the British Virgin Islands.

79.     Plaintiffs allege that by virtue of its KYC account opening procedures Defendant HSBC Hong Kong knew that Ming Xu was a shareholder and director of Agape Technology Ltd.

80.     Plaintiffs allege that by virtue of its KYC account opening procedures Defendant HSBC Hong Kong knew that Agape Technology Ltd., was part of WCM777 and offered investments.

81.     Plaintiffs allege that by virtue of its KYC account opening procedures Defendant HSBC Hong Kong knew that the source of funds for Agape Technology Ltd., would largely consist of U.S. Dollars from the United States.

82.     Hong Kong had in effect at all relevant times an Anti-Money Laundering and Counter-Terrorist Financing Ordinance ("AMLO"), which imposed Know Your Customer requirements on financial institutions such as Defendant HSBC Hong Kong.

83.     According to the Guideline on Anti-Money Laundering and Counter-Terrorist Financing of July 2012, published pursuant to section 7 of the AMLO, as part of the Customer Due Diligence required to be conducted, Financial Institutions, such as Defendant HSBC Hong Kong, were expected to understand the purpose and intended nature of a customer's business, in part by visiting the entity's internet website, keeping in mind that the veracity of the statements made on the website could not be relied upon entirely. (4.9.6)

84.     Plaintiffs alleged that Defendant HSBC Hong Kong visited the WCM777.com website repeatedly from June 2013 to March 2014.

85.     Section 25(4) of the Organized and Serious Crimes Ordinance stipulates that an indictable offense includes conduct outside Hong Kong which would constitute an indictable offense if it had occurred in Hong Kong.  Therefore, where a Financial Institution in Hong Kong

26

has information regarding money laundering, irrespective of the location, it should consider seeking clarification with and making a report to the JFIU.

86.     The Hong Kong Pyramid Schemes Prohibition Ordinance makes the promotion of a pyramid scheme an offense.

87.     Between July to December of 2013, the WCM777 Ltd., account at Defendant HSBC Hong Kong received over $37 million in United States dollars alone.

88.     Between October 12, to November 14, 2014, there were approximately 1,681 wire transfers of United States dollars into the WCM777 Ltd., account at Defendant HSBC Hong Kong.

89.     In all 8 WCM777 entities or related individuals, including WCM777 Ltd, and Agape Technology Ltd, had a total of 23 bank accounts at Defendant HSBC Hong Kong with funds held in United States Dollars, Hong Kong Dollars, Swiss Francs, British Pounds and Euros.

90.     Defendant HSBC Hong Kong allowed over $29,000,000 in transfers from the WCM777 Ltd., account to foreign and domestic accounts used by WCM777 entities.

91.     On March 31, 2014 the SEC issued a press release regarding the fact that it halted the WCM777 Pyramid scheme targeting Asian and Latino Communities.  The press release was specifically available on the SEC.gov website.

92.     On April 4, 2014, the Receiver sent Defendant HSBC Hong Kong a copy of March 27, 2014 Temporary Restraining Order, which, among other things, froze the accounts of WCM777 Ltd.

93.     On April 7, 2014, Defendant HSBC Hong Kong responded to the Receiver by stating it would not abide by the Temporary Restraining Order or take any action regarding the WCM777 account.

94.     Plaintiffs allege that Defendant HSBC Hong Kong both prior and subsequent to April 4, 2014, allowed WCM777, to withdraw all money from its accounts.

95.     To date, Defendant HSBC Hong Kong has refused to cooperate with U.S. authorities, including the court appointed Receiver.

96.     The Defendant Banks profited from fees associated with the wire transfers and also by virtue of the bulk money transfers HSBC routed through the Clearing House Interbank Payments System (CHIPS) a bank-owned, privately operated electronic payments system. CHIPS provides intraday payment finality through a real-time system. CHIPS settles small payments, which can be accommodated by the banks' available balances, individually. Other payments are netted bilaterally (e.g., when Bank A has to pay $500 million to Bank B, and Bank B has to pay $500 million to Bank A), without any actual movement of funds between CHIPS participants.  The more money that comes in to a CHIPS participant the better the likelihood the bank will not have to transfer funds to another bank during intraday clearing, this is a powerful impetus to facilitate fraud.

## FRAUDULENT CONCEALMENT

97.     Plaintiffs are informed and believe, and based upon such information and belief allege, WCM777's misrepresentations, failures to disclose and suppressions of information were made with the intent to induce plaintiffs to act in the manner they did, in reliance thereon, and for them to invest. At the time that plaintiffs entered into the Agreement, they were ignorant of the facts that WCM777 concealed and failed to disclose, which facts were beyond plaintiffs' knowledge and reach. Plaintiffs actually and justifiably relied on WCM777's representation regarding its global banking prowess and success.

## CLASS ALLEGATIONS

98.     Plaintiffs, RIGOBERTO VASQUEZ and EVA GARCIA bring this action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and as representatives of a class who are similarly situated and who fall within the following class definition:  All individuals or entities who invested and lost money with any of the WCM777 entities by transferring or having their money transferred to one of the WCM777 accounts at HSBC Hong Kong through the HSBC USA correspondent account from the Period June 1, 2013 through May 31, 2014.  For purposes of this class definition, an individual or entity lost money only if the amount of money that the individual or entity received from WCM777, including any return on investment, commissions, fees or any other payments, was less than the amount of the individual's or entity's

money invested with WCM777. Excluded from the Class are governmental entities, any judge, justice or judicial officer presiding over this matter and the members of his or her immediate family, the Defendants, along with their respective parents, subsidiaries and/or affiliates. Also excluded from this class are the legal representatives, heirs, successors and attorneys of any excluded person or entity, and any person acting on behalf of any excluded person or entity.

99.     Plaintiff RIGOBERTO VASQUEZ fits within the definition of a Class Member.  Mr. VASQUEZ was lured into investing in WCM777.  On October 21, 2013, Mr. VASQUEZ transferred $100,000, to the WCM777 Ltd account at HSBC Hong Kong account no. 817677826838 through HSBC USA. He lost this money as a result of investing.

100.     Plaintiff EVA GARCIA fits within the definition of a Class Member.  Ms. GARCIA was lured into investing in WCM777.  On October 11, 2013 she transferred $2,000 to HSBC Hong Kong through HSBC USA., 2013.  On October 15, 2013 she again transferred $2,000 to HSBC Hong Kong through HSBC USA.  She also lost this money as a result of investing.

101.     At the time the transfers were made by Mr. VASQUEZ and Ms. GARCIA the Banks knew that the funds were derived from illegal activity.

102.     Plaintiffs do not know the exact size of the class.  However, Plaintiffs believe that the number is so numerous that joinder is impracticable.  Plaintiffs do note that the Receiver has determined that WCM777 processed approximately 9,000 payouts to investors.

103.     The claims of Representative Plaintiffs are typical of the claims of the class in that Plaintiffs sent money to HSBC Hong Kong to invest in and become a WCM777 member. Indeed, Representative Plaintiffs' investments were in all relevant respects typical of investments by other class members, and the monetary damages and injunctive relief sought is common to the class.

104.     Representative Plaintiffs will fairly and adequately protect the interest of the class in that Representative Plaintiffs, have no conflicts with any other members of the class, and are represented by experienced and able counsel.  The Representative Plaintiffs' interests are coincident with, and not antagonistic to, those of the class members.

105.    Numerous questions of law and fact are common to the class, including, but not limited to the following:

Whether HSBC Hong Kong participated, directly and indirectly, in the conduct of the affairs of WCM777 through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).;

Whether HSBC Hong Kong engages in action of Laundering of Monetary Instruments (18 U.S.C. §1956), Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (18 U.S.C. §1957), wire fraud (18 U.S.C. §1343), and mail fraud (18 U.S.C. §1841;

Whether HSBC Hong Kong, HSBC USA and WCM777 collectively constituted an "enterprise" with the meaning of that term as used in 18 U.S.C. §1962(c);

Whether HSBC Hong Kong and HSBC USA participated, directly and indirectly, in the conduct of the affairs of the aforesaid enterprise through a pattern of racketeering activity in violation of 18 U.S.C.  §1962(c);

Whether HSBC Hong Kong's continuous and repeated violations of 18 U.S.C. §1956 (Laundering of Monetary Instruments), 18 U.S.C. §1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), 18 U.S.C. §1343 (wire fraud), and 18 U.S.C. §1841 (mail fraud) constitute a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

Whether a fiduciary relationship existed between WCM777 and Class Members;

Whether WCM777 breached a fiduciary duty to Class Members;

Whether Class Members' damages were caused by the breach of fiduciary duty owed to them by WCM777;

Whether Defendants aided and abetted the breach of a fiduciary duty to Class Members by WCM777;

Whether WCM777 intentionally misrepresented or conceal material facts to Class Members;

Whether WCM777 did so to induce reliance by Class Members;

30

Whether Class Members were justified in relying on the misrepresentations of material facts by WCM777;

Whether Class Members' damages were caused by misrepresentation or concealment of material facts;

Whether HSBC Hong Kong knew of the fraudulent activities of WCM777;

Whether HSBC Hong Kong substantially assisted the fraudulent activities of WCM777;

Whether HSBC USA knew of the fraudulent activities of WCM777;

Whether HSBC USA substantially assisted the fraudulent activities of WCM777;

Whether HSBC Hong Kong committed tortious acts with fraud, oppression or malice;

Whether the aforesaid enterprise engaged in interstate commerce and the activities of the enterprise affected interstate commerce;

106. The questions of law and fact common to the members of the class predominate over any questions affecting only individual members of the class.  Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Among other things, there is no interest by members of the class in individually controlling the prosecution of separate actions, and it is desirable to concentrate the litigation of the claims made herein in a single proceeding to provide small claimants with a forum in which to seek redress for these violations of Federal and New York law.  Whatever difficulties may exist in the management of the class action will be greatly outweighed by the benefits of the class action procedure, including, but not limited to, providing claimants with a method for redress of claims that may otherwise burden the Court with individual litigation.

## COUNT I

### Violation of 18 U.S.C. §1961 et seq. (RICO)

### (Money Laundering)

107. Plaintiffs reallege and incorporate herein the allegations set forth above as if fully set forth by this reference.

108. Defendant HSBC Hong Kong is a "person" within the meaning of that term as used in 18 U.S.C. §1962(c).

31

109.    Defendant HSBC USA is a "person" within the meaning of that term as used in 18 U.S.C. §1962(c).

110.    At all times relevant to this complaint Defendant HSBC Hong Kong, Defendant HSBC USA and WCM777 collectively constituted an "enterprise" within the meaning of that term as used in 18 U.S.C. §1962(c). Plaintiffs are informed and believe that the Enterprise is an ongoing association that functions as a continuing unit for the purposes of these acts of racketeering alleged above as well as for other purposes.

111.    At all times relevant to this complaint, each of the Defendants was associated with the aforesaid enterprise.

112.    Upon information and belief, and as previously described herein, each of the Defendants participated, directly and indirectly, in the conduct of the affairs of the aforesaid enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §1962(c).

113.    Upon information and belief, and as previously described herein, Defendants' racketeering activity consists of numerous related and continuous acts in violation of 18 U.S.C. §1956 (Laundering of Monetary Instruments), 18 U.S.C. §1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), 18 U.S.C. §1343 (wire fraud), and 18 U.S.C. §1841 (mail fraud).

114.    As previously described herein, upon information and belief, Defendants attempted to commit and committed acts of Laundering of Monetary Instruments (18 U.S.C. §1956), Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (18 U.S.C. §1957), wire fraud (18 U.S.C. §1343), and mail fraud (18 U.S.C. §1841).  These acts include, but are not limited to:

Defendant HSBC received thousands of wired money transfers from investors who were duped including RIGOBERTO VAZQUEZ:

```
Originator :
----------------
RIGOBERTO VASQUEZ
PO BOX 1237
SAN MATEO, CA, 94401


Receiver                              Account with Bank
----------                            ------------------
MRMDUS33                              HONGKONG AND SHANGHAI BANKING CORPO
HSBC BANK USA, N.A.                   RATION LIMITED, THE
HSBC BANK USA, N.A.                   HONG KONG


Beneficiary :
--------------------
817677826838
WCM777 LIMITED
RM 1204 12/F GREENFIELD TOWER OF
CONCORDIA PLAZA,NO.1 SCIENCE MUSEUM
ROAD, HONG KONG
```

Defendant HSBC USA acted as the intermediary bank for thousands of wired money transfers from investors who were duped.  See below bank account statement for EVA GARCIA indicating HSBC USA's direct act in furtherance of the illegal activity:

| | | | |
|---|---|---|---|
| 10/11 | 10/11 International Wire Debit Via: Hsbc USA/021001088 A/C: Hongkong And Shanghai Banking Hong Kong Hong Kong Ben: Wcm777Limited Kowloon Hk Ref:/Cts/Hmnwwwhw00Fn Imad: 1011B1Qgc04C006454 Tm: 4768100284Es | - 2,000.00 | 957.56 |
| 10/11 | International Wire Fee | - 45.00 | 912.56 |
| 10/15 | Deposit     545975878 | 2,045.00 | 2,957.56 |
| 10/15 | Card Purchase With Pin  10/14 900 Walton Ave Yuba City CA Card 0243 | - 78.56 | 2,879.00 |
| 10/15 | 10/15 Chips Debit Via: Hsbc Bank USA, N.A./0108 A/C: Hongkong And Shanghai Banking Hong Kong Ben: Wcm777Limited Kowloon Hk Ssn: 0355732 Tm: 3085600288Es | - 2,000.00 | 879.00 |

On numerous occasions, Defendant HSBC Hong Kong transferred the comingled funds to accounts for other WCM777 entities.

On a number of occasions, Defendant HSBC Hong Kong wired the comingled funds back to the United States for escrow and other accounts in the name of other WCM777 entities.

114.    Defendants attempted to, conspired to and did affect commerce by said acts in violation of 18 U.S.C. §1956 (Laundering of Monetary Instruments), 18 U.S.C. §1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), 18 U.S.C. §1343 (wire fraud), and 18 U.S.C. §1841 (mail fraud).

115.    Defendants' continuous and repeated violations of 18 U.S.C. §1956 (Laundering of Monetary Instruments), 18 U.S.C. §1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), 18 U.S.C. §1343 (wire fraud), and 18 U.S.C. §1841 (mail fraud) constitute a pattern of racketeering activity with the meaning of 18 U.S.C. §1962(c).

116.    Upon information and belief, Defendants violations of 18 U.S.C. §1956 (Laundering of Monetary Instruments), 18 U.S.C. §1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), 18 U.S.C. §1343 (wire fraud), and 18 U.S.C. §1841 (mail fraud) injured Plaintiffs in that these acts perpetuated the Pyramid scheme.

117.    By reason of the foregoing, the Plaintiffs have been, and will continue to be, injured in their business and property in an amount not currently known, but believed to exceed $37,000,000.

## COUNT II

### Aiding and Abetting Fraud

118.    Plaintiffs reallege and incorporate herein the allegations set forth above as if fully set forth by this reference.

119.    WCM777 intentionally defrauded every investor, including Plaintiff herein.  WCM777 falsely represented that it was a profitable enterprise, when in fact it was a pyramid scheme with no source of revenue other than sales to investors, and it was not deriving a profit from the sale of goods and services to third parties.  WCM777 failed to disclose material information that it was not profitable and did not have any source of revenue other than sales to investors.

120.    Plaintiffs would not have invested in WCM777 had they known the truth.

121.    Defendant HSBC Hong Kong knew that WCM777 was engaging in fraud.  Nonetheless, Defendant HSBC Hong Kong substantially assisted and aided and abetted WCM777 by providing accounts into which investors' money could be wire transferred to, comingling of funds between the WCM777 accounts, and refusing to acknowledge or even cooperate pursuant to the District Court's Order.

122.    Defendant HSBC USA knew that WCM777 was engaging in fraud.  Nonetheless, Defendant HSBC USA substantially assisted and aided and abetted WCM777 by serving at the

intermediary bank by which investors' money could be wire transferred to WCM777 accounts in Hong Kong.

123.    As a proximate result of Defendants' conduct, Plaintiffs suffered compensable damage in an amount not currently known, but believed to exceed $37,000,000.

124.    The Defendants' actions were malicious, fraudulent, oppressive and intended to injure Plaintiffs.  Consequently, Plaintiffs are entitled to punitive damages.

**COUNT III**

**Aiding and Abetting Breach of Fiduciary Duty**

125.    Plaintiffs reallege and incorporate herein the allegations set forth above as if fully set forth by this reference.

126.    WCM777 was an investment advisor to all of the Plaintiffs.  As a result, WCM777 owed Plaintiffs, who were their member/clients, fiduciary duties.  WCM777 breached the fiduciary duties they owed to the Plaintiffs.

127.    Defendant HSBC Hong Kong, at all material times, had actual knowledge of WCM777's fiduciary duties to Plaintiffs.

128.    Defendant HSBC USA, at all material times, had actual knowledge of WCM777's fiduciary duties to Plaintiffs.

129.    Defendant HSBC Hong Kong, at all material times, knew that WCM777 was violating its fiduciary duties to Plaintiffs.

130.    Defendant HSBC USA, at all material times, knew that WCM777 was violating its fiduciary duties to Plaintiffs.

131.    Defendant HSBC Hong Kong substantially assisted and aided and abetted WCM777 by providing accounts into which investors' money could be wire transferred to, comingling of funds between the WCM777 accounts, and refusing to acknowledge or even cooperate pursuant to the District Court's order.

132.    Defendant HSBC USA substantially assisted and aided and abetted WCM777 by serving at the intermediary bank by which investors' money could be wire transferred to WCM777 accounts in Hong Kong.

133.    As a proximate result of Defendants' conduct, Plaintiffs suffered compensable damage in an amount not currently known, but believed to exceed $37,000,000.

134.    The Defendants' actions were malicious, fraudulent, oppressive and intended to injure Plaintiffs.  Consequently, Plaintiffs are entitled to punitive damages.

## COUNT IV

### Aiding and Abetting Conversion

135.    Plaintiffs reallege and incorporate herein the allegations set forth above as if fully set forth by this reference.

136.    WCM777 operated as a Ponzi scheme.

137.    Defendant HSBC Hong Kong, at all material times, had actual knowledge that WCM777 operated a Ponzi scheme.

138.    Defendant HSBC USA, at all material times, had actual knowledge that WCM777 operated as a Ponzi Scheme.

139.    Defendant HSBC Hong Kong substantially assisted and aided and abetted WCM777 by providing accounts into which investors' money could be wire transferred to, comingling of funds between the WCM777 accounts, and refusing to acknowledge or even cooperate pursuant to the District Court's order enjoining WCM777.

140.    Defendant HSBC USA substantially assisted and aided and abetted WCM777 by serving at the intermediary bank by which investors' money could be transferred to WCM777 accounts in Hong Kong.

141.    As a proximate result of Defendants' conduct, Plaintiffs suffered compensable damage in an amount not currently known, but believed to exceed $37,000,000.

142.    The Defendants' actions were malicious, fraudulent, oppressive and intended to injure Plaintiffs.  Consequently, Plaintiffs are entitled to punitive damages.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and members of the class, pray for judgment against Defendants, jointly and severally, as follows:

36

Declaring that this lawsuit is properly maintainable as a class action and certifying Plaintiffs EVA GARCIA and RIGOBERTO VAZQUEZ as class representatives;

For violation of 18 U.S.C. §1962 et seq. (RICO), all Plaintiffs, including the Class Representatives on behalf of Class members, seek compensatory damages in an amount to be proven at trial, but believed to exceed $37,000,000, trebling of those damages, interest on that amount, and punitive damages;

For aiding and abetting breach of fiduciary duty, all Plaintiffs, including the Class Representatives on behalf of Class Members, seek compensatory damages in an amount to be proven at trial, but believed to exceed $37,000,000, interest on that amount, and punitive damages;

For aiding and abetting fraud, all Plaintiffs, including the Class Representatives on behalf of Class Members, seek compensatory damages in an amount to be proven at trial, but believed to exceed $37,000,000, interest on that amount, and punitive damages;

For reasonable attorneys' fees and costs of suit as permitted by law;

For such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury for all issues so triable.

Dated: March 1, 2018

Respectfully Submitted,

By: _____
Julio J. Ramos
LAW OFFICES OF JULIO J. RAMOS
35 Grove Street, Suite 107
San Francisco, California 94102
Telephone: (415) 948-3015
Facsimile:  (415) 469-9787

Steven M. Nuñez, Esq. (Pro Hac Vice Pending)
WARD & HAGEN, LLP
440 Stevens Avenue, Suite 350
Solana Beach, California 92075
Telephone: (858) 847-0505

Facsimile:  (858) 847-0105

MICHAEL E. ADAMS (Pro Hac Vice Pending)
LAW OFFICES OF MICHAEL E. ADAMS
2 702 Marshall Street, Suite 300
Redwood City, CA 94063
3 Telephone: (650) 599-9463
Fax: (650) 599-9785