**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

| | |
|---|---|
| RIGOBERTO VASQUEZ AND EVA GARCIA on behalf of themselves and all others similarly situated | :<br>:<br>: Civil Action No. 1:18-cv-01876-PAE-BM<br>:<br>: |
| Plaintiffs, | :  **FIRST AMENDED COMPLAINT**<br>: |
| v. | :<br>:<br>: |
| HONG KONG AND SHANGHAI BANKING CORPORATION LTD, a foreign company; HSBC BANK USA, N.A., a national banking association; and DOES 1 through 100, inclusive, | :<br>:<br>:   JURY TRIAL DEMANDED<br>:<br>:<br>: |
| Defendants. | : |

-------------------------------------------------------------X

## CLASS ACTION COMPLAINT

## INTRODUCTION

1.     On March 27, 2014, in an action entitled *Securities and Exchange Commission v. World Capital Market Inc., WCM777 Inc., WCM777 Ltd., and Ming Xu*, ("Ming Xu") the District Court in the Central District of California shut down the Ponzi scheme that is at the heart of this litigation. Phil Ming Xu, and the companies he controlled (collectively "WCM777"), perpetrated this Pyramid/Ponzi scheme that scammed victims out of millions of dollars beginning in March of 2013.

2.     Defendants, Hong Kong and Shanghai Banking Corporation Ltd (HSBC Hong Kong) and HSBC Bank USA, N.A. (HSBC USA) were both instrumental in helping WCM777 continue its Pyramid/Ponzi scheme even as state and federal authorities were shutting it down in the United States.  Beginning in September of 2013, WCM777 advised all prospective investors to wire investment money directly to its accounts at HSBC Hong Kong.  The bulk of the transfers went through a correspondent bank account that HSBC Hong Kong held at HSBC USA in New York. Both HSBC Hong Kong and HSBC USA, allowed these transfers to happen even though on

September 30, 2013, HSBC USA discovered information that led it to conclude that WCM777 "reasonably appeared that they are engaged in pyramid/ponzi scheme." HSBC USA, of course, shared its discovery of HSBC Hong Kong. In all, over $30 million of victims' money was transferred to HSBC Hong Kong after both it and HSBC USA thought WCM777 was conducting a Ponzi scheme.

## PARTIES

3.      Plaintiff, RIGOBERTO VASQUEZ, is an individual who resides in San Mateo, California.

4.      Plaintiff, EVA GARCIA, is an individual who resides in Live Oak, California.

5.      Defendant, HONG KONG AND SHANGHAI BANKING CORPORATION LIMITED "HSBC Hong Kong"), is a Hong Kong Corporation with its principal place of business in Hong Kong, China.

6.      Defendant, HSBC BANK USA, N.A., ("HSBC USA"), is a federally chartered bank, with its headquarters in Mclean, Virginia, with its principal place of business located in New York, NY. Defendant HSBC USA is the correspondent bank for HSBC Hong Kong.

7.      Plaintiffs are informed and believe and thereupon allege that at all times herein mentioned, Defendant and DOES 1 through 100, inclusive, and each of them, were acting as agents, servants, alter egos, and employees of each other, and were acting within the full course and scope of their agency, servancy, and employment, with the full knowledge and consent, either expressed or implied, of either of the other Defendants and DOES 1 through 100, inclusive, and each of them. (Defendants and DOES 1-100, inclusive, and each of them are hereinafter collectively referred to herein as "Defendants").

8.      Plaintiffs are informed and believe and thereupon allege that at all times relevant herein, Defendants and each of them were and are inadequately capitalized and have no genuine or separate existence, but were and are used and are existing for the sole purpose of permitting the other Defendants to transact a portion of their business under a separate guise.

9.      At all times mentioned herein, Defendants and each of them completely controlled, dominated, managed, and operated the other Defendants and intermingled their assets with the

assets owned by the other Defendants to suit their convenience, such that the individuality or separateness of the Defendants did not exist.

10.     The acts of Defendants and each of them were and are the acts of the other Defendants. Failure to pierce the corporate veil would promote injustice and, based thereon, Defendants and each of them are jointly and severally liable with the other Defendants.

**THE WCM777 PYRAMID/PONZI SCHEME**

11.     WCM777 is the umbrella name used for a multi-level marketing scheme that was at the heart of the SEC action.

12.     World Capital Market Inc., is a Delaware Corporation headquartered in Pasadena, California.  Phil Ming Xu (Ming Xu) is the founder and chairman of World Capital Market Inc. World Capital Market Inc., is also a corporation organized under the laws of the British Virgin Islands.  WCM777 began on or around March of 2013.

13.     At all relevant times, Ming Xu resided in California and World Capital Markets, Inc., WCM777 Inc., and WCM777 Ltd., had offices in or did business in the United States and specifically California.

14.     WCM777 specifically incorporated WCM777 Ltd., in Hong Kong on July 2, 2013, using a shelf corporation. WCM777 Ltd, is a subsidiary of World Capital Markets, Inc., from the British Virgin Islands, with partial ownership in Ming Xu and Suo Zhong Xu.  On February 21, 2014, WCM777 Ltd., registered with the California Secretary of State, stating that it was doing business as WCM777 Enterprises, Inc., and was located in the City of Industry in California.

15.     On July 16, 2013 WCM777 opened an account at HSBC Hong Kong in the name of WCM777 Ltd., listing Ming Xu as the main contact.

16.     On March 27, 2014, the Court in the Central District of California Ordered the seizure of all WCM777 assets, the appointment of a receiver, and other provisional relief pursuant to an Ex Parte application by the Securities and Exchange Commission.

17.     On July 30, 2014, the Court entered a Judgment against Ming Xu pursuant to a consent by him.  As part of the Judgment Xu consented to disgorgement of ill-gotten gains, prejudgment

interest thereon, and a civil penalty.  In a nutshell, Ming Xu affirmed that the scheme operated in the following manner:

a. World Capital Markets, Inc., described itself as a global merchant investment bank with branch offices in the United States, China and Japan.  World Capital Markets, Inc., purported to be in partnership with over 700 investment organizations including, among others, Siemens, Denny's, and Goldman Sachs.  On the WCM777.com website, World Capital Markets, Inc., was shown to be a corporation registered with the Registrar of Corporate Affairs of the British Virgin Islands.

b. WCM777 solicited investors through the website at WCM777.com, in-person seminars and presentations, webinars, and through the Internet such as through posts on Facebook and other message boards.  WCM777 solicited investors in the United States and abroad.

c. At all material times, the terms of the offering on the WCM777 website have remained constant.  WCM777 prepared and distributed a PowerPoint presentation that explains the WCM777 offering.  This presentation has been translated into Chinese and Spanish.

d. WCM777 offered and sold five different levels of packages of cloud-based computing services.  In addition to the computing services, each package level promised returns in the form of cash and points.

e. WCM777 said investors could earn the cash and points by referring new members, or by simply being passive.  The points were said to have two uses: (a) they could be redeemed for goods and services to be offered by WCM777 and its affiliates, or (b) they could be also converted into equity in an initial public offering of a company named WCM7.com, or other unidentified high tech company that WCM777 claimed they would bring public.

f. Each of the five different levels of membership units purported to provide purchasers with some combination of cloud computing services, with more services being provided to members who purchased higher levels.  There were seven types of World Cloud Media Products: a) videos, b) books, c) music, d) games, e) space, f) social and g) Lucky Cloud. The five levels of membership units provided different combinations of World Cloud Media Products for different terms of from one to five years.

4

g.  Each of the five levels of packages promised to pay a return in 100 days which was called the Global Business Bonus.  The first four levels of packages promised to pay a total return of approximately 100% of the amount invested, with half paid in cash and half paid in points.  The fifth, or highest level offered to pay a total return of 160% of the amount invested, with half paid in cash and half paid in points.  Thus, the fifth level offered to pay an 80% return in cash in 100 days.

h.  WCM777 did not realize any appreciable revenue other than from the sale of "packages" of cloud services to investors.  WCM777 was not profitable and was a pyramid scheme. WCM777 used some of the investor funds to make Ponzi payments of returns to investors. The bulk of the investor funds were used to pay cash for real property purchased in the United States.

i.  WCM777 sold its products exclusively to investors and had no apparent source of revenues other than money received from new investors.  WCM777 did not offer to sell any of the so-called World Cloud Media Services other than as part of a package to investors who received points.

j.  The WCM777 offering and operation depended almost entirely on the recruitment of new investors and purchases by existing investors to provide funds to pay any returns to investors.

18.    In September of 2013, the Securities Division of the Commonwealth of Massachusetts began investigating World Capital Markets, Inc., and WCM777, Inc.

19.    Around October 2013, at the same time that state regulators began investigating WCM777's offering, it stopped depositing investor funds into the United States bank accounts, although the WCM777 offering in the United States continued.  Since October 2013, WCM777 raised more than $37 million from investors, which has been deposited into its Hong Kong bank accounts at Defendant HSBC Hong Kong.  Since October 2013 approximately 38% of investor funds raised came from persons residing in the United States.

20.    Also starting in September 2013, WCM777 began directing all investors to wire transfer their investments to Defendant HSBC Hong Kong.  WCM777 explicitly stated on its website and

Facebook page and other social networks that the reason it was shifting its operation to Hong Kong was because its continued operation in the United States was not in compliance with the law.

21.     On November 11, 2013, the Securities Division of the Commonwealth of Massachusetts issued a Consent Order in the Matter of World Capital Markets, Inc. & WCM777, Inc.  The Consent Order stated that Massachusetts opened an investigation in September 2013, and in November 2013 the respondents submitted to an offer of settlement.  The Order was made publicly available through the internet.

22.     On or about November 20, 2013, the WCM777.com website announced the WCM777 Response to Massachusetts Consent Order.  It said "because the sale of securities failed to fully comply with laws and regulations in the United States, our operations in the U.S. will be on hold until further notice; WCM Limited will continue operations."

23.     On January 8, 2014, the State of California, Business, Consumer Services and Housing Agency, Department of Business Oversight, issued a Desist and Refrain Order against WCM, WCM777, Inc., WCM777 Limited, Ming Xu, and others, which found that the named parties had unlawfully sold unregistered securities, and had made untrue statements of material fact and omissions of material facts necessary to make statements not misleading in the offer and sale of securities, and ordered them to desist from such conduct.  The Order was made publicly available through the internet.

24.     On January 21, 2014, the Securities Commissioner for the State of Colorado issued a Stipulation for consent Cease and Desist Order Concerning World Capital Markets, Inc., WCM777, Inc. and Ming Xu.  The Order was made publicly available through the internet.

25.     On March 3, 2014, the State of Alaska, Department of Commerce, Community & Economic Development issued an Investor Fraud Alert concerning World Capital Market, Inc., WCM777, Inc. and WCM777 Limited.  The Alert was made available through the world wide web.

## HSBC's ROLE IS PERPETUATING THE PONZI SCHEME

26.     In or about July of 2013, Defendant HSBC Hong Kong opened an account ending in 7826 for WCM777 Ltd.  The account was a Business Vantage foreign currency account that allowed for deposit of United States Dollars.

27.     In or about July of 2013, Defendant HSBC Hong Kong knew that WCM777 Ltd., conducted commerce over the internet and had its head office in California.  HSBC Hong Kong also knew that there was no one at the office in Hong Kong listed for WCM777 Ltd.

28.     Wire transfers into the WCM777 account at Defendant HSBC Hong Kong began in or about July of 2103.

29.     HSBC Hong Kong employees Carol Ma, Sunny Ho and Xu Xie were in frequent interstate email and telephone communications with Ying Leung, WCM777's Chief Financial Officer in California, to coordinate the flow and volume of transactions and to verify the payment of funds when payments were late or missing.  HSBC Hong Kong assigned case numbers to such late or missing transactions and investigated the transactions providing further knowledge regarding WCM777'a source of revenue, their country origins, amounts and details. This communication was part of the regular way of doing business.  At its core, when a problem arose with a wire transfer, HSBC Hong Kong employees would make telephone calls or email WCM777 employees in order to make sure that deposits were properly credited to the correct account.  HSBC employees would direct WCM777 employees to make the appropriate arrangements so that transactions would be properly processed.  Once such communication is a December 19, 2013 email from commercialbanking@hsbc.hk  to  laodao@msn.com  with  the  Subject  Line of: HKPI1324-12DEC13//CYB PIV Private & Confidential.

30.     Just months prior to engaging with WCM777, the parent company of HSBC Hong Kong had entered into a deferred prosecution agreement regarding worldwide, institutionalized willful blindness toward money laundering and terrorist financing. On or about December 11, 2012, Defendant HSBC USA, entered into the Deferred Prosecution Agreement.  Also a party to the Deferred Prosecution Agreement was HSBC Holdings plc (HSBC), a financial institution holding

company organized under the laws of England and Wales.  Defendant HSBC Hong Kong is a subsidiary of HSBC plc.

31.     As part of the Deferred Prosecution Agreement HSBC, and HSBC USA, acknowledged that one of its high-risk products was its correspondent banking practices and services. Correspondent accounts are established at banks to receive deposits from, make payments on behalf of, or handle other financial transaction for foreign financial institutions.  In essence correspondent banking involves the facilitation of wire transfers between foreign financial institutions and their customers, and other financial institutions with which the foreign financial institution does not have a direct relationship.  Such correspondent accounts are generally considered high risk because the U.S. bank does not have a direct relationship with, and therefore has no diligence information on, the foreign financial institution's customers who initiated the wire transfers.

32.     As part of the Deferred Prosecution Agreement HSBC and HSBC USA entered into with the United states it vouched that it had already implemented a new automated monitoring system. The new system monitors every wire transaction that moves through HSBC USA. The system also tracks the originator, sender, and beneficiary of a wire transfer, allowing HSBC USA to look at its customer's customer. HSBC USA also implemented a new customer risk-rating methodology based on a multifaceted approach that weighs: (1) the country where the customer is located, (2) the products and services utilized by the customer, (3) the customer's legal entity structure, and (4) the customer and business type. Transactions that meet a threshold for suspicious activity were flagged for additional review by HSBC USA's anti-money laundering department.

33.     Defendant HSBC USA, at all times relevant, maintained a correspondent account for HSBC Hong Kong.

34.     The HSBC Hong Kong correspondent bank account at HSBC USA was utilized for conducting wire transfers to the WCM777 accounts at HSBC Hong Kong beginning in July of 2013.

35.     A statement for one of the WCM777 accounts at HSBC Hong Kong indicates that for the period July 22, 2013 to August 14, 2013 there had already been over 3.5 million in United States Dollars credited to WCM777 limited by over 174 deposits?

36.     In July of 2013, HSBC USA flagged a wire transfer headed to one of the WCM777 accounts at HSBC Hong Kong for a further, manual review.

37.     As part of the that further review, HSBC USA requested additional information about WCM777 from HSBC Hong Kong.

38.     In or about October 2013, HSBC Hong Kong responded to the inquiry from HSBC USA by confirming that it knew that its customer WCM777 Ltd., was incorporated on July 2, 2013, had opened its account on July 10, 2013, that it was a small business whose main office was in the United States, that it did not conduct a site visit because of that, and that it was controlled by Ming Xu.

39.     As part of the further review conducted by HSBC USA, it discovered a multi-level marketing review internet website that did a review of WCM777 and declared that it was a Ponzi scheme.  A copy of the Google search and review is attached hereto as **Exhibit A.**

40.     On or about September 30, 2013 HSBC USA  also expressly determined WCM777 was a fraud: **"**BENE – WCM777 LIMITED though identified by its website and no adverse information on RDC, internet research however shows that the BENE is alleged as a pyramid/Ponzi scheme (sample google results attached) … Review of the products posted on BENE website reasonably appeared that they are engaged in pyramid/ponzi scheme as they offer no concrete underlying products/services while offering guaranteed "daily" profit/returns by buying multi-level shares"

41.     On or about October 2, 2013, HSBC USA emailed its findings about WCM777 to HSBC Hong Kong.

42.     The Ponzi scheme continued to survive because Defendants HSBC Hong Kong and HSBC USA knowingly delivered, organized, converted and laundered proceeds from the illegal Ponzi scheme.  They were instrumental in helping WCM777 to continue its Ponzi scheme even as state, federal and overseas authorities were notifying HSBC USA of problems with WCM777.

43.     In this case, HSBC USA covered payments for the scheme's credit at HSBC Hong Kong, in the absence of such a mechanism the scheme would have collapsed. Cover payments are used by a bank to facilitate funds transfers on behalf of a customer to a beneficiary, most often in another country, but also in the same country when a foreign currency is used. They typically involve both (i) a transaction in a currency other than that of the country in which the originator's or beneficiary's bank is domiciled, and (ii) the originator's and beneficiary's banks not having a relationship with each other that allows them to settle with each other directly. In this circumstance, the originator's bank may directly instruct the beneficiary's bank to effect the payment and advise that transmission of funds to "cover" the interbank obligation created by the payment order has been arranged through a separate channel. Settlement is often accomplished through the originator bank's correspondent in the country where the national currency is the currency of the payment. If the originator bank's correspondent has a relationship with the beneficiary's bank, it can settle the payment itself; otherwise, settlement generally takes place through an additional intermediary bank that has a relationship with the beneficiary's bank. In current practice, the beneficiary can have his account credited by its own bank before interbank settlement is completed, especially when there is a robust commercial relationship.   Source: Basel Committee on Banking Supervision, Due diligence and transparency regarding cover payment messages related to cross border wire transfers, May 2009, p.1.

44.     Defendant HSBC USA as HSBC Hong Kong's correspondent bank was the crucial link in substantially assisting from June 2013 through February 2014 the transfer of over 3,000 transactions and over $45,000,000 of U.S. dollars to WCM's multiple bank accounts held at HSBC Hong Kong.  Correspondent relationships between banks provide the electronic pathway for funds moving from one jurisdiction to another. Through thousands of transactions via Fedwire, Clearing House Interbank Bank Payments Systems (CHIPS), and Bank to Bank, HSBC USA provided continued access to the global Financial System for WCM777.  This was essential to the schemes success because its worldwide investor base was instructed to make investments in United States dollars and investors were given the HSBC Hong Kong account number and address through its website, seminars and face to face meetings.  Consequently, money flowed into to HSBC's Hong

Kong correspondent bank account in New York, prior to being credited to HSBC Hong Kong accounts controlled by the scheme.  HSBC USA knew this was taking place because it monitored most of the wire transfers to WCM777 accounts at HSBC Hong Kong.

45.     An additional critical component of the Ponzi Scheme that HSBC Hong Kong substantially assisted was to make lulling payments to Plaintiffs in the form of returns for their investments so they would be assured that their investment was sound and secure.  HSBC Hong Kong made repeated transfers totaling over 12 million United States Dollars to a United States based entity Global Payouts Inc., a payments processor for eventual distribution to WCM777's investor base in the following manner:

| HSBC | After bank fees | | | |
|------|-----------------|--|--|--|
| 10/2/2013 | $100.00 $100.00 | | 10/2/2013 | in payment credit Global Payout |
| 10/7/2013 | $30,000.00 $29,860.00 | | 10/7 & 10/18 | In payment credit WCM777 |
| 10/21/2013 | $70,000.00 $69,910.05 | | 10/24/2013 | in payment credit Global Payout |
| 10/23/2013 | $100,000.00 $99,910.02 | | 10/28/2013 | in payment credit WCM777 |
| 10/28/2013 | $500,000.00 $499,910.09 | | 10/30/2013 | in payment credit WCM777 |
| 10/29/2013 | $300,000.00 $299,910.28 | | 11/4/2013 | in payment credit WCM777 |
| 10/31/2013 | $200,000.00 $199,910.33 | | 11/4/2013 | in payment credit WCM777 |
| 11/1/2013 | $200,000.00 $199,910.36 | | 11/5/2013 | in payment credit WCM777 |
| 11/6/2013 | $200,000.00 $199,910.29 | | 11/11/2013 | in payment credit WCM777 |
| 11/7/2013 | $200,000.00 $199,910.27 | | 11/12/2013 | in payment credit WCM777 |
| 11/8/2013 | $200,000.00 $199,910.37 | | 11/15/2013 | in payment credit WCM777 |
| 11/8/2013 | $200,000.00 $199,910.37 | | 11/18/2013 | in payment credit WCM777 |
| 11/11/2013 | $200,000.00 $199,910.39 | | 11/18/2013 | in payment credit WCM777 |
| 11/12/2013 | $200,000.00 $199,910.44 | | 11/18/2013 | in payment credit WCM777 |
| 11/14/2013 | $200,000.00 $199,910.42 | | 11/18/2013 | in payment credit WCM777 |
| 11/16/2013 | $200,000.00 $199,910.40 | | 11/18/2013 | in payment credit WCM777 |
| 11/16/2013 | $200,000.00 $199,910.36 | | 11/18/2013 | in payment credit WCM777 |
| 11/18/2013 | $200,000.00 $199,910.39 | | 11/18/2013 | in payment credit WCM777 |
| 11/18/2013 | $200,000.00 | | | |

| 11/20/2013 | $200,000.00 | 11/21/2013 | in payment credit WCM777 |
| | $399,820.65 | | |
| 11/21/2013 | $200,000.00 | 11/25/2013 | in payment credit WCM777 |
| | $199,910.52 | | |
| 11/22/2013 | $200,000.00 | 11/25/2013 | in payment credit WCM777 |
| | $199,910.45 | | |
| 11/23/2013 | $200,000.00 | 11/26/2013 | in payment credit WCM777 |
| | $199,910.56 | | |
| 11/26/2013 | $200,000.00 | 11/26/2013 | in payment credit WCM777 |
| | $199,910.59 | | |
| 11/27/2013 | $200,000.00 | 12/2/2013 | in payment credit WCM777 |
| | $199,910.69 | | |
| 11/28/2013 | $200,000.00 | 12/2/2013 | in payment credit WCM777 |
| | $199,910.69 | | |
| 11/29/2013 | $200,000.00 | 12/2/2013 | in payment credit WCM777 |
| | $199,910.62 | | |
| 11/30/2013 | $200,000.00 | 12/4/2013 | in payment credit WCM777 |
| | $199,910.62 | | |
| 12/3/2013 | $200,000.00 | 12/4/2013 | in payment credit WCM777 |
| | $199,910.65 | | |
| 12/4/2013 | $200,000.00 | 12/4/2013 | in payment credit WCM777 |
| | $199,910.65 | | |
| 12/5/2013 | $200,000.00 | 12/6/2013 | in payment credit WCM777 |
| | $199,910.70 | | |
| 12/6/2013 | $200,000.00 | 12/6/2013 | in payment credit WCM777 |
| | $199,910.66 | | |
| 12/7/2013 | $200,000.00 | 12/9/2013 | in payment credit WCM777 |
| | $199,910.60 | | |
| 12/9/2013 | $200,000.00 | 12/10/2013 | in payment credit WCM777 |
| | $199,910.62 | | |
| 12/10/2013 | $200,000.00 | 12/11/2013 | in payment credit WCM777 |
| | $199,910.58 | | |
| 12/11/2013 | $200,000.00 | 12/15/2013 | in payment credit WCM777 |
| | $199,910.67 | | |
| 12/12/2013 | $200,000.00 | 12/15/2013 | in payment credit WCM777 |
| | $199,910.79 | | |
| 12/13/2013 | $200,000.00 | 12/15/2013 | in payment credit WCM777 |
| | $199,910.76 | | |
| 12/16/2013 | $200,000.00 | 12/17/2013 | in payment credit WCM777 |
| | $199,910.79 | | |
| 12/17/2013 | $200,000.00 | 12/18/2013 | in payment credit WCM777 |
| | $199,910.83 | | |
| 12/18/2013 | $200,000.00 | 12/18/2013 | in payment credit WCM777 |
| | $199,910.87 | | |
| 12/19/2013 | $200,000.00 | 12/19/2013 | in payment credit WCM777 |
| | $199,910.87 | | |
| 12/20/2013 | $200,000.00 | 12/23/2013 | in payment credit WCM777 |
| | $199,910.79 | | |
| 12/23/2013 | $200,000.00 | 12/30/2013 | in payment credit WCM777 |
| | $199,910.50 | | |
| 12/24/2013 | $200,000.00 | 12/30/2013 | in payment credit WCM777 |
| | $199,910.50 | | |
| 12/28/2013 | $200,000.00 | 1/2/2014 | in payment credit WCM777 |
| | $199,911.21 | | |
| 12/31/2013 | $200,000.00 | 1/2/2014 | in payment credit WCM777 |
| | $199,911.19 | | |
| 1/2/2013 | $200,000.00 | 1/3/2014 | in payment credit WCM777 |
| | $199,910.77 | | |

| | | | | | |
|---|---|---|---|---|---|
| 1/3/2013 | $200,000.00 $199,910.81 | | 1/6/2014 | in payment credit WCM777 |
| 1/6/2014 | $200,000.00 $199,910.78 | | 1/7/2014 | in payment credit WCM777 |
| 1/7/2014 | $200,000.00 $199,910.76 | | 1/8/2014 | in payment credit WCM777 |
| 1/8/2014 | $200,000.00 $199,910.80 | | 1/12/2014 | in payment credit WCM777 |
| 1/15/2014 | $173,940.27 $170,512.29 | HKD wires | 1/16/2014 | in payment credit WCM777 |
| 1/15/2014 | $97,000.00 $96,910.81 | | 1/16/2014 | in payment credit WCM777 |
| 1/15/2014 | $34,000.00 $33,965.75 | | 1/16/2014 | in payment credit WCM777 |
| 1/15/2014 | $4,980.00 $4,945.75 | | 1/16/2014 | in payment credit WCM777 |
| 1/24/2014 | $200,000.00 $199,935.99 | | 1/28/2014 | in payment credit WCM777 |
| 1/24/2014 | $773,926.41 $770,253.31 | HKD wires | 1/28/2014 | in payment credit WCM777 |
| 1/29/2014 | $200,000.00 $199,935.09 | | 1/31/2014 | in payment credit WCM777 |
| 2/1/2014 | $773,926.41 $770,166.28 | HKD wires | 2/4/2014 | in payment credit WCM777 |

TTL:     $12,457,873.09   TTL:     $12,442,113.64 (after bank fees)

The transactions described above constitute the predicate act of money returning to the United States and derived only from investor deposits into the HSBC 817677826838 Hong Kong accounts.  By agreement the money was transferred by HSBC Hong Kong to an entity named Global Payouts Inc. at an account it held with Bank of America. Global Payouts would then distribute the money to WCM777 investors as agreed upon.

## JURISDICTION AND VENUE

46.     On April 4, 2014, the Receiver sent Defendant HSBC Hong Kong a copy of March 27, 2014 Temporary Restraining Order, which, among other things, froze the accounts of WCM777 Ltd.

47.     On April 7, 2014, Defendant HSBC Hong Kong responded to the Receiver by stating it would not abide by the Temporary Restraining Order or take any action regarding the WCM777 account.

48.     Plaintiffs allege that Defendant HSBC Hong Kong both prior and subsequent to April 4, 2014, allowed WCM777, to withdraw all money from its accounts.

13

49.     To date, Defendant HSBC Hong Kong has refused to cooperate with U.S. authorities, including the court appointed Receiver.

50.     The Defendant Banks profited from fees associated with the wire transfers and also by virtue of the bulk money transfers HSBC routed through the Clearing House Interbank Payments System (CHIPS) a bank-owned, privately operated electronic payments system. CHIPS provides intraday payment finality through a real-time system. CHIPS settles small payments, which can be accommodated by the banks' available balances, individually. Other payments are netted bilaterally (e.g., when Bank A has to pay $500 million to Bank B, and Bank B has to pay $500 million to Bank A), without any actual movement of funds between CHIPS participants.  The more money that comes in to a CHIPS participant the better the likelihood the bank will not have to transfer funds to another bank during intraday clearing, this is a powerful impetus to facilitate fraud.

51.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(a) and 1332(d), because there are more than 100 class members nationwide, at least one class member is of diverse citizenship from one Defendant, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.   Jurisdiction is proper under This Court also has subject matter jurisdiction pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.

52.     Venue is proper in this jurisdiction under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims in this action occurred in this Judicial District, and the Defendants may be found within this judicial District and conduct business within this Judicial District.

53.     This Court has personal jurisdiction over Defendants because certain of them have business operation in this state, while others have sufficient minimum contacts with the state, and otherwise intentionally avail themselves of the markets of this state so as to render this Court's exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

## FRAUDULENT CONCEALMENT

54.     Plaintiffs are informed and believe, and based upon such information and belief allege, WCM777's misrepresentations, failures to disclose and suppressions of information were made with the intent to induce plaintiffs to act in the manner they did, in reliance

thereon, and for them to invest. At the time that plaintiffs entered into the Agreement, they were ignorant of the facts that WCM777 concealed and failed to disclose, which facts were beyond plaintiffs' knowledge and reach. Plaintiffs actually and justifiably relied on WCM777's representation regarding its global banking prowess and success.

## CLASS ALLEGATIONS

55.     Plaintiffs, RIGOBERTO VASQUEZ and EVA GARCIA bring this action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and as representatives of a class who are similarly situated and who fall within the following class definition:  All individuals or entities who invested and lost money with any of the WCM777 entities by transferring or having their money transferred to one of the WCM777 accounts at HSBC Hong Kong through the HSBC USA correspondent account from the Period June 1, 2013 through May 31, 2014.  For purposes of this class definition, an individual or entity lost money only if the amount of money that the individual or entity received from WCM777, including any return on investment, commissions, fees or any other payments, was less than the amount of the individual's or entity's money invested with WCM777. Excluded from the Class are governmental entities, any judge, justice or judicial officer presiding over this matter and the members of his or her immediate family, the Defendants, along with their respective parents, subsidiaries and/or affiliates. Also excluded from this class are the legal representatives, heirs, successors and attorneys of any excluded person or entity, and any person acting on behalf of any excluded person or entity.

56.     Plaintiff RIGOBERTO VASQUEZ fits within the definition of a Class Member.  Mr. VASQUEZ was lured into investing in WCM777.  On October 21, 2013, Mr. VASQUEZ transferred $100,000, to the WCM777 Ltd account at HSBC Hong Kong account no. 817677826838 through HSBC USA. He lost this money as a result of investing.

57.     Plaintiff EVA GARCIA fits within the definition of a Class Member.  Ms. GARCIA was lured into investing in WCM777.  On October 11, 2013 she transferred $2,000 to HSBC Hong Kong through HSBC USA., 2013.  On October 15, 2013 she again transferred $2,000 to HSBC Hong Kong through HSBC USA.  She also lost this money as a result of investing.

58.     At the time the transfers were made by Mr. VASQUEZ and Ms. GARCIA both HSBC Hong Kong and HSBC USA knew that the funds were derived from illegal activity.

59.     Plaintiffs do not know the exact size of the class.  However, Plaintiffs believe that the number is so numerous that joinder is impracticable.  Plaintiffs do note that the Receiver has determined that WCM777 processed approximately 9,000 payouts to investors.

60.     The claims of Representative Plaintiffs are typical of the claims of the class in that Plaintiffs sent money to HSBC Hong Kong to invest in and become a WCM777 member.   Indeed, Representative Plaintiffs' investments were in all relevant respects typical of investments by other class members, and the monetary damages and injunctive relief sought is common to the class.

61.     Representative Plaintiffs will fairly and adequately protect the interest of the class in that Representative Plaintiffs, have no conflicts with any other members of the class, and are represented by experienced and able counsel.   The Representative Plaintiffs' interests are coincident with, and not antagonistic to, those of the class members.

62.     Numerous questions of law and fact are common to the class, including, but not limited to the following:

> a)  Whether HSBC Hong Kong participated, directly and indirectly, in the conduct of the affairs of WCM777 through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).;
>
> b)  Whether HSBC Hong Kong engages in action of Laundering of Monetary Instruments (18 U.S.C. §1956), Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (18 U.S.C. §1957), wire fraud (18 U.S.C. §1343), and mail fraud (18 U.S.C. §1841;
>
> c)  Whether HSBC Hong Kong, HSBC USA and WCM777 collectively constituted an "enterprise" with the meaning of that term as used in 18 U.S.C. §1962(c);

16

d) Whether HSBC Hong Kong and HSBC USA participated, directly and indirectly, in the conduct of the affairs of the aforesaid enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c);

e) Whether HSBC Hong Kong's continuous and repeated violations of 18 U.S.C. §1956 (Laundering of Monetary Instruments), 18 U.S.C. §1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), 18 U.S.C. §1343 (wire fraud), and 18 U.S.C. §1841 (mail fraud) constitute a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

f) Whether a fiduciary relationship existed between WCM777 and Class Members;

g) Whether WCM777 breached a fiduciary duty to Class Members;

h) Whether Class Members' damages were caused by the breach of fiduciary duty owed to them by WCM777;

i) Whether Defendants aided and abetted the breach of a fiduciary duty to Class Members by WCM777;

j) Whether WCM777 intentionally misrepresented or conceal material facts to Class Members;

k) Whether WCM777 did so to induce reliance by Class Members;

l) Whether Class Members were justified in relying on the misrepresentations of material facts by WCM777;

m) Whether Class Members' damages were caused by misrepresentation or concealment of material facts;

n) Whether HSBC Hong Kong knew of the fraudulent activities of WCM777;

o) Whether HSBC Hong Kong substantially assisted the fraudulent activities of WCM777;

p) Whether HSBC USA knew of the fraudulent activities of WCM777;

q) Whether HSBC USA substantially assisted the fraudulent activities of WCM777;

r) Whether HSBC Hong Kong committed tortious acts with fraud, oppression or malice;

s) Whether the aforesaid enterprise engaged in interstate commerce and the activities of the enterprise affected interstate commerce;

63.     The questions of law and fact common to the members of the class predominate over any questions affecting only individual members of the class.  Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Among other things, there is no interest by members of the class in individually controlling the prosecution of separate actions, and it is desirable to concentrate the litigation of the claims made herein in a single proceeding to provide small claimants with a forum in which to seek redress for these violations of Federal and New York law.  Whatever difficulties may exist in the management of the class action will be greatly outweighed by the benefits of the class action procedure, including, but not limited to, providing claimants with a method for redress of claims that may otherwise burden the Court with individual litigation.

## COUNT I

## VIOLATION OF 18 U.S.C. §1961 ET SEQ. (RICO)

## (MONEY LAUNDERING)

64.     Plaintiffs reallege and incorporate herein the allegations set forth above as if fully set forth by this reference.

65.     Defendant HSBC Hong Kong is a "person" within the meaning of that term as used in 18 U.S.C. §1962(c).

66.     Defendant HSBC USA is a "person" within the meaning of that term as used in 18 U.S.C. §1962(c).

67.     At all times relevant to this complaint Defendant HSBC Hong Kong, Defendant HSBC USA and WCM777 collectively constituted an "enterprise" within the meaning of that term as used in 18 U.S.C. §1962(c). Plaintiffs are informed and believe that the Enterprise is an ongoing association that functions as a continuing unit for the purposes of these acts of racketeering alleged above as well as for other purposes.

68.     At all times relevant to this complaint, each of the Defendants was associated with the aforesaid enterprise.

69.     Upon information and belief, and as previously described herein, each of the Defendants participated, directly and indirectly, in the conduct of the affairs of the aforesaid enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §1962(c).

70.     Upon information and belief, and as previously described herein, Defendants' racketeering activity consists of numerous related and continuous acts in violation of 18 U.S.C. §1956 (Laundering of Monetary Instruments), 18 U.S.C. §1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), 18 U.S.C. §1343 (wire fraud), and 18 U.S.C. §1841 (mail fraud).

71.     As previously described herein, upon information and belief, Defendants attempted to commit and committed acts of Laundering of Monetary Instruments (18 U.S.C. §1956), Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity (18 U.S.C. §1957), wire fraud (18 U.S.C. §1343), and mail fraud (18 U.S.C. §1841).  These acts include, but are not limited to:

a)  Defendant HSBC received thousands of wired money transfers from investors who were duped including RIGOBERTO VAZQUEZ:

b)  Defendant HSBC USA acted as the intermediary bank for thousands of wired money transfers from investors who were duped.  See below bank account statement enteries for EVA GARCIA indicating HSBC USA's direct act in furtherance of the illegal activity:

c)  Example Bank Statement Entries: Entry No. 1: dated 10/11 "10/11 International Wire Debit Via: HSBC USA/021001088 A/C Honkong and Shanghai Banking Hong Kong Hong Kon Ben: WCM777Limited Kowloon HK Ref:/CTS/hmnwwwhw00fn lmad: 1011B1Qgc04C006465 Tm: 4768100254Es" -2,000.00 | 957.56.

Entry No. 2:  Dated: 10/11 "International Wire Fee" -45.00 | 912.56.

Entry No. 3 Dated:10/15 "Deposit 545975878" 2,045.00 | 2,957.56.

Entry No. 4 Dated: 10/15 "Card Purchase with Pin 10/14 900 Walton Ave Yuba City CA Card 0243" -78.56 | 2,879.00

Entry No. 5 Dated: 10/15 "10/15 Chips Debit Via: HSBC Bank USA, NA/0108 A/C: Hongkong and Shanghai Banking Hong Kong Ben: WCM777Limited Kowloon HK SSN:0355732 Trn:3085600288Es" -2.000.00 | 897.00

d) On numerous occasions, Defendant HSBC Hong Kong transferred the comingled funds to accounts for other WCM777 entities.

e) On a number of occasions, Defendant HSBC Hong Kong wired the comingled funds back to the United States for escrow and other accounts in the name of other WCM777 entities.

72.   Defendants attempted to, conspired to and did affect commerce by said acts in violation of 18 U.S.C. §1956 (Laundering of Monetary Instruments), 18 U.S.C. §1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), 18 U.S.C. §1343 (wire fraud), and 18 U.S.C. §1841 (mail fraud).

73.   Defendants' continuous and repeated violations of 18 U.S.C. §1956 (Laundering of Monetary Instruments), 18 U.S.C. §1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), 18 U.S.C. §1343 (wire fraud), and 18 U.S.C. §1841 (mail fraud) constitute a pattern of racketeering activity with the meaning of 18 U.S.C. §1962(c).

74.   Upon information and belief, Defendants violations of 18 U.S.C. §1956 (Laundering of Monetary Instruments), 18 U.S.C. §1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), 18 U.S.C. §1343 (wire fraud), and 18 U.S.C. §1841 (mail fraud) injured Plaintiffs in that these acts perpetuated the Pyramid scheme.

75.   By reason of the foregoing, the Plaintiffs have been, and will continue to be, injured in their business and property in an amount not currently known, but believed to exceed $37,000,000.

## COUNT II

## AIDING AND ABETTING FRAUD

76.   Plaintiffs reallege and incorporate herein the allegations set forth above as if fully set forth by this reference.

77.   WCM777 intentionally defrauded every investor, including Plaintiff herein.  WCM777 falsely represented that it was a profitable enterprise, when in fact it was a pyramid scheme with

no source of revenue other than sales to investors, and it was not deriving a profit from the sale of goods and services to third parties.  WCM777 failed to disclose material information that it was not profitable and did not have any source of revenue other than sales to investors.

78.     Plaintiffs would not have invested in WCM777 had they known the truth.

79.     Defendant HSBC Hong Kong knew that WCM777 was engaging in fraud.  Nonetheless, Defendant HSBC Hong Kong substantially assisted and aided and abetted WCM777 by providing accounts into which investors' money could be wire transferred to, comingling of funds between the WCM777 accounts, and refusing to acknowledge or even cooperate pursuant to the District Court's Order.

80.     Defendant HSBC USA knew that WCM777 was engaging in fraud.  Nonetheless, Defendant HSBC USA substantially assisted and aided and abetted WCM777 by serving at the intermediary bank by which investors' money could be wire transferred to WCM777 accounts in Hong Kong.

81.     As a proximate result of Defendants' conduct, Plaintiffs suffered compensable damage in an amount not currently known, but believed to exceed $37,000,000.

82.     The Defendants' actions were malicious, fraudulent, oppressive and intended to injure Plaintiffs.  Consequently, Plaintiffs are entitled to punitive damages.

### COUNT III

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

83.     Plaintiffs reallege and incorporate herein the allegations set forth above as if fully set forth by this reference.

84.     WCM777 was an investment advisor to all of the Plaintiffs.  As a result, WCM777 owed Plaintiffs, who were their member/clients, fiduciary duties.  WCM777 breached the fiduciary duties they owed to the Plaintiffs.

85.     Defendant HSBC Hong Kong, at all material times, had actual knowledge of WCM777's fiduciary duties to Plaintiffs.

86.     Defendant HSBC USA, at all material times, had actual knowledge of WCM777's fiduciary duties to Plaintiffs.

87.     Defendant HSBC Hong Kong, at all material times, knew that WCM777 was violating its fiduciary duties to Plaintiffs.

88.     Defendant HSBC USA, at all material times, knew that WCM777 was violating its fiduciary duties to Plaintiffs.

89.     Defendant HSBC Hong Kong substantially assisted and aided and abetted WCM777 by providing accounts into which investors' money could be wire transferred to, comingling of funds between the WCM777 accounts, and refusing to acknowledge or even cooperate pursuant to the District Court's order.

90.     Defendant HSBC USA substantially assisted and aided and abetted WCM777 by serving at the intermediary bank by which investors' money could be wire transferred to WCM777 accounts in Hong Kong.

91.     As a proximate result of Defendants' conduct, Plaintiffs suffered compensable damage in an amount not currently known, but believed to exceed $37,000,000.

92.     The Defendants' actions were malicious, fraudulent, oppressive and intended to injure Plaintiffs.  Consequently, Plaintiffs are entitled to punitive damages.

## COUNT IV

## AIDING AND ABETTING CONVERSION

93.     Plaintiffs reallege and incorporate herein the allegations set forth above as if fully set forth by this reference.

94.     WCM777 operated as a Ponzi scheme.

95.     Defendant HSBC Hong Kong, at all material times, had actual knowledge that WCM777 operated a Ponzi scheme.

96.     Defendant HSBC USA, at all material times, had actual knowledge that WCM777 operated as a Ponzi Scheme.

97.     Defendant HSBC Hong Kong substantially assisted and aided and abetted WCM777 by providing accounts into which investors' money could be wire transferred to, comingling of funds

between the WCM777 accounts, and refusing to acknowledge or even cooperate pursuant to the District Court's order enjoining WCM777.

98.    Defendant HSBC USA substantially assisted and aided and abetted WCM777 by serving at the intermediary bank by which investors' money could be transferred to WCM777 accounts in Hong Kong.

99.    As a proximate result of Defendants' conduct, Plaintiffs suffered compensable damage in an amount not currently known, but believed to exceed $37,000,000.

100.   The Defendants' actions were malicious, fraudulent, oppressive and intended to injure Plaintiffs.  Consequently, Plaintiffs are entitled to punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and members of the class, pray for judgment against Defendants, jointly and severally, as follows:

1.    Declaring that this lawsuit is properly maintainable as a class action and certifying Plaintiffs EVA GARCIA and RIGOBERTO VAZQUEZ as class representatives;

2.    For violation of 18 U.S.C. §1962 et seq. (RICO), all Plaintiffs, including the Class Representatives on behalf of Class members, seek compensatory damages in an amount to be proven at trial, but believed to exceed $37,000,000, trebling of those damages, interest on that amount, and punitive damages;

3.    For aiding and abetting breach of fiduciary duty, all Plaintiffs, including the Class Representatives on behalf of Class Members, seek compensatory damages in an amount to be proven at trial, but believed to exceed $37,000,000, interest on that amount, and punitive damages;

4.    For aiding and abetting fraud, all Plaintiffs, including the Class Representatives on behalf of Class Members, seek compensatory damages in an amount to be proven at trial, but believed to exceed $37,000,000, interest on that amount, and punitive damages;

5.    For reasonable attorneys' fees and costs of suit as permitted by law;

6.    For such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury for all issues so triable.

Dated: October 9, 2018

Respectfully Submitted,

By: /s/ Julio J. Ramos
Julio J. Ramos
LAW OFFICES OF JULIO J. RAMOS
35 Grove Street, Suite 107
San Francisco, California 94102
Telephone: (415) 948-3015
Facsimile:  (415) 469-9787

Steven M. Nuñez, Esq. (Pro Hac Vice Pending)
WARD & HAGEN, LLP
440 Stevens Avenue, Suite 350
Solana Beach, California 92075
Telephone: (858) 847-0505
Facsimile:  (858) 847-0105

MICHAELE. ADAMS (Pro Hac Vice Pending)
LAW OFFICES OF MICHAELE. ADAMS
2 702 Marshall Street, Suite 300
Redwood City, CA 94063
3 Telephone: (650) 599-9463
Fax: (650) 599-9785