**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
RIGOBERTO VASQUEZ AND EVA GARCIA                    :
on behalf of themselves and all others similarly        :
situated                                                 :   Civil Action No. 1:18-cv-01876-PAE-BM
                                                         :
                                                         :
                         Plaintiffs,                     :
                                                         :
        v.                                               :
                                                         :
                                                         :
HONG KONG AND SHANGHAI                               :
BANKING CORPORATION LTD, a                           :
foreign company; HSBC BANK USA, N.A.,                :
a national banking association; and DOES 1            :
through 100, inclusive,                                  :
                                                         :
                         Defendants.                     :
-----------------------------------------------------------------X


**PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANT HSBC BANK USA, N.A.'S**

**AND HSBC HONG KONG'S MOTION TO DISMISS THE FIRST AMENDED**

**COMPLAINT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(B)(6)**

**AND 9(B)**

## I.       INTRODUCTION

        This action arises because both HSBC USA, N.A. ("HSBC USA") and The Hongkong

and Shanghai Banking Corporation Limited ("HSBC Hong Kong") (collectively "HSBC") knew

with specific evidence that its client was operating a global Ponzi scheme. The nationwide and

global reach of the World Capital Market 777 scheme (WCM777) could never have succeeded

without the active participation of HSBC's correspondent account in New York.  Through the

correspondent account, HSBC was able to convert foreign currency from overseas investors to

United States dollars and convert them to Hong Kong dollars, cover payments on the scheme's

behalf, communicate directly with the fraudsters to clarify problems, and manage the flow of

over 3,000 wire transactions. FAC. ¶¶ 2,44. The scheme was further assisted when after the United States District Court issued a TRO; HSBC Hong Kong concealed the magnitude of the scheme and delayed the attempted shut down of the back accounts held in Hong Kong. FAC. ¶¶47, 49. The Plaintiffs here and the class they seek to represent had their money routed to the HSBC correspondent account in New York after being solicited during in person seminars and presentations. See FAC. ¶ 17(a).

1. **The Prior Class Action in California**

On November 15, 2018 a putative class action based on the same set of operative facts as those here was filed in the Central District of California entitled *Giron et. al. v. Hong Kong and Shanghai Bank Company, Ltd.; HSBC USA, N.A.;* and Does 1 through 100, inclusive NO.: 2:15-cv-08869-ODW-JCx. The class in *Giron* was defined as "All individuals or entities who invested and lost money with any of the WCM777 entities by transferring or having their money transferred to one of the WCM777 accounts at HSBC Hong Kong." Plaintiffs Vasquez and Garcia were members of that class.

On November 13, 2017 Judge Wright dismissed the TAC and denied class-certification. According to the District Court, the Plaintiffs in *Giron* never connected HSBC USA's conduct with the harm they allegedly suffered, based on the fact that none sent money through HSBC USA' correspondent bank and consequently there was "no evidence of causation". Slip Opinion at p. 18, LL 18-20. With respect to the class certification motion the court denied on the basis of typicality and adequacy only. Slip Opinion at pp. 25-26.

2. **WCM777 was Conduction a Ponzi Scheme Based On Cloud Computing Services, and Was Ultimately Shut Down by the SEC.**

On March 27, 2014, the SEC shut down WCM777 in Federal District Court because it was a Ponzi scheme. (First Amended Complaint "FAC" ¶ 1.) Through its website and social media pages WCM777 held itself out as the brainchild of World Capital Markets, Inc., which purported to be a global merchant investment bank. (FAC ¶17.) WCM777 was described as an investment opportunity offering packages of cloud computer services that promised remarkable returns. (FAC

¶ 17.)  However, WCM777 generated no revenue apart from the investments made by victims. (FAC ¶ 17.) Nonetheless, it lead members to believe that their investments were accruing the promised value by, in combination, providing redeemable points to victims, which could be used as a cash substitute, or by sending money said to be fictitious profits. (FAC ¶23e-23g, & 45.)  In October of 2013, after Massachusetts began investigating it, WCM777 turned to HSBC Hong Kong to help place its continued operation outside the reach of United States jurisdiction.  (FAC ¶ 14-15, 20.)  As it "shut down" operations in the United States, WCM777 explicitly stated on its website that it was shifting its operation to Hong Kong because it was not in compliance with U.S. law.  (FAC, ¶20.)

**3.  HSBC USA Early On Concluded That WCM777 Was a Ponzi Scheme, But Nonetheless Continued to Manage Thousands of Wire Transfers From Victims Worth Millions of Dollars.**

In July of 2013, the same month that WCM777 opened up its first bank account with HSBC Hong Kong, HSBC USA flagged a wire transfer as suspicious and began a manual investigation. (FAC ¶ 36.) In July of 2013, HSBC Hong Kong opened up a Business Vantage account, which allowed for a U.S. Dollar balance, for WCM777 Ltd, which had just been incorporated in Hong Kong.  (FAC 14, 26.)  HSBC Hong Kong maintained a correspondent bank account with HSBC USA, which it utilized as part of its relationship with WCM777.  (FAC ¶33, 34.)  As part of the manual review, HSBC USA simultaneously asked HSBC Hong Kong for more information regarding WCM777 and independently investigated it.  (FAC. ¶ 37 & 39.)  On September 30, 2013, HSBC USA discovered an extensive, seven-page review of the WCM777 investment opportunity by a multi-level marketing blogger that concluded WCM777 was a Ponzi scheme. (FAC ¶ 39.)  HSBC USA independently reviewed the WCM777 website and also concluded that it was a Ponzi scheme:

> "internet research however shows that the BENE is alleged as a pyramid/Ponzi scheme (ample google results attached) … Review of the products posted on BENE website reasonably appeared that they are engaged in pyramid/ponzi scheme as they offer no concrete underlying products/services while offering guaranteed `daily' profit/returns by buying multi-level shares"

(FAC ¶ 40.)  On October 2, 2013, HSBC USA emailed its findings to HSBC Hong Kong.  Even so, HSBC USA processed thousands of U.S. Dollar wire transfers from victims to WCM777 in Hong Kong.  (FAC ¶ 44.)

## II.     ARGUMENT

### 1.   HSBC and WCM777 constituted an Enterprise to Avoid U.S. Jurisdiction

Pursuant to the Racketeering and Corrupt Practices Act ("RICO') an "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  "[T]he existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure." *United States v. Coonan,* 938 F.2d 1553, 1559 (2d Cir. 1991)(internal quotation marks omitted; emphasis in original)  As a result, "[proof of racketeering activity may therefore be relied upon to establish the existence of an enterprise." *Black Radio Network v. NYNEZ Corp.,* 44 F.Supp. 2d 565, 580 (S.D.N.Y 1999).

The FAC alleges that WCM777 was initially a group of entities operating in the United States, headed by Phil Ming Xu.  The entities associated for the purpose of conducting a Ponzi scheme under the façade of a successful global merchant bank.  FAC ¶¶ 1, 11-14, 17.  The FAC also alleges that the group of legal entities expanded to include the Hong Kong version of WCM777, a separate legal entity incorporated in Hong Kong, for the express purpose of continuing its activities outside of what it believed to be the jurisdictional reach of the United States.  (FAC ¶19, 20) The FAC states that WCM777, although hoping to be beyond the reach of U.S. laws continued to required investors to exclusively utilize U.S. Dollars in order to partake in its purportedly successful business. FAC ¶ 26.

The FAC illustrates that by September 30, 2013 HSBC had intensively investigated WCM777 and came to the conclusion that they were being used as what can only be referred as a "money mule" delivering funds unlawfully obtained by WCM777's global marketing efforts. FAC¶ ¶36-41.  Despite notice and knowledge of unlawful activity on a global scale, HSBC decided to continue its relationship with WCM777 after September 30, 2013 by managing and

directing the flow thousands of wire and fund transfers on behalf of HSBC Hong Kong for the benefit of WCM777.  FAC ¶ 42, 44.  In doing so, HSBC USA became complicit and associated itself with the scheme because to do otherwise would have resulted in the loss of substantial wire fees being lost. Moreover, the greater the volume of money through CHIPS the better likelihood HSBC USA would not have to transfer funds out of pocket to another bank during CHIPS intraday clearing, this was also a powerful impetus to facilitate fraud.  FAC ¶ 50.  By October 1, 2013 HSBC knew that WCM777 was unlawful because HSBC USA had analyzed WCM777 business model through internet searches, flagged suspicious transactions in the 817677826838 account, and managed an ever-increasing amount of transactions from suspect origins/locations.

### 2.  HSBC controlled the flow of money for the Enterprise

Defendants argue that Plaintiffs have failed to sufficiently allege facts that satisfy the "operation and management" of a RICO §1962(c) claim.  *Citing Rosner v. Bank of China,* 528 F.Supp.2d 419, Defendants assert that they merely providing banking services in aid of the fraudulent scheme is insufficient.  However, "knowingly carrying out the orders of the enterprise satisfies the "operation or management" test.  *Ouwinga v. Benistar* 419 Plan Servs., 694 F.3d 783, 793 (6th Cir. 2012).

In *Rosner*, supra., the plaintiff sued the Bank of China for its role in providing banking services to a fraudulent entity that was essential in helping the entity place funds the entity had fraudulently obtained into its accounts in Macau.  However, the court specifically noted that the complaint's allegations were insufficient to support an inference that the Bank knew the funds it was transporting were the product of fraud.  *Rosner*, supra., at p. 426 ("*Rosner* provides no factual basis for the assertion that BoC had actual knowledge of the fraud.")  Because of its prior finding of no knowledge, the court similarly concluded that "*Rosner's* sole allegation is that BoC provided banking services that aided in the perpetration of the fraudulent scheme." *Id.,* at p. 431. That the Plaintiffs in *Rosner* did not sufficiently allege the bank knew of the fraud when it processed the wires makes it factually distinguishable from HSBC USA's role in this scheme because as of September 30, 2018 it in fact knew that WCM777 was engaged in unlawful

activity of a global scale. FAC ¶¶ 36-41, at that specific point in time the separate structure element of RICO was satisfied.  Plaintiffs specifically allege in detailed fashion the manner in which HSBC USA discovered that WCM777 was a Ponzi scheme and the role it was being asked to take in the continuation of that scheme after acquiring that knowledge.  Thus, Plaintiffs allege that in knowingly deciding to conduct thousands of wire transfers after its discovery, HSBC USA crossed the line from passive to active member of the RICO enterprise.  Every act after that date constituted acting in concert with the fraudsters to control the flow of thousands of transactions in an attempt to evade the reach of United States law enforcement. Additionally, the FAC alleges that "HSBC Hong Kong employees Carol Ma, Sunny Ho and Xu Xie were in constant email and telephone communications with Ying Leung, WCM777's Chief Financial Officer in California." Together, they coordinated the flow and volume of transactions and verified the payment of funds when payments were late or missing.

At its core, when a problem arose with a wire transfer, HSBC Hong Kong employees would make telephone calls or email WCM777 employees in order to make sure that deposits were properly credited to the correct account. HSBC employees would direct WCM777 employees to make the appropriate arrangements so that transactions would be properly processed." (emphasis added).  *See Republic of Colom. v. Diageo N. Am. Inc.*  531 F. Supp. 2d. 365 (E.D.N.Y. 2007)("However, Plaintiffs have essentially alleged that the entire vertical distribution chain is involved in the conspiracy, and, given the numerous other specific allegations about the enterprise's organization, this is sufficient to permit meaningful discovery.")

**3.  The FAC Details HSBC's Role In The Enterprise**

Where the predicate acts on which a RICO claim is based sound in fraud, those acts must be pleaded with sufficient detail to allow a court to discern that the allegations pertain to the type of serious and broad-based frauds that the statute was intended to remedy.  Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC, 2012 U.S. Dist. LEXIS 51841 at *12 (S.D.N.Y.  2012). The FAC alleges that "HSBC USA acted as the intermediary bank for thousands of wired money

transfers from investors who were duped. See below bank account statement entries for EVA GARCIA indicating HSBC USA's direct act in **furtherance of the illegal activity" FAC ¶71.** Upon delivery of those funds to Hong Kong, "HSBC Hong Kong transferred the comingled funds to accounts for other WCM entities" and "that on a number of occasions, Defendant HSBC Hong Kong wired the comingled funds back to the United States for escrow and other accounts in the name of the WCM entities" Id. Without HSBC USA's role in the distribution chain there would have never been scheme successful in evading United States jurisdiction, thus no proximate causation for Mr. Vasquez or Mrs. Garcia. *See Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 126 S. Ct. 1991, 1998, 164 L. Ed. 2d 720 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."). FAC ¶81.

4. **Plaintiffs allege the predicate act of money laundering under both 18 U.S.C. §§ 1956 and 1957.**

Section 1956 requires that: (1) the individual conducted a financial transaction in interstate commerce, (2) with knowledge that the property involved in the transaction represented some form of unlawful activity, (3) with the transaction in fact involving the proceeds of specified unlawful activity, (4) with the purpose, in whole or in part, of concealing or disguising the nature, the location, the source, the ownership or the control of the illegally acquired proceeds. *Bernstein v. Misk,* 948 F. Supp. 228, 236 n.2 (E.D.N.Y. 1997). *See Republic of Colom.* at 440 ("Defendants learned of the source of the funds that they were receiving . . . through close supervision of their distribution chain.") Plaintiffs allege how and when HSBC USA discovered that WCM777 was a Ponzi scheme and the role it undertook as distributor of the scheme's proceeds after acquiring that knowledge. Thus, Plaintiffs allege that once HSBC USA knew that thousands of wire transfers were the product of an unlawful scheme a RICO enterprise was established that acted in concert with the fraudsters. "'[A] complaint alleging mail and wire fraud must show (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in

furtherance of the scheme.'" *Leung v. Law,* 387 F. Supp. 2d 105, 115-16 (E.D.N.Y. 2005) (Garaufis, J.) (*quoting S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.,* 84 F.3d 629, 633 (2d Cir. 1996).   Had the Plaintiffs known about the falsity of the representations made by WCM777 they would have never invested in the scheme.  See FAC ¶79.  Plaintiffs justifiably relied upon the statements made over the internet, wire and mail.  ¶54.  HSBC Hong Kong facilitated the transfer of over $12 million U.S. dollars in lulling payments from Hong Kong to the United States in order to build the impression of a return on their investment.  ¶45.  Those purported returns on the investment were derived only from investor deposits into the HSBC Hong Kong 816826838 account.  In addition, the bulk of the investor funds were used to pay cash for real property purchased in the United States. FAC ¶ 17(h).

### 5.   HSBC USA and HSBC Hong Kong Knowingly Aided The Scheme

As discussed above, HSBC had full knowledge of what it was doing on behalf of the fraudulent scheme.  To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must show: "(1) breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) plaintiff suffered actual damages as a result of the breach." *Kottler v, Deutsche Bank AG,* 607 F. Supp. 2d 447, 466 (S.D.N.Y. 2009) (citation omitted).

To state a claim for aiding and abetting fraud, a plaintiff must show: "(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud." Id. at 464. The actual knowledge prong is "not identical to the scienter required for the underlying fraud." *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 652 F. Supp. 2d 495, 502 (S.D.N.Y. 2009) (*quoting J.P. Morgan Chase Bank v. Winnick,* 406 F. Supp. 2d 247, 253 n.4. (S.D.N.Y. 2005)). Plaintiffs must allege a strong inference of actual knowledge or conscious avoidance; reckless disregard will not suffice. *See Kirschner v. Bennett,* 648 F. Supp. 2d 525, 544 (S.D.N.Y. 2009) ("To survive a motion to dismiss, therefore, the [plaintiff] must allege facts giving rise to a 'strong inference' of defendant's actual knowledge of the underlying

harm, or the conscious avoidance of the same such that 'it can almost be said that the defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge.'"  The Court will not allow an aider and abettor to consciously avoid confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor he or she substantially furthers. *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt, LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007).  The allegations in the FAC indicate that due to government regulatory action HSBC was under an obligation to be vigilant for fraud, and that despite this obligation when it came into possession of evidence indicating unlawful activity in the correspondent account it chose to join the fraudsters by becoming the indispensable spoke in the wheel of the enterprise.  "At its core, when a problem arose with a wire transfer, HSBC Hong Kong employees would make telephone calls or email WCM777 employees in order to make sure that deposits were properly credited to the correct account. HSBC employees would direct WCM777 employees to make the appropriate arrangements so that transactions would be properly processed."  FAC ¶ 29.

A claim can exist for aiding and abetting conversion if the aider-abettor has actual knowledge that the person who directly converted the plaintiff's property did not own that property.  *See Weisman, Celler, Spett & Modlin v Chadbourne & Parke,* 271 AD2d 329, 330 (1st Dept. 2000).  Here, HSBC knew exactly where the money was coming from and that WCM777 had no right to that money by virtue of the fact that it had identified WCM777 as a fraud by September 30, 2018. For conversion, a three-year statute of limitations applies and runs from the date that the conversion took place, not from discovery of the theft. See CPLR 214; *Vigilant Ins. Co. of Am. v Housing Auth. of City of El Paso, Tex.,* 87 NY2d 36, 44 (1995).

**6.  The Court should apply Equitable Tolling**

In *Chavez v. Occidental Chem. Corp.,* 300 F. Supp. 3d 517, 530 (S.D.N.Y. 2018) this Court held that "New York most likely would recognize cross-jurisdictional class-action tolling". *See Famular v. Whirlpool Corp.,* 2017 WL 2470844, at *9 (S.D.N.Y. June 7, 2017) (same); *In re LIBOR-Based Fin. Instruments Antitrust Litig.,* 2015 WL 6243526, at *145–46 (S.D.N.Y. Oct.

20, 2015) (same); *See also Hart v. BHH, LLC,* No. 15-cv-4804, 2018 WL 4215002, at *4 (S.D.N.Y. Sept. 5, 2018)( *See Chavez,* 300 F. Supp. 3d 517, 529 ("Under this theory, a limitations period is tolled at all times while a complaint based on the same underlying facts is pending in another state on behalf of a putative class that includes plaintiffs as absent members.").  The balancing of equities favors tolling in this case: (1) the underlying facts of *Giron* and this class actions are essentially the same (2) the same lawyers in the prior action are litigating this action (3) there has not been an inordinate amount of time between dismissal of the first action and the second action (4) the nucleus of operative fact in the class action took place in New York and (5) the *Giron* dismissal and denial of class action were based on narrow technical grounds unique to those Plaintiffs thus comity is not an issue.  Weighing these factors supports tolling during the pendency of the *Giron* action.  The California 9th Circuit has also articulated that California would apply equitable tolling analysis to a subsequently filed class action dismissed in another state.  *Hatfield v. Halifax PLC,* 564 F3d 1177, 1188-1189 (9th Cir. 2009). With respect to California law, an out of state defendant tolls the statute of limitations. California Civil Code of Procedure ¶351 provides for the tolling – the suspension – of the statute of limitations for the duration that the defendant is absent from the state. To put it simply, the running of the statute of limitations "pauses" while the defendant is out of state.  See also NY CPLR 207 tolling statute of limitation for out of state defendant.  HSBC Hong Kong contests jurisdiction here as being out of state;  *United States Fidelity and Guaranty Company, Appellant, v. E. W. Smith Co., Respondent,* 46 N.Y.2d 498 (1979)(three year statute of limitation for conversion tolled during time defendant was out of state).  "The statute of limitations for a civil RICO claim under 18 U.S.C. § 1964(c) is four years." *Frankel v. Cole,* 313 F. App'x 418, 419-20 (2d Cir. 2009) (*citing Agency Holding Corp. v. Malley-Duff & Assocs.,* 483 U.S. 143, 156 (1987)). "The statute of limitations is triggered when plaintiffs discover or should have discovered their RICO injury, not when they discover or should have discovered the underlying pattern of racketeering activity, even if the pattern of racketeering activity includes fraud."

Frankel, 313 F. App'x at 419-20.  The inquiry notice here occurred on March 27, 2014 when the SEC shutdown the scheme in the Central District of California.

## III.      CONCLUSION

There UCC does not supplant fraud claims.0186  In alleging that WCM777 was a Ponzi scheme the complaint necessarily alleges that it provided the fictitious profits, cash or points, that made them believe the scheme was working as planned.  Thus, there is no statute of limitations defense demonstrated by the complaint.  In addition, there is nothing on the face of the complaint to suggest that inquires that may be required by any statute of limitations defenses to the state law claims would preclude certification.  Therefore, the motion should be denied in its entirety.

Dated: December 7, 2018

Respectfully Submitted,

By: /s/ Julio J. Ramos            
Julio J. Ramos
LAW OFFICES OF JULIO J. RAMOS
35 Grove Street, Suite 107
San Francisco, California 94102
Telephone: (415) 948-3015
Facsimile:  (415) 469-9787

Steven M. Nuñez, Esq. (Pro Hac Vice Pending)
WARD & HAGEN, LLP
440 Stevens Avenue, Suite 350
Solana Beach, California 92075
Telephone: (858) 847-0505
Facsimile:  (858) 847-0105

MICHAELE. ADAMS (Pro Hac Vice Pending)
LAW OFFICES OF MICHAELE. ADAMS
2 702 Marshall Street, Suite 300
Redwood City, CA 94063
3 Telephone: (650) 599-9463
Fax: (650) 599-9785