UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  5/30/19
```

RIGOBERTO VASQUEZ and EVA GARCIA *on behalf of themselves and all others similarly situated*,

                                    Plaintiffs,

              -v-

HONG KONG AND SHANGHAI BANKING CORPORATION LTD., *a foreign company*, HSBC BANK USA, N.A., *a national banking association*, and DOES 1 THROUGH 100,

                                    Defendants.

18 Civ. 1876 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiffs Rigoberto Vasquez and Eva Garcia bring this putative class action against Hong Kong and Shanghai Banking Corporation Ltd. ("HSBC Hong Kong"), HSBC Bank USA, N.A. ("HSBC USA") (together, the "HSBC defendants"), and Does 1 to 100. Plaintiffs allege that the HSBC defendants and unnamed others facilitated the international bank transfers required to perpetrate a Ponzi scheme which violated the federal racketeering statute 18 U.S.C. § 1961 *et seq.* ("RICO"). Plaintiffs also bring, under state law, three common law claims for aiding and abetting, with the underlying conduct of fraud, breach of fiduciary duty, and conversion.

HSBC Hong Kong now moves to dismiss for lack of personal jurisdiction. In addition, the HSBC defendants move collectively and individually to dismiss all claims on a variety of grounds under Federal Rule of Civil Procedure 12(b)(6) and to strike plaintiffs' class allegations.

For the reasons that follow, as to HSBC Hong Kong, the Court authorizes jurisdictional discovery, to assist in resolution of that defendant's motion to dismiss for lack of personal jurisdiction. The Court dismisses all claims against HSBC USA under Rule 12(b)(6), which

1

obviates the need to resolve the motion to strike class allegations as made by that defendant. After jurisdictional discovery, the Court will, if personal jurisdiction is then established, resolve HSBC Hong Kong's Rule 12(b)(6) motion and its motion to strike plaintiffs' class allegations.

## I.    Background

### A.    Facts[1]

Plaintiffs allege that the HSBC defendants facilitated the perpetration of a Ponzi scheme they call "WCM777." FAC ¶ 1.  The perpetrators of WCM777 maintained accounts with HSBC Hong Kong and advised prospective investors to wire money to these accounts.  *Id.* ¶ 2.  The bulk of these transfers went through a correspondent bank account held by HSBC Hong Kong at HSBC USA in New York.  *Id.*  Plaintiffs allege that HSBC USA became aware that WCM777 was a Ponzi scheme at least by September 30, 2013, and shared this discovery with HSBC Hong Kong.  However, the banks continued transferring more than $30 million worth of transactions afterwards until a federal court shut down the scheme in March 27, 2014.  *Id.* ¶¶ 1–2.

### 1.    The Operation of WCM777

WCM777 is the umbrella name for a number of businesses operating together.  *Id.* ¶ 11. Its name derives from World Capital Markets, Inc., a Delaware corporation headquartered in Pasadena, California, and organized under the laws of the British Virgin Islands.  *Id.* ¶ 12.  It was founded around March 2013 by Phil Ming Xu ("Ming Xu"), its chairman.  *Id.*  Ming Xu lived in California.  *Id.* ¶ 13.  World Capital Markets, Inc. maintained a website with the URL "WCM777.com."  *Id.* ¶ 17(a).

---

[1] This account is drawn from the First Amended Complaint.  Dkt. 45 ("FAC").  For the purpose of resolving the motion to dismiss, all factual allegations in the FAC are presumed true.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  As described more fully below, for purposes of resolving the motion to dismiss for lack of personal jurisdiction, the Court may consider materials outside the FAC and has done so here.

WCM777 Ltd. is a subsidiary of World Capital Markets, Inc.  It is based in the British Virgin Islands and partially owned by Ming Xu and Suo Zhong Xu.  *Id.* ¶ 14.  On July 2, 2013, WCM777 Ltd. was incorporated in Hong Kong.  *Id.*  On February 21, 2014, WCM777 Ltd. registered with the California Secretary of State, stating that it was doing business as WCM777 Enterprises, Inc., and was located in the City of Industry, California.  *Id.* ¶ 14.  Collectively, the above businesses are known as "WCM777."

WCM777 styled itself as a global merchant investment bank and claimed to be in partnership with more than 700 investment organizations.  *Id.* ¶ 17(a).  It solicited investors in the United States and abroad through its website, in-person seminars and presentations, webinars, and posts on social media sites such as Facebook and other message boards.  *Id.* ¶ 17(b).

WCM777 offered and sold five different levels of packages of cloud-based computing services, titled "World Cloud Media Products."  *Id.* ¶¶ 17(d) & (f).  In addition to computer services, each package level promised a return within 100 days of approximately 100% of the amount invested with half paid in cash and half paid in points.  *Id.* ¶¶ 17(d) & (g).  As marketed, these points could ostensibly be redeemed for goods and services to be offered by WCM777 and its affiliates, or converted into equity in an initial public offering of either a company named WCM7.com, or another unidentified high-tech company that WCM777 claimed it planned to bring public.  *Id.* ¶ 17(e).  WCM777 represented that investors could earn additional cash and points by referring new members or by being passive.  *Id.*

WCM777 was a pyramid scheme in that it used some of the investor funds to make Ponzi payments of returns to investors.  *Id.* ¶ 17(h).  It used the bulk of the investor funds to pay cash for real property purchased in the United States.  *Id.*  It had no apparent source of revenue other

than money received from new investors, and its offering and operation depended almost entirely on the recruitment by existing investors of new investors and purchasers, whose funds were used to pay purported returns to investors.  *Id.* ¶¶ 17(h)–(j).

### 2.      The Role of the HSBC Defendants

On or about December 11, 2012, HSBC USA and HSBC Holding plc ("HSBC"), of which HSBC Hong Kong is a subsidiary, entered into a Deferred Prosecution Agreement with the United States regarding money laundering and terrorist financing.  *Id.* ¶¶ 30, 32.  As part of the Agreement, HSBC vouched that it had implemented a new automated system that monitored every wire transaction that moved through HSBC USA.  *Id.* ¶ 32.  The system tracks the originator, sender, and beneficiary of a wire transfer.  *Id.*  HSBC represented that it had also implemented a new customer risk-rating methodology that evaluates: "(1) the country where the customer is located, (2) the products and services utilized by the customer, (3) the customer's legal entity structure, and (4) the customer and business type."  *Id.*  Transactions that meet a certain threshold for suspicious activity are flagged for additional review by HSBC USA's anti-money laundering department.  *Id.*

HSBC USA, at all relevant times, maintained a correspondent account for HSBC Hong Kong.  *Id.* ¶ 33.  HSBC USA covered payments for credit at HSBC Hong Kong.  *Id.* ¶ 43.  This meant that money from the United States wired to an HSBC Hong Kong account number would flow through the HSBC Hong Kong correspondent bank account in New York before being credited to an HSBC Hong Kong account.  *Id.* ¶ 44.

In July 2013, WCM777 opened an account at HSBC Hong Kong in the name of WCM777 Ltd., listing Ming Xu as the main contact.  *Id.* ¶ 15.  The account was a "Business Vantage foreign currency account that allowed for the deposit of United States Dollars."  *Id.* ¶ 26.  Wire transfers into WCM777's HSBC Hong Kong account began in July 2013.  *Id.* ¶ 29.

HSBC Hong Kong employees were in frequent contact with WCM777 employees in California to ensure that the wire transfers were properly processed. *Id.* Between July 22, 2013 and August 14, 2013, WCM777 accounts at HSBC Hong Kong received more than $3.5 million, comprised of more than 174 deposits. *Id.* ¶ 35.

In July 2013, HSBC USA flagged a wire transfer headed to one of the WCM777 accounts at HSBC Hong Kong for further, manual review. *Id.* ¶ 36. On or around September 30, 2013, HSBC USA, through internet research, learned of allegations that WCM777 was a "pyramid/Ponzi scheme." *Id.* ¶ 40. On October 2, 2013, it emailed these findings to HSBC Hong Kong. *Id.* ¶ 41.

As part of this review, HSBC USA requested additional information about WCM777 from HSBC Hong Kong. *Id.* ¶ 37. In October 2013, HSBC Hong Kong responded that its customer WCM777 Ltd. had been incorporated on July 2, 2013 and had opened its account on July 10, 2013. *Id.* ¶ 38. HSBC Hong Kong had not conducted a site visit because WCM777 Ltd. was a small business with a main office in the United States. *Id.*

In September 2013, the Securities Division of the Commonwealth of Massachusetts began investigating WCM777. *Id.* ¶ 18. Beginning in September 2013, WCM777 started directing all investors to wire transfer their investments to HSBC Hong Kong, explaining that WCM777 was not in compliance with United States law. *Id.* ¶ 20.

On November 11, 2013, the Securities Division issued a Consent Order reflecting that WCM777 had submitted to an offer of settlement. *Id.* ¶ 21. On or about November 20, 2013, the WCM777.com website stated that WCM777 was putting its U.S. operations on hold in response to the Consent Order. *Id.* ¶ 22.

On January 8, 2014, the State of California—through the Business, Consumer Services and Housing Agency's Department of Business Oversight—issued a Desist and Refrain Order against WCM777 that was publicly available online. *Id.* ¶ 23. On January 21, 2014, the Securities Commissioner for the State of Colorado issued a "Stipulation for [C]onsent Cease and Desist Order" concerning WCM777 that was publicly available online. *Id.* ¶ 24. On March 3, 2014, the State of Alaska—through its Department of Commerce, Community & Economic Development—issued an Investor Fraud Alert concerning WCM777 that was made publicly available online. *Id.* ¶ 25. On March 27, 2014, in an action entitled *Securities and Exchange Commission v. World Capital Market Inc.*, the District Court in the Central District of California "shut down" the WCM777 Ponzi scheme. *Id.* ¶ 1.

Both before and after these regulatory actions—specifically in the period from June 2013 to February 2014—more than $45 million was wired, via more than 3,000 wire transfers, through HSBC Hong Kong's correspondent bank account at HSBC USA to WCM777's HSBC Hong Kong bank accounts. *Id.* ¶ 44.

### 3.    Plaintiffs' Alleged Injuries

Vasquez and Garcia bring this action on behalf of a purported class of "[a]ll individuals or entities who invested and lost money with any of the WCM777 entities by transferring or having their money transferred to one of the WCM777 accounts at HSBC Hong Kong through the HSBC USA correspondent account from the Period June 1, 2013 through May 31, 2014." *Id.* ¶ 55. Vasquez and Garcia each reside in California. *Id.* ¶¶ 3–4.

Vasquez transferred $100,000 to the WCM Ltd. account at HSBC Hong Kong on October 21, 2013 and lost all this money. *Id.* ¶ 56. Garcia transferred $2,000 to WCM777 in HSBC Hong Kong through HSBC USA on October 11, 2013, and again on October 15, 2013. *Id.* ¶ 57. She lost this $4,000. *Id.*

### B.     Procedural History

#### 1.     Action in the Southern District of New York

On March 1, 2018, plaintiffs filed the original complaint in this action.  Dkt. 1.  On July 25, 2018, the Court extended the time for the HSBC defendants to respond.  Dkt. 26.  On August 28, 2018, the HSBC defendants moved to dismiss and to strike the class allegations.  Dkts. 31–42.  On September 11, 2018, the Court extended the time for plaintiffs to amend their complaint.  Dkt. 44.  On October 9, 2018, plaintiffs filed the FAC, the operative complaint today.  Dkt. 45.

On November 13, 2018, the HSBC defendants collectively filed a motion to strike class allegations from the FAC pursuant to Federal Rules of Civil Procedure 12(f), 23(c)(1)(A), and 23(d)(1)(D), Dkt. 58, and a memorandum of law in support, Dkt. 59.  HSBC Hong Kong filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, Dkt. 48, a memorandum of law in support, Dkt. 49 ("Def. 12(b)(2) Mem."), and declarations in support from Yin Yuen Shan Susan, Dkt. 50 ("Shan Decl."), George Rajah, Dkt. 51 ("Rajah Decl."), Nicole Annunziata, Dkt. 52 ("Annunziata Decl."), and Gregory S. Korman, Esq., Dkt. 53 ("Korman Decl.").  HSBC USA and HSBC Hong Kong each separately filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), Dkts. 54, 56, and memoranda of law in support, Dkt. 55 ("HSBC USA Mem."), Dkt. 57 ("HSBC Hong Kong Mem.").

Before the plaintiffs responded, they filed an emergency letter motion seeking leave to conduct limited discovery to subpoena documents from the court-appointed Receiver in *SEC v. World Capital Market Inc. et al.*, No. 14 Civ. 2334 (JFW) (MRW), then pending in the Central District of California, because the documents were due to be destroyed on November 30, 2018.  *See* Dkt. 60.  The Court invited responses from the Receiver and defendants.  Dkt. 61.  On November 21, 2018, the HSBC defendants filed a response.  Dkt. 67.  On November 28, 2018,

the Receiver and the Securities and Exchange Commission ("SEC") filed a response.  Dkts. 68
(Receiver), 69 (SEC).  On November 29, 2018, plaintiffs filed a reply.  Dkt. 70.

On November 30, 2018, the Court denied plaintiffs' letter motion, finding that the
California court had given the "plaintiffs ample opportunity to access [these] documents on the
reasonable terms [it] set forth, but plaintiffs declined to meet these terms" and requiring that any
further application for relief be made before the Central District of California.  Dkt. 71.

On December 7, 2018, plaintiffs responded to the HSBC defendants' motion to strike
class allegations, Dkt. 74, and HSBC Hong Kong's motion to dismiss for lack of personal
jurisdiction, Dkt. 75 ("Pl. 12(b)(2) Mem.").  On December 8, 2018, plaintiffs filed a combined
opposition to the motions to dismiss under Rules 12(b)(6), Dkt. 76 ("Pl. 12(b)(6) Mem."), and a
request for judicial notice of certain documents under Federal Rule of Evidence 201, Dkt. 77
("Pl. 201 Mem.").

On December 10, 2018, the Court held an initial pretrial conference in which it stayed
discovery until resolution of the pending motions.  Dkt. 78.  On December 19, 2018, the HSBC
defendants replied collectively and individually.  Dkts. 79 ("Def. 12(b)(2) Reply"), 80 ("HSBC
USA Reply"), 81 ("HSBC Hong Kong Reply"), 82 (12(f) Reply).  They also collectively
opposed plaintiffs' request for judicial notice.  Dkt. 83 ("Def. 201 Mem.").

### 2.    Action in the Central District of California

On November 16, 2015, approximately two and one half years before this action was
initiated, plaintiffs Ramiro Giron, Nicolas J. Herrera, and Orlando Antonio Mendez (the
"California plaintiffs") filed a separate putative class action complaint against HSBC Hong
Kong, HSBC USA, and Does 1 through 100 in the Central District of California, No. 2:15-cv-
08869-ODW-JC ("CDCA action").  Korman Decl. Exs. A (CDCA docket sheet), B ("CDCA
Compl.").  The California plaintiffs brought substantially the same claims as those now made in

this action, as well as claims for violations of California's unfair competition law. *See* CDCA

Compl. ¶¶ 88–129. Those plaintiffs were represented by the same counsel, Julio J. Ramos, Esq.,

as the plaintiffs here. *See id.* at 25.

On October 21, 2016, the district court dismissed the CDCA action as against HSBC

Hong Kong for lack of personal jurisdiction. Korman Decl. Ex. J. On November 15, 2017, the

district court granted HSBC USA's motion for summary judgment, finding that plaintiffs had

failed to show causation, and denied the motion for class certification. *See Giron v. Hong Kong

& Shanghai Bank Co., Ltd.*, No. 2:15-cv-08869-ODW(JC), 2017 WL 5495504, at *16 (C.D. Cal.

Nov. 15, 2017).

On December 13, 2017, the plaintiffs appealed the adverse summary judgment decision

to the Ninth Circuit. Korman Decl. Ex. L. On July 18, 2018, counsel Ramos filed an unopposed

motion for voluntary dismissal, with prejudice, of the appeal. Korman Decl. Ex. O. On July 31,

2018, the Ninth Circuit granted the motion to dismiss the appeal. *Giron v. HSBC Bank USA,

N.A.*, No. 17-56866, 2018 WL 6606521, at *1 (9th Cir. July 31, 2018).

## II.     Applicable Legal Standards

### A.     Proper Sequence of Motions

"Where a Court is asked to rule on a combination of Rule 12 defenses, it will pass on the

jurisdictional issues before considering whether a claim is stated in the complaint." *Koulkina v.

City of New York*, 559 F. Supp. 2d 300, 310 (S.D.N.Y. 2008) (collecting cases); *see also

Arrowsmith v. United Press Int'l.*, 320 F.2d 219, 221 (2d Cir. 1963) (en banc) ("[L]ogic

compel[s] initial consideration of the issue of jurisdiction over the defendant—a court without

such jurisdiction lacks power to dismiss a complaint for failure to state a claim . . . ."); *Mende v.

Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003) ("Before addressing

9

Defendants' Rule 12(b)(6) motion to dismiss, the Court must first address the preliminary question[] of . . . personal jurisdiction.").

### B.    Personal Jurisdiction

"[T]he plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)); *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).

To make out a *prima facie* case of personal jurisdiction, whether based on general or specific personal jurisdiction, plaintiffs must establish both "a statutory basis" for jurisdiction and that exercise of such jurisdiction accords "with constitutional due process principles." *Cortlandt St. Recovery Corp. v. Deutsche Bank AG, London Branch*, No. 14 Civ. 01568 (JPO), 2015 WL 5091170, at *2 (S.D.N.Y. Aug. 28, 2015) (quoting *Reich v. Lopez*, 38 F. Supp. 3d 436, 454 (S.D.N.Y. 2014)).  General personal jurisdiction subjects a defendant to suit on all claims. *Id.*; *see also Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  Specific personal jurisdiction subjects a defendant to suit on only claims that arise from the defendant's conduct in the forum. *Cortlandt*, 2015 WL 5091170, at *2; *see also Daimler AG v. Bauman*, 571 U.S. 117, 126–27 (2014).

"In evaluating jurisdictional motions, district courts enjoy broad discretion in deciding whether to order discovery." *In re Terrorist Attacks*, 349 F. Supp. 2d at 811 (collecting cases). "A district court retains considerable latitude in devising the procedures it will follow to ferret

out the facts pertinent to jurisdiction." *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)

(quotations and citation omitted). "If a plaintiff has identified a genuine issue of jurisdictional

fact, jurisdiction[al] discovery is appropriate even in the absence of a *prima facie* showing as to

the existence of jurisdiction." *Daventree Ltd. v. Rep. of Azerbaijan*, 349 F. Supp. 2d 736, 761

(S.D.N.Y. 2004) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 207–08 (2d Cir.

2003). "However, a court is not obligated to subject a foreign corporation to discovery where the

allegations of jurisdictional facts, construed most favorably in the plaintiff's favor, fail to state a

basis for the exercise of jurisdiction or where a plaintiff's proposed discovery, if granted, would

not uncover facts sufficient to sustain jurisdiction." *Id.* (citing *Jazini v. Nissan Motor Co., Ltd.*,

148 F.3d 181, 185–86 (2d Cir. 1998); *APWU*, 343 F.3d at 627).

### C.      Failure to State A Claim

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough

facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly

dismissed where, as a matter of law, "the allegations in a complaint, however true, could not

raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

For the purpose of resolving a motion to dismiss, the Court must assume all well-pled

facts to be true, drawing all reasonable inferences in favor of the plaintiff. *See Koch*, 699 F.3d at

145. That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A

pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a

cause of action will not do." *Twombly*, 550 U.S. at 555.

11

In evaluating whether a complaint states a claim, the Court also applies Rule 9(b).  It provides that where "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Rule 9(b) "requires that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Global Master Fund, Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004).

## III.    Discussion

Mindful of the above authority, the Court will address HSBC Hong Kong's motion to dismiss for lack of personal jurisdiction before turning to defendants' motions to dismiss for failure to state a claim.  At the threshold, however, the Court considers plaintiffs' motion asking the Court to take judicial notice, on these motions, of certain documents.

### A.    Judicial Notice

Plaintiffs ask the Court to take judicial notice of six documents.  *See* Pl. 201 Mem. at 2–3.  The HSBC defendants object to only two. Def. 201 Mem. at 1.

The four unobjected-to documents are orders and public filings from the California action.  *See id.* Exs. 2–3, 5–6; Def. 201 Mem. at 1 & n.1.  The Court accordingly takes judicial notice of them.

As to the remaining two documents, the first is a Consent Order filed in a separate matter, *In re HSBC Bank USA, N.A., McLean, Virginia*, U.S. Dep't of Treasury, Office of the Comptroller of the Currency, No. AA-EC-10-98 (Oct. 6, 2010), Pl. 201 Mem. Ex. 4.  The HSBC defendants object to this document solely on the ground that plaintiffs neither cite to nor rely on it in their briefs.  Def. 201 Mem. at 1.  There is, accordingly, no present occasion for the Court to

take judicial notice of this document.  The Court accordingly denies the request for judicial

notice as unripe.

The second document is a Deferred Prosecution Agreement filed in *United States v.*

*HSBC Bank USA, N.A.*, No. 12 Cr. 763, Dkt. 3-2 (E.D.N.Y. Dec. 10, 2012).  *See* Pl. 201 Mem.

Ex. A (the "DPA"); Def. 201 Mem. at 1–2.  The DPA is between, on one side, HSBC North

America Holdings, Inc., and HSBC Holdings plc, and, on the other, various components of the

United States Department of Justice (specifically, the Asset Forfeiture and Money Laundering

Section of the Criminal Division; the United States Attorney's Office for the Eastern District of

New York; and the United States Attorney's Office for the Northern District of West Virginia).

DPA at 1.  It sets out the terms for the Department's deferral of prosecution of the charges in an

attached Information, the terms of which include steps taken and to be taken by the various

HSBC parties to combat money laundering, the forfeiture of certain funds, and future

cooperation.  *See generally id.*

The HSBC defendants object on two grounds: (1) that the DPA is irrelevant "to establish

HSBC Hong Kong's contacts with New York or the reasonableness of jurisdiction," and (2) that

judicial notice is improper because the plaintiffs ask the Court to take notice of the truth of the

matters asserted in the DPA.  *See* Def. 201 Mem. at 1–2.

The Court grants plaintiffs' request to take judicial notice of the DPA, but solely for the

fact of its filing, not the truth of its contents.  As the HSBC defendants correctly note, Federal

Rule of Evidence 201(b) allows a court to "take judicial notice of a document filed in another

court 'not for the truth of the matters asserted in the other litigation, but rather to establish the

fact of such litigation and related filings.'"  *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*,

969 F.2d 1384, 1388 (2d Cir. 1992) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d

Cir. 1991)).  As developed *infra*, the Court does not find the DPA relevant to HSBC Hong

Kong's personal jurisdiction motion, but does briefly examine it in addressing HSBC USA's

Rule 12(b)(6) motion.

**B.     Personal Jurisdiction Over HSBC Hong Kong**

HSBC Hong Kong argues that the Court lacks both general and specific personal

jurisdiction over it.  Def. 12(b)(2) Mem. at 10–25.  The Court considers these potential bases for

personal jurisdiction in turn.

**1.     General Jurisdiction**

General personal jurisdiction in New York courts is exercised pursuant to N.Y. C.P.L.R.

§ 301.  It provides that jurisdiction is proper when "a company has engaged in such a continuous

and systematic course of doing business [in New York] that a finding of its presence [in New

York] is warranted."  *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir.

2014) (internal quotation marks omitted); *see also Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d

88, 95 (2d Cir. 2000).

As for the constitutional requirements for general personal jurisdiction, courts may

exercise general personal jurisdiction over foreign corporations only "when their affiliations with

the state are so 'continuous and systematic' as to render them essentially at home in the forum

state."  *Goodyear Dunlop*, 564 U.S. at 919.  "[E]xcept in a truly 'exceptional' case, a corporate

defendant may be treated as 'essentially at home' only where it is incorporated or maintains its

principal place of business—the 'paradigm' cases."  *Brown v. Lockheed Martin Corp.*, 814 F.3d

619, 627 (2d Cir. 2016).

Plaintiffs here do not claim to have pled facts establishing, under the above standards,

general personal jurisdiction over HSBC Hong Kong.  And the facts pled clearly fall well short

of establishing this.  Nothing in the FAC suggests that HSBC Hong Kong is or was "at home" in

New York.  On the contrary, as pled, HSBC Hong Kong is not incorporated in New York and

does not maintain its principal place of business there.

Accordingly, the Court holds that it cannot properly exercise general personal jurisdiction

over HSBC Hong Kong.

### 2.        Specific Jurisdiction

To meet the requirements for specific jurisdiction, a defendant must satisfy the

requirements of both New York's long-arm statute and of constitutional due process.  *See State

Farm Fire & Cas. Co. v. Swizz Style, Inc.*, 246 F. Supp. 3d 880, 887 (S.D.N.Y. 2017).

New York's long-arm statute identifies four categories of conduct that can justify

exercise of personal jurisdiction over a defendant.  *See* N.Y. C.P.L.R. § 302(a).  Three are clearly

inapplicable:  These concern (1) tortious acts in New York, (2) tortious acts outside New York

that are felt in New York, and (3) the ownership of property in New York.[2]  Both sides instead

focus their arguments on the fourth category, as relevant here, under which a defendant that

"transacts any business within the state or contracts anywhere to supply goods or services in the

state" is subject to the jurisdiction of New York courts.  *Id.* § 302(a)(1).

"To establish personal jurisdiction under § 302(a)(1), two requirements must be met:

(1) [t]he defendant must have transacted business within the state; and (2) the claim asserted

must arise from that business activity."  *Barrett v. Tema Development (1988), Inc.*, 251 F. App'x

698, 700 (2d Cir. 2007) (internal citation omitted).  Thus, "jurisdiction is proper even though the

defendant never enters New York, so long as the defendant's activities here were purposeful and

there is a substantial relationship between the transaction and the claim asserted."  *Fischbarg v.

Doucet*, 9 N.Y.3d 375, 380 (2007) (quotation marks and citations omitted); *see also Grand River*

---

[2] The plaintiffs have not alleged that HSBC Hong Kong committed tortious acts against it or
anyone else or that it owns property in the state.

*Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005) ("[W]here there is a showing

that business was transacted, there must be a 'substantial nexus' between the business and the

cause of action." (quoting *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 59–60 (2d Cir.

1985))).  It is possible for a single transaction to satisfy the requirements for specific personal

jurisdiction under § 302(a)(1), so long as it is purposeful.  *See Franklin v. X Gear 101, LLC*, No.

17 Civ. 6452 (GBD) (GWG), 2018 WL 3528731, at *6 (S.D.N.Y. July 23, 2018).  "Purposeful

activities are those with which a defendant, through volitional acts, avails itself of the privilege

of conducting activities within the forum State, thus invoking the benefits and protections of its

laws." *Fischbarg*, 9 N.Y.3d at 380.

Plaintiffs' primary basis for asserting specific personal jurisdiction under New York's

Long-Arm Statute here involves HSBC Hong Kong's use of a correspondent bank account in

New York.  The First Circuit has helpfully explained the operation of such accounts:

> Interbank accounts, also known as correspondent accounts, are used by foreign
> banks to offer services to their customers in jurisdictions where the banks have no
> physical presence, and otherwise to facilitate transactions involving such
> jurisdictions.  *See generally* Minority Staff of S. Permanent Subcomm. on
> Investigations, 107th Cong., Report on Correspondent Banking: A Gateway for
> Money Laundering 11–14 (Comm. Print 2001).  Given the international importance
> of U.S. currency and the U.S. market, many foreign banks have such interbank
> accounts in the United States. *Id.* at 11–12.  There are banks that conduct virtually
> all transactions external to the bank through their U.S. interbank accounts. *Id.* at
> 13.

*United States v. Union Bank for Savings & Investment (Jordan)*, 487 F.3d 8, 15 (1st Cir. 2007).

Plaintiffs allege that, to facilitate the international wire transfers requested by WCM777, HSBC

Hong Kong made use of a correspondent account at HSBC USA.  FAC ¶¶ 34, 44.  They argue

that HSBC Hong Kong's "'intentional and repeated use of New York correspondent bank

accounts to launder their customers' illegally obtained funds constitutes purposeful transaction of

business substantially related to plaintiffs' claims,' so as to confer personal jurisdiction within

the meaning of § 302(a)(1)." Pl. 12(b)(2) Mem. at 5 (quoting, and relying primarily on *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 328 (2016)).

HSBC Hong Kong counters that its use of correspondent account with HSBC USA in New York was merely passive and does not rise to the level of purposeful conduct required under § 302(a)(1), Def. 12(b)(2) Mem. at 15–16 (citing *Hau Yin To v. HSBC Holdings PLC*, No. 15 Civ. 3590 (LTS) (SN), 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017)).

Whether the use of a correspondent account satisfies the requirements of § 302(a)(1) is a fact-intensive inquiry. As the New York Court of Appeals has held, the existence of "a correspondent banking relationship standing by itself is insufficient to establish long-arm jurisdiction" over the foreign bank. *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 337 (2012) ("*Licci II*") (quotation marks omitted). However, "'the first prong of the long-arm jurisdiction test under [CPLR 302(a)(1)] . . . may be satisfied by the defendant's use of a correspondent bank account in New York, even if no other contacts between the defendant and New York can be established, *if* the defendant's use of that account was purposeful.'" *Id.* (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012) ("*Licci I*")) (alterations in original).

The Court's assessment is that the facts of this case, as pled, appear to fall between the facts of cases finding maintenance of a correspondent banking relationship sufficient to supply personal jurisdiction under § 302(a)(1) and those finding maintenance of such a relationship insufficient. The Court's further judgment is that jurisdictional discovery will prove helpful in developing the facts, so as to enable the Court to situate this case more reliably among the relevant precedents applying § 302(a)(1) to foreign banks alleged to have utilized in-district correspondent banks in the service of unlawful conduct.

17

A brief review of three pertinent precedents of the New York Court of Appeals is informative.

In *Amigo Foods Corp. v. Marine Midland Bank–New York*, 39 N.Y.2d 391 (1979) ("*Amigo Foods III*"), the Court of Appeals affirmed a ruling that the maintenance by a Maine bank of a correspondent account in New York did not satisfy § 302(a)(1).  Plaintiff Amigo Foods Corporation ("Amigo") had contracted to buy potatoes from a Maine potato grower, defendant E.H. Parent, Inc. ("Parent").  Payment was to be made through Aroostook Trust Company ("Aroostook"), a Maine bank.  Aroostook maintained a small correspondent account with Irving Trust Company ("Irving"), a New York bank.  To make payment, Amigo obtained a letter of credit from defendant Marine Midland Bank ("Marine").  Marine delivered the letter to Irving and Parent refused to accept payment.  Amigo sued for breach of contract, but also sued Aroostook on the theory that it, and the series of banks, had wrongfully failed to deliver payment.

Aroostook moved to dismiss for lack of personal jurisdiction.  It argued that "[b]eyond the notification to its depositor of the arrival of the Letter of Credit and the notification to [Irving], who had forwarded the Letter of Credit[,] that [Parent was] rejecting the Letters of Credit, [Aroostook] took no action, and had none to take."  *Amigo Foods Corp. v. Marine Midland Bank–N.Y.*, 39 N.Y.2d 391, 394 (1976) ("*Amigo Foods I*").  The Court of Appeals initially remanded for jurisdictional discovery to determine "whether Aroostook purposely availed itself of the privilege of conducting activities in New York thereby invoking the benefits and protections of its laws and, particularly, the precise nature of its relationship with [Irving] vis-à-vis the handling of letters of credit."  *Id.* at 396.  After discovery, it became clear that after Parent had made a demand for payment, Amigo had directed Marine to wire funds to Parent for

its account, but it was *Marine* that unilaterally chose to deposit the funds with Irving in New York, in the interests of speed. *Amigo Foods II*, 402 N.Y.S.2d at 408. It was therefore for Marine's convenience, not Aroostook's, that the transfer had been made through Aroostook's New York correspondent account rather than to Aroostook directly. *Id.* On this basis, the lower court found that Aroostook had not purposely availed itself of the privilege of conducting activities in New York, and so did not meet § 302(a)(1)'s requirements, in that the bank had been "passively and unilaterally . . . made the recipient of funds which at its customer's direction it ha[d] declined." *Amigo Foods Corp. v. Marine Midland Bank–N.Y.*, 402 N.Y.S.2d 406, 408 (1st Dep't 1978) ("*Amigo Foods II*"). The Court of Appeals affirmed. *Amigo Foods Corp. v. Marine Midland Bank–New York*, 46 N.Y.2d 226 (1979).

The Court of Appeals reached a different outcome as to the application of § 302(a)(1) in *Licci II*. There, a group of plaintiffs whose family members had been killed or injured as the result of rocket attacks allegedly launched by Hizballah in 2006 sued the Lebanese Canadian Bank, SAL ("LCB"), a bank headquartered in Beirut. *Id.* at 330. LCB maintained a correspondent bank account with American Express Bank ("AmEx") in New York. *Id.* at 332. The U.S. Department of State had designated Hizballah as an Islamic terrorist organization, and the Department of Treasury had designated LCB as a "primary money laundering concern." *Id.* at 330 & n.1. The *Licci* plaintiffs claimed that LCB had used the correspondent account with AmEx in New York to transfer several million dollars by means of "dozens" of international wire transfers to the Shahid Foundation ("Shahid"), an organization that they alleged was the "financial arm" of Hizballah. *Id.* at 331–32.

The district court did not find § 302(a)(1) satisfied. It reasoned that the "'active execution through New York of dozens of wire transfers totaling millions of dollars over a multi-

year period' does not convert 'mere maintenance' into 'a "use" of a correspondent account . . .

sufficient to confer jurisdiction over a foreign bank' since 'no meaningful distinction may be

drawn between a foreign bank's maintenance of a correspondent account to effect international

wire transfers and its indiscriminate use of that account for that exact purpose.'" *Id.* at 333

(quoting *Licci v. Am. Exp. Bank Ltd.*, 704 F. Supp. 2d 403, 407 (S.D.N.Y. 2010)).[3]

On appeal, the Second Circuit, in *Licci I*, certified to the New York Court of Appeals the

question whether "a foreign bank's maintenance of a correspondent bank account at a financial

institution in New York, and use of that account to effect 'dozens' of wire transfers on behalf of

a foreign client, constitute a 'transact[ion]' of business in New York within the meaning of N.Y.

C.P.L.R. § 302(a)(1)?" 673 F.3d at 74.  In *Licci II*, the Court of Appeals held that such activities

did so qualify.  It noted that "[i]n the banking context, the requisite inquiry under CPLR

302(a)(1)'s first prong may be complicated by the nature of interbank activity, especially given

the widespread use of correspondent accounts nominally in New York to facilitate the flow of

money worldwide, often for transactions that otherwise have no other connection to New York,

or indeed the United States." *Licci II*, 20 N.Y.3d at 338.  However, the Court of Appeals held,

"complaints alleging a foreign bank's repeated use of a correspondent account in New York on

behalf of a client—in effect, a 'course of dealing'—show purposeful availment of New York's

dependable and transparent banking system, the dollar as a stable and fungible currency, and the

predictable jurisdictional and commercial law of New York and the United States." *Id.* at 339

(quoting *Indosuez Int'l Fin. v. Nat'l Reserve Bank*, 98 N.Y.2d 238, 247 (2002)).  The Court of

Appeals noted that "[w]hile it may be that LCB could have routed the dollar transactions on

---

[3] In so ruling, the district court denied plaintiffs' request for jurisdictional discovery.  That ruling was not appealed. *Licci II*, 960 N.Y.S.2d at 334 n.8.

behalf of Shahid elsewhere, the fact that LCB used a New York account 'dozens' of times indicates desirability and a lack of coincidence.  Presumably, using the AmEx account was cheaper and easier for LCB than other options, and whatever financial and other benefits LCB enjoyed as a result allowed the bank to retain Shahid as a customer." *Id.* at 340.  The Second Circuit thereafter found that subjecting LCB to personal jurisdiction in New York comported with constitutional due process. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 165 (2d Cir. 2013) ("*Licci III*").

In the third and most recent decision, *Rushaid*, the Court of Appeals again addressed whether use of a correspondent account by a foreign bank was sufficient to satisfy the first prong of § 302(a)(1).  Defendants in that case were Pictet & Cie ("Pictet"), a Swiss bank, and its Vice President, Pierre-Alain Chambaz. *Id.* at 319.  Plaintiff Rushaid, co-owner of a Saudi company, Al Rushaid Petroleum Investment Corporation, sued Pictet and Chambaz in New York state court for laundering money in conjunction with three of his employees, as part of an illicit scheme. *Id.* at 319–20.  Chambaz had been friends with these employees and had set up a "bogus" company to receive bribes on their behalf, called TSJ Engineering Consulting Co. Ltd. ("TSJ"). *Id.* at 320.  Chambaz opened and managed Geneva bank accounts for TSJ and the individual employees. *Id.*  Vendors would wire bribes in favor of "Pictet and Co. Bankers Geneva"; the money would go first to the correspondent account that Pictet maintained in New York; Pictet would then credit these funds to TSJ's Geneva-based account; and the funds would then be divided up and transferred to the employees' individual accounts. *Id.*

Pictet and Chambaz moved to dismiss for lack of personal jurisdiction. *Id.* at 321.  In opposition, plaintiffs "submitted copies of documents tracing wire transfers from the vendors to Pictet's five New York correspondent accounts." *Id.*  As described by the Court of Appeals:

> The documents provide a record of invoices directing payment to Pictet's Citibank account in New York [and] similar documents evidencing receipts from and transfers to various other Pictet accounts in New York including HSBC Bank USA, N.A., Deutsche Bank Trust Company, America, and JPMorgan Chase Bank N.A. In sum, the documents represented numerous transfers, including at least 12 of which were to/from Citibank, New York and totaled over $4 million.

*Id.* at 321–22.

The lower court and intermediate appellate courts found personal jurisdiction lacking. The Court of Appeals, however, found that Pictet's contact with New York through its correspondent account had been purposeful under the first prong of § 302(a)(1). The Court of Appeals distilled the holdings of *Amigo Foods* and *Licci* as follows:

> [U]nintended and unapproved use of a correspondent bank account, where the non-domiciliary bank is a passive and unilateral recipient of funds later rejected—as in *Amigo Foods*—does not constitute purposeful availment for personal jurisdiction under CPLR 302(a)(1). Repeated, deliberate use that is approved by the foreign bank on behalf of and for the benefit of a customer—as in *Licci*—demonstrates volitional activity constituting transaction of business. In other words, the quantity and quality of a foreign bank's contacts with the correspondent bank must demonstrate more than banking by happenstance.

*Rushaid*, 28 N.Y.3d at 326–27. In *Rushaid*, the Court of Appeals held, "Pictet did not ignore or reject the funds, as the defendant did in *Amigo Foods* [but instead] credited the funds in that correspondent bank account to TSJ, an essential step in the money-laundering scheme." *Id.* at 327.

The Court of Appeals parsed carefully—and put heavy weight on—the volitional aspect of bank Pictet's role in the scheme:

> Citibank and the other banks held funds for Pictet, then Pictet credited them to the TSJ account, and next distributed the funds to the employee accounts. It is of no moment that the employees "directed the vendors" to deposit the money in the New York accounts because what matters is defendants' banking activity with the correspondent accounts, here, that the money deposited in New York was credited to the Pictet accounts in accordance with Pictet's money-laundering. As described in the complaint, the employees accessed the funds in those accounts after Pictet credited the transfer from its New York correspondent account.

> The Appellate [D]ivision erroneously concluded that plaintiffs failed to establish purposeful availment because defendants "merely carried out their clients' instructions." 9 N.Y.S.3d 16. Our cases do not require that the foreign bank itself direct the deposits, only that the bank affirmatively act on them. . . . A foreign bank with a correspondent account, therefore, that repeatedly approves deposits and the movement of funds through that account for the benefit of its customer is no less "transacting business in New York" because the customer, or a third party at the customer's direction, actually deposits or transfers the funds to New York.

*Rushaid*, 28 N.Y.3d at 327–28.

Plaintiffs here argue that "[t]he role of HSBC Hong Kong is indistinguishable from the defendant bank in *Rushaid*." Pl. 12(b)(2) Mem. at 6. They allege that HSBC Hong Kong knew that WCM777 was centered in the United States. They note that HSBC Hong Kong allowed WCM777 to open an HSBC Hong Kong account without conducting a site visit. They allege that WCM777 directed potential investors to wire money directly to HSBC Hong Kong and that HSBC Hong Kong—for its own convenience as well as that of its customer, WCM777—chose to involve its New York correspondent accounts rather than sending WCM777's funds through other channels.

HSBC Hong Kong, in contrast, depicts its activity as entirely passive. HSBC Hong Kong does not appear to dispute, factually, that plaintiffs' money was wired through its correspondent account in New York. But, it argues, its use of its correspondent account, as in *Amigo Foods*, was insufficiently purposeful to meet the requirements of § 302(a)(1).[4] It argues that *plaintiffs* chose to use United States dollars and to wire these funds to Hong Kong, and that it was those

---

[4] HSBC Hong Kong relies on *Hau Yin To*, 2017 WL 816136. That case, however, is readily distinguished, in that it did not involve a correspondent account. The court there held that bank transactions in New York in connection with the obligations of the administrator and custodian of a Bernard Madoff "feeder fund" did not supply a basis for personal jurisdiction over a foreign bank.

choices that led to the use of HSBC Hong Kong's correspondent bank account.  Def. 12(b)(2)
Mem. at 15.

The Court concludes that jurisdictional discovery is required to enable the Court reliably
to determine whether there is personal jurisdiction under the first prong of § 302(a)(1), insofar as
the requirement there that the defendant have transacted business within the state has been held
to require purposeful availment by the defendant.[5]  "A court may order limited discovery
'targeted at the missing jurisdictional elements[]' if plaintiff has shown that such an exercise
'would serve to *fill any holes* in its showing.'"  *Smit v. Isiklar Holding A.S.*, 354 F. Supp. 2d 260,
263 (S.D.N.Y. 2005); *see id.* at 268 (authorizing jurisdictional discovery to develop facts relating
to one defendant); *In re Sledziejowski*, No. 15–08207 (SHL), 2016 WL 6155929, at *10 (Bankr.
S.D.N.Y. Oct. 21, 2016) (authorizing jurisdictional discovery "regarding the contacts relevant to
specific [personal] jurisdiction"); *see also In re Terrorist Attacks*, 349 F. Supp. 2d at 820
(authorizing limited jurisdictional discovery to determine whether personal jurisdiction over
foreign bank constitutionally sufficient); *Daventree Ltd.*, 349 F. Supp. 2d at 765 (authorizing
jurisdictional discovery "regarding the extent of defendant [bank's] general business contacts
with the United States [during the relevant period]").  Among other unknowns, plaintiffs do not
allege which banks they used to wire money to Hong Kong or where or by whom the decision
was taken to wire this money through HSBC Hong Kong's New York correspondent account.  If,
for example, plaintiffs' local banks made the decision to use that correspondent account for their

---

[5] Some arguments by HSBC Hong Kong appear predominantly relevant to the second prong of
§ 302(a)(1), which requires that the claim asserted arise from the defendant's in-state business
activities.  For example, HSBC Hong Kong distinguishes *Rushaid* on the ground that the
collusion and friendship between the defendants in *Rushaid* and the orchestrators of the scheme
in that case has no analog here.  Def. 12(b)(2) Reply at 3–5.  Having not resolved whether there
has been a transaction of business in New York sufficient to satisfy the first, threshold, prong of
§ 302(a)(1), however, the Court has not here considered the second prong.

own convenience, then the facts here would appear more analogous to those of *Amigo Foods*, in which the defendant bank had not made the choice to use the local account. *Licci* and *Rushaid*, however, also point to other factors with the capacity to bear on the § 302(a)(1) question of purposeful availment. These include: (1) whether the use of the correspondent account is cheaper or easier for the foreign bank than other alternatives; (2) how often the correspondent account was used on behalf of the specific customer at issue; (3) the amount of money transferred through the account on behalf of that customer; and (4) the extent to which the customer specifically requested the use of the correspondent account. The declarations submitted by HSBC Hong Kong attest that the use of a correspondent account is not necessary to transfer funds from the United States to HSBC Hong Kong, *see* Yiu Decl. ¶¶ 14–16, and that originator banks have the power to dictate whether or not to use a correspondent account, *see* Rajah Decl. ¶¶ 4–5. They do not, however, engage with the conduct *in this case*. They leave opaque how the wire transfers *in this case* came to occur through the New York correspondent account, and what the volume was of those transfers.

The Court accordingly directs that the parties promptly undertake jurisdictional discovery aimed at the issue of purposeful availment. The Court expects that such discovery can be completed within two months of this decision and that counsel will then expeditiously brief anew the issue of personal jurisdiction. In light of the potential impact of this discovery on ensuing questions in the personal jurisdiction inquiry (e.g., whether the second prong of § 302(a)(1) is met and whether constitutional due process is satisfied), the Court invites counsel, on rebriefing, to address those questions as well.

### C.      Failure to State a Claim

Because the Court has not yet determined that it has personal jurisdiction over HSBC Hong Kong, the Court considers only HSBC USA's motion to dismiss under Rule 12(b)(6).[6]

HSBC USA moves to dismiss all claims in the FAC against it.  It argues the FAC fails to state claims under RICO or state law; that its state law claims are displaced by the Uniform Commercial Code ("UCC"); and that all claims against it are time-barred.  For the reasons that follow, the Court holds that the FAC fails to state either a RICO claim or a claim under state law. The Court therefore does not address HSBC USA's arguments based on timeliness or the UCC.

### 1.      RICO Claim

Count One of the FAC brings a RICO claim under 18 U.S.C. § 1962(c).  *See* FAC ¶¶ 64–75. Section 1962(c) provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or the collection of unlawful debt.

18 U.S.C. § 1962(c).  HSBC USA argues that the FAC does not adequately allege a RICO enterprise, that its actions do not rise to the level of "participation" in the conduct of the affairs of the enterprise, and that the FAC does not meet the heightened pleading requirements of Rule 9(b).  HSBC USA Mem. at 5–8.  The Court holds, as to HSBC USA, that the FAC does not adequately allege the "participation" element necessary for liability under § 1962(c) and therefore addresses only this element.

---

[6] In the event that personal jurisdiction is found over HSBC Hong Kong, the Court will then take up HSBC Hong Kong's motion to dismiss under Rule 12(b)(6).  That motion is not necessarily controlled by the outcome of HSBC USA's motion, insofar as HSBC USA's motion turns on facts particular to the pleadings as to it.

The Supreme Court has held that "'to conduct or participate, directly or indirectly, in the conduct of [a RICO] enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). Here, in defining the alleged enterprise, the FAC broadly labels the HSBC defendants and WCM777 as, collectively, an "enterprise" under RICO, which existed for the purpose of committing the illegal racketeering acts alleged. FAC ¶ 67. Specifically, it alleges that HSBC USA participated in the enterprise by "act[ing] as the intermediary bank for thousands of wired money transfers from investors who were duped." *Id.* ¶ 71.

For purposes of this decision only, the Court accepts *arguendo* the FAC's enterprise definition as viable. Courts in this District, however, have repeatedly held that "provid[ing] banking services—even with knowledge of the fraud—is not enough to state a claim under § 1962(c)." *Indus. Bank of Latvia v. Baltic Fin. Corp.*, No. 93 Civ. 9032 (LLS), 1994 WL 286162, at *3 (S.D.N.Y. June 27, 1994); *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 431 (S.D.N.Y. 2007) ("*Rosner I*") ("[Plaintiff's] sole allegation . . . that [defendant] provided banking services that aided in the perpetration of the fraudulent scheme . . . does not qualify as participation in a RICO enterprise."); *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003) ("[Plaintiff's] allegations of the opening of accounts for [defendant] by [bank employees], transferring funds for [defendants] do not constitute exerting control over the enterprise."); *Zhu v. First Atl. Bank*, No. 05 Civ. 96 (NRB), 2005 WL 2757536, at *5 (S.D.N.Y. Oct. 25, 2005) ("[Defendant banks] do not remotely satisfy [§ 1962(c)'s] strict test, as each bank merely transferred funds that the plaintiff requested they transfer. The fact that the money eventually benefitted an alleged extortionist has no bearing whatsoever on the banks' limited roles as intermediaries in the transaction.").

Plaintiffs attempt to distinguish these cases on the ground that the FAC alleges that

HSBC USA had actual knowledge of the fraud. Pl. 12(b)(6) Mem. at 5–6. But even treating that

allegation as well-pled, that fact would not demonstrate participation in the enterprise. Rather, as

the above cases demonstrate, more is required to show the bank's "operation and management"

of the enterprise.

In *Industrial Bank of Latvia*, for example, the court clearly stated that "knowledge of the

fraud" would not elevate the provision of banking services to the level of participation required

to state a claim for racketeering under § 1962(c). 1994 WL 286162 at *3. Similarly, as the court

in *Dubai Islamic Bank* summarized governing precedent:

> —"Providing important services to a racketeering enterprise is not the same as
> directing the affairs of an enterprise. . . . [E]ven provision of services essential to
> the operation of the RICO enterprise itself is not the same as participating in the
> conduct of the affairs of the enterprise." *Dep't of Econ. Dev. V. Arthur Andersen
> & Co.*, 924 F. Supp. 449, 466–67 (S.D.N.Y. 1996) (citation omitted).

> —"Simply because one provides goods or services that ultimately benefit the
> enterprise does not mean that one becomes liable under RICO as a result." *LaSalle
> Nat'l Bank* [*v. Duff & Phelps Credit Rating Co.*], 951 F. Supp. [1071,] 1090
> [(S.D.N.Y. 1996)] (citation omitted).

> —"A defendant does not 'direct' an enterprise's affairs under § 1962(c) merely by
> engaging in wrongful conduct that assists the enterprise." *Redtail Leasing, Inc. v.
> Belleza*, [No.] 95 Civ. 5191 [(JFK)], 1997 WL 603496, at *5 (S.D.N.Y. Sept. 30,
> 1997).

256 F. Supp. 2d at 164.

Here, the FAC is devoid of allegations supporting the claim that HSBC USA conducted

or directed the affairs of the enterprise. Tellingly, it does not contain any allegations that HSBC

USA ever interfaced with representatives of WCM777. It is said to have interacted only with

origin banks and with its affiliate, HSBC Hong Kong. That HSBC USA, as alleged, continued to

facilitate wire transfers after it, allegedly, acquired suspicion about WCM777—even if these

were sufficient to concretely allege knowledge of WCM777's wrongdoing—is not tantamount to

engagement by HSBC USA in WCM777's "operation and management." *Cf. Dubai Islamic Bank*, 256 F. Supp. 2d at 164–68 (dismissing § 1962(c) claim against Citibank while finding that Citibank had actual knowledge of a fraudulent scheme because Citibank was not "a central figure" but "[a]t most, . . . a handful of relatively low-level employees . . . were responsible for the alleged scheme").

The Court therefore holds that the FAC does not plead sufficient facts to allege the RICO element of "participation," and grants HSBC USA's motion to dismiss the FAC's RICO claim.

### 2.      Common Law Claims

Plaintiffs' remaining claims against HSBC USA are for various forms of aiding and abetting: of breach of fiduciary duty, fraud, and conversion. FAC ¶¶ 64–100. The parties treat New York law as governing these claims, HSBC USA Mem. at 8 n.2 (citing FAC ¶ 63); Pl. 12(b)(6) Mem. at 9 (citing New York law), and this Court will follow suit. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (noting implied consent of parties to New York law sufficient to establish choice of law). HSBC USA argues that, as to each such claim, the FAC does not sufficiently plead HSBC's actual knowledge, substantial assistance, or fraudulent intent. *See* HSBC USA Mem. at 8–15. Plaintiffs counter that HSBC USA's alleged investigation of WCM777 and continued facilitation of wire transfers supplied the requisite knowledge, intent, and assistance. *See* Pl. 12(b)(6) Mem. at 8–9.

To state a claim for aiding and abetting under New York law, plaintiffs must allege (1) the existence of a primary violation, (2) knowledge of this violation on the part of the aider and abettor, and (3) substantial assistance by the aider and abettor in the achievement of the primary violation. *See Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169 (1st Dep't 2003) (citing *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 847–48 (2d Cir. 1987)) (aiding and abetting breach of fiduciary duty); *Fidelity Funding of Calif., Inc. v. Reinhold*, 79 F. Supp. 2d 110, 122 (E.D.N.Y. 1997)

(citing *Franco v. English*, 620 N.Y.S.2d 156, 159 (3d Dep't 1994)) (aiding and abetting fraud);

*Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 493 (S.D.N.Y. 2003) (aiding and abetting

conversion).

The "heightened pleading requirement of Rule 9(b) applies equally to claims alleging

aiding and abetting fraud, claims alleging aiding and abetting breach of fiduciary duty sounding

in fraud, and claims alleging aiding and abetting conversion premised on fraud." *Berman v.*

*Morgan Keegan & Co.*, No. 10 Civ. 5866 (PKC), 2011 WL 1002683, at *7 (S.D.N.Y. Mar. 14,

2011) (citing *Wight v. BankAmerica Corp.*, 219 F.3d 79, 91–92 (2d Cir. 2000)), *aff'd*, 455 F.

App'x 92 (2d Cir. 2012). Here, because all aiding and abetting claims relate to the underlying

fraud alleged against WCM777, each is subject to Rule 9(b)'s heightened pleading requirements.

### a.   Actual Knowledge

Under Rule 9(b), an allegation of aiding and abetting fraud has a distinct scienter

requirement from an allegation of fraud itself. *Iowa Pub. Emp. Retirement Sys. v. Deloitte &*

*Touche LLP*, 919 F. Supp. 2d 321, 344–45 (S.D.N.Y. 2013). Specifically, plaintiffs "must allege

that the defendant had *actual knowledge* of the wrongful conduct committed, not simply that the

defendant *should have known* of the conduct." *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp.

2d 372, 442–43 (S.D.N.Y. 2010) (citing *Rosner v. Bank of China*, 349 F. App'x 637, 639 (2d

Cir. 2009) ("*Rosner III*") (emphasis added). Important here, "[s]tatements alleging that . . . a

defendant 'should have known that something was amiss with [] transactions,' even if pled with

conclusory statements that the defendant 'actually knew something notwithstanding . . . [are]

insufficient to support an aiding-and-abetting claim under New York law.'" *In re Agape*, 773 F.

Supp. 2d 298, 308 (E.D.N.Y. 2011) (quoting *Rosner III*, 349 F. App'x at 639). "[P]leading

knowledge for purposes of an aiding and abetting claim [therefore] requires allegations of facts

that give rise to a 'strong inference' of actual knowledge." *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007).

Courts have generally held that allegations of conscious avoidance, where adequately pled, can satisfy the actual knowledge requirement in the context of an aiding and abetting claim. *See, e.g., Agape*, 773 F. Supp. 2d at 309 (collecting cases). Conscious avoidance, however, is distinct from constructive knowledge:

> Constructive knowledge is knowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person. Conscious avoidance, on the other hand, occurs when it can almost be said that the defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be ably to deny knowledge. Conscious avoidance therefore involves a culpable state of mind whereas constructive knowledge imputes a state of mind on a theory of negligence.

*Fraternity Fund Ltd.*, 479 F. Supp. 2d at 368 (quotation marks and footnotes omitted). "Plausibly alleging actual knowledge through conscious avoidance is a very high bar . . . ." *Agape*, 773 F. Supp. 2d at 319.

Here, the FAC alleges that HSBC USA was on notice of that there was a risk of money laundering associated with its correspondent account, based on its DPA with the Justice Department. FAC ¶¶ 31–32. It further alleges that, in July 2013, the same month that HSBC Hong Kong's correspondent bank account at HSBC USA began to be used to facilitate WCM777 wire transfers, HSBC USA flagged a wire transfer headed to one of the WCM777 HSBC Hong Kong accounts, began a manual review, and requested additional information about WCM777 from HSBC Hong Kong. *Id.* ¶¶ 34, 36–37. As alleged, HSBC Hong Kong reported back that WCM777 Ltd. had been incorporated on July 2, 2013, that it opened its account on July 10, 2013, and that because it was a small business with a main office in the United States, HSBC Hong Kong had not conducted a site visit. *Id.* ¶ 38.

These allegations, viewed in isolation, fall far short of pleading actual knowledge by HSBC USA of a fraud by WCM777. They fall short of pleading conscious avoidance, *i.e.*, awareness of a probability of fraud and a decision to refrain from confirming that fact. "New York courts overwhelmingly recognize that a plaintiff does not satisfy Rule 9(b) by alleging a bank's actual knowledge of a fraud based on allegations of the bank's suspicions or ignorance of obvious 'red flags' or warning signs indicating the fraud's existence." *Rosner v. Bank of China*, 2008 WL 5416380, at *6 (S.D.N.Y. Dec. 18, 2008) ("*Rosner II*"), *aff'd* 349 F. App'x 637 (2d Cir. 2008) (*Rosner III*); *see id.* (collecting cases). Rather, as courts have widely recognized, suspicious patterns of bank transfers, withdrawals, and balances indicative of fraud, while sometimes rising to the level of constructive knowledge, do *not* make out conscious disregard. *See Agape*, 773 F. Supp. 2d at 310 (collecting cases).

The FAC, however, contains an additional allegation—not as to circumstantial evidence of a fraud but one tending to put HSBC USA on actual notice of the fraud. It alleges that HSBC USA, as part of its manual review, found an evaluation of WCM777 from June 30, 2013, on a multi-level marketing review website that concluded WCM777 was a Ponzi scheme. FAC ¶ 39 & Ex. A. The FAC also quote HSBC USA on or about September 30, 2013, as concluding that

> "BENE – WCM777 LIMITED though identified by its website and no adverse information on RDC, internet research however shows that the BENE is alleged as a pyramid/Ponzi scheme (sample google results attached) . . . Review of the products posted on BENE website reasonably appeared that they are engaged in pyramid/ponzi scheme as they offer no concrete underlying products/services while offering guaranteed 'daily' profit/returns by buying multi-level shares[.]"

*Id.* ¶ 40. The FAC alleges that, despite allegedly receiving this information and drawing this conclusion about the nature of WCM777's operation, HSBC USA, by dint of the correspondent bank account it held for HSBC Hong Kong, thereafter served as "the crucial link in substantially assisting from June 2013 through February 2014 the transfer of over 3,000 transactions and over

$45,000,000" from the United States to WCM777's HSBC Hong Kong accounts, continuing five months after their alleged report. *Id.* ¶ 44. And, the FAC alleges, between November 2013 to March 2014, the oversight agencies of several states issued public orders against WCM777 on the basis of unlawful securities. *Id.* ¶¶ 21–25.

These additional allegations make plaintiffs' claim of actual knowledge on HSBC USA's part stronger than in reported cases where the basis for a bank's alleged knowledge of a third party's fraud was solely circumstantial. To be sure, several courts have held that banks do not have actual knowledge of a customer's fraud even where they have been specifically informed by a third party of its conclusion that fraudulent conduct was afoot. In *Agape*, for example, the court found that a bank did not have actual knowledge, or conscious avoidance tantamount to actual knowledge, of a fraudulent scheme even though an investor had furnished evidence of the fraud to the bank's vice president, and the bank had separately been made aware of the customer's report as made to the Office of the Controller of the Currency. 773 F. Supp. 2d at 320–21. In finding that the conscious avoidance standard had not been met, the *Agape* court noted that the bank representatives did not investigate these allegations because of a broader bank policy not to do so, not "specifically to avoid learning of the . . . fraud." *Id.* at 321. Similarly, in *Kolbeck v. LIT America, Inc.*, the court held that a bank did not have knowledge of the fraud even though non-clients had claimed a fraud and demanded that the bank liquidate the fraudsters' accounts. 939 F. Supp. 240, 247–48 (S.D.N.Y. 1996). The court reasoned that a bank "cannot be charged with knowledge of [the fraudster's] misconduct simply because they had knowledge of accusations against him, without more." *Id.* at 248. Finally, in *Ryan v. Hunton & Williams*, the court found that a bank's suspicions of fraud that resulted in both an investigation and termination of the accounts amounted only to "suspicions—not actual

33

knowledge—of fraudulent activity." No. 99 Civ. 5938 (JG), 2000 WL 1375265, at *9 (E.D.N.Y.

Sept. 20, 2000).

This case, however, is different. The allegations here go farther than in the above cases,

in that, as alleged, HSBC USA followed up its suspicion of fraud by doing independent internet

research. And, importantly, this investigation led HSBC USA, as alleged, to the conclusion that

WCM777's business model, as advertised, was a "pyramid/ponzi scheme" devoid of any

"underlying products/services." These allegations about the conclusions drawn by the defendant

bank itself distinguish this case from *Agape* and *Kolbeck*, where the suspicion was founded on

outsiders' claims of illegality, and *Ryan*, where the bank's suspicion derived from abnormalities

in the accounts and transactions themselves. Plaintiffs here have concretely alleged not merely

that outsiders on the internet had labelled WCM777 a Ponzi scheme, but that, on its review of

WCM777's own products, it "reasonably appeared" to HSBC USA that WCM777 was in fact a

Ponzi scheme.

The Court is satisfied, on these allegations, that the Amended Complaint adequately

alleges the element of actual knowledge on HSBC USA's part. The decision in *Fraternity Fund

Ltd.*, *supra*, lends a degree of support to this conclusion. The court there concluded that a bank's

willful ignorance of the most likely explanation for conduct was enough for it to have actual

knowledge of the underlying fraud. There, the defendant bank had rubber-stamped a list of

values sent to it by an asset management company and had honored a suspicious request by the

company itself not to conduct its own independent valuation. 479 F. Supp. 2d at 370. The court

reasoned that the asset management company "would not have made such a request [of the bank]

if it thought that [the bank's] independent valuation would produce corroborative marks. In

other words, the *most likely explanation* for [the company's] request is that it thought its prices

34

were beyond the range of what could be corroborated and therefore not reflective of the [true] market values . . . ." *Id.* (emphasis added). Here, as alleged, HSBC USA drew the affirmative conclusion, from its research, that it was most likely that WCM777 was a Ponzi scheme. As alleged, HSBC USA had not, apparently unearthed evidence pointing to the contrary conclusion; rather, the bank concluded that WCM777 did not offer any legitimate products. Nonetheless, HSBC USA chose not to investigate further. The FAC plausibly pleads that HSBC USA's decision, after the bank allegedly concluded that WCM777 was an apparent Ponzi scheme, neither to stop transferring WCM777's funds nor to further test this conclusion, reflected conscious avoidance of a high probability plus a conscious decision not to take steps that stood to confirm this conclusion. The Court therefore finds the pled facts sufficient to allege that HSBC USA had, under the conscious avoidance doctrine, actual knowledge of WCM777's fraudulent Ponzi scheme.

### b.   *Substantial Assistance*

The FAC, however, fails—by a good margin—to allege that HSBC USA substantially assisted WCM777's fraudulent activity. "'[S]ubstantial assistance' generally exists where: (1) a defendant 'affirmatively assists, helps conceal, or by virtue of failing to act *when required to do so* enables the fraud to proceed'; and (2) 'the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated.'" *Rosner II*, 2008 WL 5416380, at *12 (quoting *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001)) (emphasis added).

"Inaction on the part of the alleged aider and abettor 'ordinarily should not be treated as substantial assistance, except when it was designed intentionally to aid the primary fraud or it was in conscious and reckless violation of a duty to act.'" *Rosner II*, 2008 WL 5416380, at *5 (quoting *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983)). A bank that maintains another

bank's correspondent account is not, without more, under an independent duty to act affirmatively to terminate accounts of an entity suspected to be engaged in fraud. *See Kaufman v. Cohen*, 760 N.Y.S.2d 157, 170 (1st Dep't 2003) ("[T]he mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty *directly* to the plaintiff." (emphasis added)). Plaintiffs have not pointed to a freestanding duty by HSBC USA to close such accounts, and the FAC does not—and cannot—allege that HSBC owed plaintiffs a fiduciary duty (let alone breached such a duty). The "mere fact that participants in a fraudulent scheme use accounts at a bank to perpetrate it, without more, does not in and of itself rise to the level of substantial assistance" by the bank. *Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.*, No. 98 Civ. 4960 (MBM), 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999) (citations and internal quotations omitted); *see also Ryan*, 2000 WL 1375265, at *9 (bank's opening of account and approval of transfers from the bank account did not constitute substantial assistance); *Renner v. Chase Manhattan Bank*, No. 98 Civ. 926 (CSH), 2000 WL 781081, at *8 (S.D.N.Y. June 16, 2000) (bank manager's drafting of letter confirming bank's receipt of funds which was later used by alleged primary violator to defraud plaintiff and authorization of fund transfers did not constitute substantial assistance); *Williams v. Bank Leumi Trust Co.*, No. 96 Civ. 6695 (LMM), 1997 WL 289865, at *5 (S.D.N.Y. May 30, 1997) (primary violators' use of accounts did not constitute substantial assistance on the part of the bank). The FAC therefore does not allege, on HSBC's part, affirmative assistance in WCM777's illegal plot, concealment, or a failure to act in the face of a legal duty to do so. The element of substantial assistance is, therefore, not met by HSBC USA's failure to act to terminate the correspondent account relationship.

The FAC alleges that HSBC USA had its own internal protocols for flagging money laundering. *See* FAC ¶ 32. But, even assuming that the FAC adequately pled conduct inconsistent with those protocols, "violation of an organization's internal policy with respect to financial transactions does not in and of itself constitute substantial assistance." *Mazzaro de Abreu v. Bank of America Corp.*, 525 F. Supp. 2d 381, 391 (S.D.N.Y. 2007) (citing *Cromer Fin. Ltd.*, 137 F. Supp. 2d at 471 ("A failure to enforce margin requirements, or continuing to execute trades despite . . . violations" of "its own institutional rules" does "not constitute substantial assistance.")).

Similarly, to the extent the FAC alleges that maintaining the correspondent account breached HSBC USA's obligations under its DPA with the Justice Department, plaintiffs have not cited any legal authority to the effect that such an agreement gave rise to a duty to plaintiffs, the breach of which constituted substantial assistance. On the contrary, even the "violation of a federal regulation . . . does not of itself constitute substantial assistance." *Id.* at 391.

A separate fatal problem in the FAC's pleading as to substantial assistance is that the maintenance of the correspondent account is not adequately pled to have been the proximate cause of the alleged fraud, breach of fiduciary duty, or conversion. "Allegations of 'but for' causation are insufficient; an alleged aider and abettor will be liable only where the plaintiffs' injury is a direct or reasonably foreseeable result of the defendant's conduct." *Rosner II*, 2008 WL 5416380, at *5 (citation omitted). As alleged, HSBC USA merely received transfers from plaintiffs' bank(s) and relayed them to WCM777's accounts at HSBC Hong Kong. The FAC does not allege that HSBC USA maintained HSBC Hong Kong's only correspondent account, or that the use of a correspondent account was necessary to these transfers. As the *Agape* court aptly recognized in the context of a plaintiffs' similar theory there, although the actions of the

correspondent bank may have "made it easier for [WCM777] to effectuate the scheme, these conventional banking transactions were not the proximate cause of the Plaintiffs' damages and therefore do not constitute substantial assistance." *Agape*, 773 F. Supp. 2d at 325 (citing *Cromer Fin. Ltd.*, 137 F. Supp. 2d at 472 ("While the Ponzi scheme may only have been possible because of Bear Stearns' actions, or inaction, Bear Stearns' conduct was not a proximate cause of the Ponzi scheme.")).

Accordingly, the Court dismisses the FAC's claims against HSBC USA for aiding and abetting breach of fiduciary duty, fraud, and conversion.

## CONCLUSION

For the foregoing reasons, as to HSBC USA, the Court grants the motion to dismiss the claims against it. The dismissal is with prejudice.[7]

As to HSBC Hong Kong, however, the Court grants plaintiffs' request for jurisdictional discovery as to the issue of personal jurisdiction, so as to enable the Court to resolve HSBC Hong Kong's motion to dismiss under Rule 12(b)(2). The Court directs HSBC Hong Kong and plaintiffs to file, by June 10, 2019, a joint letter proposing a discovery schedule to be completed within approximately two months of today. The Court denies, without prejudice, HSBC Hong Kong's motions to dismiss and to strike class allegations, without prejudice to the right of HSBC Hong Kong to renew such motions if the motion to dismiss for lack of personal jurisdiction is denied.

The Clerk of Court is respectfully requested to terminate the motions pending at Dkts. 48, 54, 56, and 58, and to terminate HSBC USA as a defendant in this case.

---

[7] Plaintiffs have already amended their complaint once. And, in defending against the motion to dismiss, plaintiffs have not pointed to any additional facts, beyond those in the FAC, that could cure the deficiencies that HSBC USA identified in the claims against it.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: May 29, 2019
      New York, New York