UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RIGOBERTO VASQUEZ and EVA GARCIA, *on behalf of themselves and all others similarly situated*,

                                        Plaintiffs,

        -v-

HONG KONG AND SHANGHAI BANKING
CORPORATION, LTD., *a foreign company*, and DOES 1
THROUGH 100,

                                        Defendants.

---

18 Civ. 1876 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiffs Rigoberto Vasquez and Eva Garcia bring this putative class action against Hong

Kong and Shanghai Banking Corporation Ltd. ("HSBC Hong Kong") and Does 1 through 100, in

connection with HSBC Hong Kong's alleged facilitation of international bank transfers of money

used to perpetrate a Ponzi scheme called "WCM777."  Plaintiffs' federal claims are brought

under the federal racketeering statute 18 U.S.C. § 1961 *et seq.* ("RICO").  Plaintiffs also bring,

under state law, three common law claims for aiding and abetting fraud, breach of fiduciary duty,

and conversion.

The Court previously denied HSBC Hong Kong's motion to dismiss for lack of personal

jurisdiction under Federal Rule of Civil Procedure 12(b)(2), without prejudice, while authorizing

"jurisdictional discovery as to the issue of personal jurisdiction, so as to enable the Court to

resolve" that motion.  Dkt. 85, published at *Vasquez v. H.K. & Shanghai Banking Corp.*

("*Vasquez I*"), No. 18 Civ. 1876 (PAE), 2019 WL 2327810, at *19 (S.D.N.Y. May 30, 2019).

HSBC Hong Kong then filed a motion to reconsider the Court's authorization of jurisdictional

discovery, which the Court denied.  Dkt. 92, published at *Vasquez v. H.K. & Shanghai Banking Corp.* ("*Vasquez II*"), No. 18 Civ. 1876 (PAE), 2019 WL 3252907 (S.D.N.Y. July 19, 2019).

Jurisdictional discovery is now complete.  The Court accordingly now considers, in light of that discovery, HSBC Hong Kong's renewed motion to dismiss the Amended Complaint ("AC") for lack of personal jurisdiction under Rule 12(b)(2).  For the reasons that follow, the Court grants HSBC Hong Kong's motion.

## I.      Background

### A.      Factual Background[1]

The Court incorporates by reference the factual background set out in its May 30, 2019 Opinion and Order.  *See Vasquez I*, 2019 WL 2327810, at *1–5.  The Court provides background only to the extent necessary to resolve the pending motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2).

#### 1.      The Parties

Vasquez and Garcia are residents of California.  AC ¶¶ 3–4.

---

[1] The Court's account of the factual allegations is drawn from the Amended Complaint, Dkt. 45 ("AC"), its attached exhibit, and various declarations and exhibits submitted by the parties, as described more fully *infra*.  On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the Court may look beyond the four corners of the complaint and consider materials outside of the pleadings, including accompanying affidavits, declarations, and other written materials.  *See Jonas v. Estate of Leven*, 116 F. Supp. 3d 314, 323 (S.D.N.Y. 2015) (citing *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012)).  After jurisdictional discovery, the plaintiff must make a "factually supported" *prima facie* showing of personal jurisdiction that includes "an averment of facts that, if credited by the [ultimate trier of fact], would suffice to establish jurisdiction over the defendant."  *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) (alteration in original) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.1990)).  "[T]o the extent they are uncontroverted by the defendant's affidavits," *MacDermid*, 702 F.3d at 727 (citation omitted), the Court "credits all [p]laintiffs' factual averments as true, resolving any doubts in [p]laintiffs' favor," *Kiobel v. Royal Dutch Petrol. Co.*, No. 02 Civ. 7618 (KMW), 2010 WL 2507025, at *8 (S.D.N.Y. June 21, 2010) (citing *See A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993)).

HSBC Hong Kong is a Hong Kong corporation with its principal place of business in Hong Kong, China.  *Id*. ¶ 5.

Former defendant HSBC Bank USA ("HSBC USA")—dismissed as a party by the Court's May 30, 2019 Opinion—is a federally charted bank, headquartered in Virginia, with its principal place of business in New York, New York.  *Id*. ¶ 6; *see also Vasquez I*, 2019 WL 2327810, at *13–19 (dismissing claims against HSBC USA).  Relevant here, HSBC USA maintains a correspondent bank account[2] in the United States which is used by HSBC Hong Kong.  AC ¶¶ 6, 33.

### 2.    The Scheme and HSBC Hong Kong's Alleged New York Connections

Plaintiffs allege that HSBC Hong Kong helped perpetrate a Ponzi scheme called WCM777.  *Id*. ¶ 2.  In brief, WCM777—run by persons not alleged to be affiliated with any HSBC entity—marketed and sold various cloud-based computing services packages. *Id.* ¶ 17(d), (f).  In addition to the computing services, these packages also promised a 100% return to investors who purchased them:  Within 100 days, the investors were to receive the value of their original investment back, half paid in cash and half paid in points. *Id.* ¶ 17(d), (g).  Investors could redeem the points for goods or services with WCM777 or convert them into equity in other companies WCM777 allegedly planned to bring public. *Id.* ¶ 17(e).  Investors could also earn additional cash and points by referring new investors or by being passive. *Id.*  WCM777, however, was a pyramid scheme, which used the initial investor funds to make payments for the

---

[2] "A correspondent bank account is a domestic bank account held by a foreign bank, 'similar to a personal checking account used for deposits, payments and transfers of funds.'"  *Licci ex rel. Licci v. Lebanese Canadian Bank* ("*Licci III*"), 732 F.3d 161, 165 n.3 (2d Cir. 2013) (quoting *Int'l Hous. Ltd. v. Rufidain Bank Iraq*, 893 F.2d 8, 9 (2d Cir. 1989)).  These accounts help to "facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed to the United States." *Id.* (quoting *Licci v. Lebanese Canadian Bank* ("*Licci II*"), 20 N.Y.3d 327, 338 (2012)).

returns of other investors.  *Id.* ¶ 17(h).  Aside from the income it received from new investors, it had no other sources of revenue, and it used most of these funds to pay cash for real property in the United States.  *Id.* ¶ 17(h)–(j).

WCM777 Ltd. was based in the British Virgin Islands and was later incorporated in Hong Kong and registered with the California Secretary of State as WCM777 Enterprises, Inc. (collectively, "WCM777").  *Id.* ¶ 14.  WCM777 maintained a main office in California, where its Chief Financial Officer worked.  *Id.* ¶¶ 27, 29.  In July 2013, WCM777 opened a "Business Vantage foreign currency" account at HSBC Hong Kong, which allowed for the deposit of U.S. dollars.  *Id.* ¶ 26; *see also id.* ¶ 15.  HSBC Hong Kong employees frequently communicated via email and telephone with WCM777's Chief Financial Officer, to coordinate transactions and verify payments.  *Id.* ¶ 29.

Beginning in September 2013, WCM777 advised its investors to wire money to its HSBC Hong Kong accounts.  *Id.* ¶ 2.  Plaintiffs allege that most of these transfers went through HSBC Hong Kong's correspondent bank account at HSBC USA in New York.  *Id.*  Although not used for these transfers, HSBC Hong Kong also has a U.S. correspondent account with Bank of America.  Dkt. 115 ("Yiu Decl.") ¶ 13.

Between July 22, 2013 and August 14, 2013, WCM777 accounts with HSBC Hong Kong received more than 174 deposits, totaling more than $3.5 million.  AC ¶ 35.  In July 2013, HSBC USA flagged a wire transfer to one of the WCM777 accounts held by HSBC Hong Kong for review and consulted HSBC Hong Kong for additional information about WCM777.  *See id.* ¶¶ 36–37.  On or around September 30, 2013, HSBC USA learned, through Internet research, of allegations that WCM777 was a Ponzi scheme, and concluded that it "reasonably appeared that

they [WCM777] are engaged in pyramid/ponzi scheme." *Id*. ¶ 2; *see also id.* ¶¶ 39–40.  On October 2, 2013, HSBC USA shared these findings with HSBC Hong Kong via email.  *Id.* ¶ 41.

After HSBC USA told HSBC Hong Kong that WCM777 was an alleged Ponzi scheme, plaintiffs allege, more than $30 million worth of transactions occurred involving WCM777 accounts at HSBC Hong Kong, before the scheme was shut down on March 27, 2014.  *See id.* ¶¶ 1–2.  These included three transfers from plaintiffs.  Specifically, on October 11 and 15, 2013, Garcia transferred a total of $4,000 to WCM777's account at HSBC Hong Kong, via the correspondent account at HSBC USA.  *Id.* ¶ 57.  On October 21, 2013, Vasquez transferred $100,000 in the same manner.  *Id.* ¶ 56.  Plaintiffs did not receive any money from WCM777.  *See* Dkt. 117 ("Calabrese Decl.") ¶ 7.

After jurisdictional discovery, plaintiffs contend that between July 2013 and March 2014, HSBC Hong Kong used the HSBC USA New York-based correspondent bank account more than 2,500 times to facilitate more than $25 million worth of incoming and outgoing wire transfers on behalf of WCM777.  *See* Dkt. 119 ("Pl. Mem.") at 3; Dkt. 138 (Ramos Decl., Ex. 6) ("Outgoing Transfers Spreadsheet"); Dkt. 139 (Ramos Decl., Ex. 8) ("Incoming Transfers Spreadsheet").  Although transactions in U.S. dollars can be cleared by HSBC Hong Kong in Hong Kong—as opposed to through a U.S.-based correspondent account—defendants, in jurisdictional discovery, did not produce evidence that any WCM777 transfers had been processed in Hong Kong.  *See* Dkt. 124-5 (Ramos Decl., Ex. 16) ("Yiu Dep.") at 59; *see also* Yiu Decl. ¶¶ 14–15 (use of correspondent account not required to transfer U.S. dollar payments to HSBC Hong Kong).

As to incoming transfers to the correspondent account, plaintiffs contend that HSBC Hong Kong credited WCM777 accounts with the proceeds of more than 2,500 wire transfers, totaling over $19,270,000.  Pl. Mem. at 3; Incoming Transfers Spreadsheet.

For outgoing transfers from the HSBC USA correspondent account, plaintiffs contend that HSBC Hong Kong routed 24 WCM777 wire transfers, totaling $5.8 million, through that account.  Pl. Mem. at 3; Outgoing Transfers Spreadsheet.  All but $26,000 of the outgoing transfers took place on or after October 2, 2013—the date when HSBC USA allegedly notified HSBC Hong Kong that WCM777 appeared to be a Ponzi scheme.[3]  *See* Outgoing Transfers Spreadsheet.  Three of these transfers, totaling $200,000, were to Global Payouts Inc., an entity that plaintiffs allege made "lulling payments" to investors, to help them "be assured that their investment was safe and secure."[4]  *See* Pl. Mem. at 3; Outgoing Transfers Spreadsheet; AC ¶ 45.

Based on these alleged transactions, plaintiffs propose to represent a class of investors in WCM777 whose transfers were routed through the HSBC USA New York correspondent account between June 1, 2013 and May 31, 2014.  AC ¶ 55.

### 3.    The California Litigation

On November 16, 2015, three plaintiffs (not overlapping with those here) brought a substantially similar putative class action in the United States District Court for the Central

---

[3] Plaintiffs, in their memorandum, state that all 24 outgoing transfers occurred after October 2, 2013.  Pl. Mem. at 3.  A review of the spreadsheet cataloguing outgoing transfers proves that characterization is incorrect:  Two transfers occurred on September 23 and 25, respectively.  *See* Outgoing Transfers Spreadsheet.

[4] Plaintiffs state that "many" of these outgoing deposits were sent to Global Payouts.  *See* Pl. Mem. at 3.  However, the Outgoing Transfers Spreadsheet shows only three payments to Global Payouts.  *See* Outgoing Transfers Spreadsheet.

District of California, suing both HSBC Hong Kong and HSBC USA.  Dkt. 114 ("Def. Mem.")
at 6–8; Dkt. 118 ("Korman Decl.") ¶ 3.

On October 21, 2016, the court dismissed the California plaintiffs' claim against HSBC
Hong Kong for lack of personal jurisdiction.  *See* Korman Decl. ¶ 16; *Giron v. H.K. & Shanghai
Banking Corp.*, No. 15 Civ. 08869 (ODW), 2016 WL 11585001 (C.D. Cal. Oct. 21, 2016).
Plaintiffs alleged—without specifying the location—that HSBC USA had maintained a
correspondent account for HSBC Hong Kong, and the court credited this allegation for purposes
of the motion to dismiss.[5]  *See* Korman Decl., Ex. B (original California complaint) ¶ 35; *id.*,
Ex. C (third amended California complaint) ¶ 34; *Giron*, 2016 WL 11585001, at *3.  The court,
however, described HSBC Hong Kong's contacts with California as merely "the passive act, of
receiving deposits, without more[.]"  *Giron*, 2016 WL 11585001, at *3.  The court held that
HSBC Hong Kong's maintenance of "deposit accounts in a foreign country and accepting
deposits in that country" did not give rise to personal jurisdiction.  *Id.*  Independently, it found
that the HSBC USA correspondent account was not substantially related to plaintiffs' claims.
*See id.*

As for defendant HSBC USA, on November 15, 2017, the district court granted HSBC
USA's motion for summary judgement on the basis that plaintiffs failed to show causation.  *See
Giron*, 2017 WL 5495504, at *9–12, 16.  It also denied plaintiffs' motion for class certification.
*Id.* at *14–15.

---

[5] None of the plaintiffs in the California litigation sent wire transfers that utilized the HSBC USA
correspondent account.  *Giron v. H.K. & Shanghai Bank Co.*, No. 15 Civ. 8869 (ODW),
2017 WL 5495504, at *10 (C.D. Cal. Nov. 15, 2017).

## B.      Procedural History of This Litigation

The procedural history of this litigation is set out more fully in the Court's May 30, 2019 Opinion.  *See Vasquez I*, 2019 WL 2327810, at *4–5.  The Court incorporates it here by reference.

On March 1, 2018, plaintiffs filed the original complaint.  Dkt. 1.  On August 28, 2018, the HSBC defendants (HSBC Hong Kong and HSBC USA) moved to dismiss and to strike the class allegations.  *See* Dkts. 31–42.  On October 9, 2018, plaintiffs filed the First Amended Complaint, which is the operative complaint today.  AC.  On November 13, 2018, the HSBC defendants collectively filed a motion to strike class allegations from the AC, Dkt. 58, HSBC Hong Kong filed a motion to dismiss for lack of personal jurisdiction, Dkt. 48, and HSBC USA and HSBC Hong Kong each separately filed motions to dismiss for failure to state a claim upon which relief can be granted, Dkts. 54, 56.

On May 30, 2019, the Court granted HSBC USA's motion to dismiss the claims against it.  *See Vasquez I*, 2019 WL 2327810, at *19.  As to plaintiffs' RICO claim, the Court held that the AC failed to plead HSBC USA's participation adequately to support that claim.  *See id.* at *14.  The Court also dismissed plaintiffs' state common law claims of aiding and abetting breach of duty, fraud, and conversion.  Although the Court found that the AC adequately alleged that HSBC USA had become aware of the WCM777 fraud, it held that the AC had not adequately pled that HSBC USA thereafter had substantially assisted the fraud.  *See id.* at *15–19.  Pertinent here, the Court held that the maintenance of the correspondent account was not adequately alleged to have been a proximate cause of the fraud.  *Id*. at *19.

The Court, however, denied HSBC Hong Kong's motion to dismiss for lack of personal jurisdiction, without prejudice.  *See id.*  The Court authorized jurisdictional discovery as to HSBC Hong Kong's transaction of business in New York.  *See id.* at *13.  Such discovery, the

Court held, was relevant to determining whether there was specific jurisdiction in this District over HSBC Hong Kong under N.Y. CPLR § 302(a)(1).  *Id.*

On June 13, 2019, HSBC Hong Kong filed a motion for reconsideration.  Dkt. 88.  On July 19, 2019, the Court denied that motion and ordered both parties to file, within one week, a new joint letter proposing a discovery schedule.  *See Vasquez II*, 2019 WL 3252907, at *3.

On July 26, 2019, the parties submitted a joint letter setting out their respective views on the scope of and schedule for jurisdictional discovery.  *See* Dkt. 93.  On July 31, 2019, the Court issued an order that largely adopted HSBC Hong Kong's proposal for discovery, with one caveat:  "The Court agrees with plaintiffs' request that discovery should enable plaintiffs to probe beyond the three wire transfers at issue and into other 'incoming and outgoing wire transfers involving the WCM fraud[.]'"  Dkt. 94.  The Court explained that such discovery need "not entail the production of documents specific to individual such wire transfers [n]or include any identifying details as to account holders other than plaintiffs," but should "convey information to counsel on an aggregated level."  *Id.*

On August 2, 2019, the parties filed a proposed protective order, Dkt. 95, which the Court entered on August 5, 2019, Dkt. 96.

On August 27, 2019, the Court received a letter from plaintiffs seeking additional discovery from HSBC Hong Kong and dismissed party HSBC USA.  Dkt. 97.  On August 30, 2019, HSBC Hong Kong filed a response.  Dkt. 100.  On September 3, 2019, the Court denied plaintiffs' letter motion for additional discovery, explaining that plaintiffs had requested production of documents outside the scope of discovery addressed in the July 31, 2019 order.  *See* Dkt. 102.  On September 12, 2019, the parties filed a proposed stipulation to extend plaintiffs' deposition deadline—for the depositions of George Rajah in New York, Susan Yiu in

Hong Kong, and an unidentified branch manager in Hong Kong—and to extend HSBC Hong Kong's deadline to file its renewed 12(b)(2) motion.  Dkt. 105.  On September 13, 2019, the Court approved that stipulation.  Dkt. 106.

On September 30, 2019, plaintiffs filed an *ex parte* motion requesting to take depositions abroad of Susan Yiu and of an unidentified branch manager (subsequently identified as Cheung Shuk Har Jenny).  Dkt. 107.  On October 1, 2019, HSBC Hong Kong filed an opposition to plaintiffs' motion.  Dkt. 108.  On October 1, 2019 plaintiffs filed a reply.  Dkt. 109.  The same day, the Court denied plaintiffs' motion.  Dkt. 110.

On November 8, 2019, HSBC Hong Kong filed a renewed motion to dismiss the amended complaint for lack of personal jurisdiction, Dkt. 113, accompanied by a memorandum of law in support, Def. Mem.; a declaration from Yiu Susan Yuen Shan, Yiu Decl.; a declaration from George Rajah, Dkt. 116 ("Rajah Decl."); a declaration from Carol M. Calabrese, Calabrese Decl., and its attached exhibits; and a declaration from Gregory S. Korman, Esq., Korman Decl., and its attached exhibits.  On December 6, 2019, plaintiffs filed a memorandum of law in opposition, Pl. Mem., accompanied by a declaration from lead plaintiff Rigoberto Vasquez, Dkt. 120 ("Vasquez Decl."); a declaration from Eva Garcia, Dkt. 121 ("Garcia Decl."); a declaration from Robert Almanas, Dkt. 122 ("Almanas Decl."); and a declaration from Julio J. Ramos, Esq. (consisting of part one and part two separately filed), Dkts. 123–24 ("Ramos Decl."), and its attached exhibits.  On December 20, 2019, HSBC Hong Kong filed its reply. Dkt. 129 ("Def. Reply").

## II.    Applicable Legal Standards

On a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant."  *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (quoting

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)); *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).  "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'"  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball*, 902 F.2d at 197).

Before jurisdictional discovery, a plaintiff's *prima facie* showing of jurisdiction "may be established solely by allegations."  *Ball*, 902 F.2d at 197.  However, where jurisdictional discovery has been conducted—as here—a plaintiff's *prima facie* showing must be "factually supported"; in other words, it must "include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant."  *Metro. Life Ins. Co.*, 84 F.3d at 567 (alteration in original) (quoting *Ball*, 902 F.2d at 197); *see also Melnick v. Adelson-Melnick*, 346 F. Supp. 2d 499, 502 (S.D.N.Y. 2004).

In assessing the plaintiff's showing, the court applies a "standard . . . akin to that on a motion for summary judgment," construing the "pleadings documents, and other evidentiary materials . . . in the light most favorable to the plaintiff and all doubts are resolved in its favor."  *Melnick*, 346 F. Supp. 2d at 503 (citing *Kamen v. AT&T Co.*, 791 F.2d 1006, 1010–11 (2d Cir. 1986)); *accord Moneygram Payment Sys., Inc. v. Consorcio Oriental, S.A.*, No. 05 Civ. 10773 (RMB), 2007 WL 1489806, at *2 (S.D.N.Y. May 21, 2007).  "At the same time, particularly given the amount of time provided for jurisdictional discovery, the Court will limit its jurisdictional analysis to the facts presented and must assume that the [p]laintiffs have provided all the evidence they possess to support their jurisdictional claims."  *Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F. Supp. 2d 722, 731 (S.D.N.Y. 2001).

Although Rule 12(b)(2) motions cannot be converted into a Rule 56 motion for summary judgment when extrinsic evidence is considered, the Rule 56 standard nevertheless guides the Court as to the documents it may consider outside of the pleadings. *See Big Apple Pyrotechnics & Multimedia Inc. v. Sparktacular Inc.*, No. 05 Civ. 9994 (KMW), 2007 WL 747807, at *1 (S.D.N.Y. Mar. 9, 2007) (citing *Kamen*, 791 F.2d at 1011). Under that rule, a court, in resolving a Rule 12(b)(2) motion made after jurisdictional discovery, may consider only *admissible* evidence.[6] *Cf. Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (motion for summary judgment). Accordingly, affidavits or declarations in support of personal jurisdiction "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

As to the standards guiding personal jurisdiction, to make out a *prima facie* case of personal jurisdiction, whether based on general or specific personal jurisdiction, a plaintiff must establish both a "statutory basis" for jurisdiction and that the exercise of such jurisdiction accords "with constitutional due process principles." *Reich v. Lopez*, 38 F. Supp. 3d 436, 454 (S.D.N.Y. 2014) (citation omitted).

There are "two categories of personal jurisdiction: general and specific personal jurisdiction." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 134 (2d Cir. 2014) (internal quotation

---

[6] Courts commonly decline to rely on non-admissible evidence in the context of Rule 12(b)(2) motions made after jurisdictional discovery. *See, e.g.*, *DeLorenzo v. Ricketts & Assocs.*, No. 15 Civ. 2506 (VSB), 2017 WL 4277177, at *7 n.13 (S.D.N.Y. Sept. 25, 2017) (declining to rely on inadmissible hearsay evidence in resolving Rule 12(b)(2) motion), *aff'd sub nom. DeLorenzo v. Viceroy Hotel Grp., LLC*, 757 F. App'x 6 (2d Cir. 2018); *Nationwide Mut. Ins. Co. v. Morning Sun Bus Co.*, No. 10 Civ. 1777 (ADS), 2011 WL 381612, at *5 (E.D.N.Y. Feb. 2, 2011) (same for inadmissible statement in, and attachment to, memorandum of law); *Moneygram*, 2007 WL 1489806, at *3 n.5 (noting that defendant had not presented any admissible jurisdictional evidence, aside from his deposition testimony, and that the court had excluded an affidavit because it was not based on personal knowledge).

marks and citation omitted).  General personal jurisdiction subjects a defendant to suit on all

claims.  *Cortlandt St. Recovery Corp. v. Deutsche Bank AG*, No. 14 Civ. 01568 (JPO),

2015 WL 5091170, at *2 (S.D.N.Y. Aug. 28, 2015); *see also Goodyear Dunlop Tires

Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  A court may assert general jurisdiction

over a corporation where its "affiliations with the State are so 'continuous and systematic' as to

render [it] essentially at home in the forum State."  *Daimler AG v. Bauman*, 571 U.S. 117, 127

(2014) (quoting *Goodyear*, 546 U.S. at 919).  Specific personal jurisdiction, in contrast, subjects

a defendant to suit only on claims that arise out of or relate to the defendant's conduct in the

forum.  *Cortlandt St. Recovery Corp.*, 2015 WL 5091170, at *2; *see also Daimler*, 571 U.S.

at 126–27.

## III.   Discussion

The Court has previously held that HSBC Hong Kong is not subject to general personal

jurisdiction in New York.  *See Vasquez I*, 2019 WL 2327810 at *7–8.  Therefore, only specific

jurisdiction is at issue.

For the purposes of specific jurisdiction, a defendant must satisfy the requirements of

both New York's long-arm statute and of constitutional due process.  *See State Farm Fire &

Cas. Co. v. Swizz Style, Inc.*, 246 F. Supp. 3d 880, 886 (S.D.N.Y. 2017).  The Court finds that

plaintiffs have not met their burden of showing that HSBC Hong Kong falls within the New

York long-arm statute.  Accordingly, the Court does not have occasion to consider constitutional

due process.

New York's long-arm statute identifies four categories of conduct that can justify

exercise of specific personal jurisdiction over a defendant.  *See* CPLR § 302(a).  Three, the

parties agree, are inapplicable here: (i) the commission of tortious acts in New York, (ii) the

commission of tortious acts outside New York that are felt in New York, and (iii) the ownership

of real property in New York.  Only the last category is at issue: whether the defendant "transacts

any business within the state or contracts anywhere to supply goods or services in the state."

CPLR § 302(a)(1).

"To establish personal jurisdiction under section 302(a)(1), two requirements must be

met: (1) The defendant must have transacted business within the state; and (2) the claim asserted

must arise from that business activity." *Licci III*, 732 F.3d at 168 (quoting *Sole Resort, S.A. de

C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006)).  The Court here ordered

jurisdictional discovery to determine whether HSBC Hong Kong's New York contacts, which

gave rise to plaintiffs' claims, are sufficient to meet the first prong of § 302(a)(1).  *See Vasquez I*,

2019 WL 2327810, at *12–13.  The Court now holds that they are not.

### A.     Applicable Legal Principles

Under the first prong of § 302(a)(1), a defendant may be subject to specific personal

jurisdiction if it transacts business within the state.  "New York courts define transact[ing]

business as purposeful activity—some act by which the defendant purposefully avails itself of

the privilege of conducting activities within the forum State, thus invoking the benefits and

protections of its laws."  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007)

(alteration in original) (internal quotation marks and citation omitted); *see also Fischbarg v.

Doucet*, 9 N.Y.3d 375, 380 (2007).  Thus, "jurisdiction is proper even though the defendant

never enters New York, so long as the defendant's activities here were purposeful and there is a

substantial relationship between the transaction and the claim asserted."  *Fischbarg*, 9 N.Y.3d

at 380 (internal quotation marks and citation omitted).

The Court's primary consideration under § 302(a)(1) is "[t]he quality of the defendants'

New York contacts."  *Id.*  "Notably, '[t]he transacting business requirement of N.Y. C.P.L.R.

302 requires far fewer contacts with New York than does the [general jurisdiction]

14

doing-business requirement of N.Y. C.P.L.R. 301. . . .  This easing of requirements is offset by

the corresponding requirement that a cause of action arise from the very transaction or

transactions which are relied upon to provide the contact with the forum.'" *Rushaid v. Pictet &*

*Cie*, 28 N.Y.3d 316, 323 n.4 (2016) (quoting 15 N.Y. Jur. 2d, Business Relationships § 1159).

As such, a single act in New York may satisfy § 302(a)(1), if it was sufficiently purposeful and

substantially related to plaintiff's cause of action arising from the transaction.  *See Licci v.*

*Lebanese Canadian Bank* ("*Licci I*"), 673 F.3d 50, 62 (2d Cir. 2012); *Bank Brussels Lambert*,

171 F.3d at 787; *Farkas v. Farkas*, 830 N.Y.S.2d 220, 221 (2d Dep't 2007).  Otherwise,

however, "an ongoing course of conduct or relationship in the state" will be necessary.  *Licci I*,

673 F.3d at 62.  When making this assessment, courts look to the "totality of the circumstances."

*Id.* (quoting *Farkas*, 830 N.Y.S.2d at 221); *see also Bank Brussels Lambert*, 171 F.3d at 787

("To determine whether a party has 'transacted business' in New York, courts must look at the

totality of circumstances concerning the party's interactions with, and activities within, the state."

(citation omitted)).

     The parties agree that the § 302(a)(1) analysis here focuses on HSBC Hong Kong's use

of its New York correspondent account at HSBC USA.  *See supra* note 2 (defining

correspondent account).  The New York Court of Appeals has instructed that, while the existence

of a correspondent account in New York is insufficient on its own to establish personal

jurisdiction, "the first prong of the long arm-jurisdiction test under [CPLR § 302(a)(1)] . . . may

be satisfied by the defendant's use of a correspondent bank account in New York, even if no

other contacts between the defendant and New York can be established, *if* the defendant's use of

that account was purposeful."  *Licci II*, 20 N.Y.3d at 337 (alteration and emphasis in original).

The Court of Appeals has instructed that, in determining whether the use of a correspondent account by a foreign bank meets this standard, the key distinction is between the "unintended and unapproved use of a correspondent bank account, where the nondomiciliary bank is a passive and unilateral recipient" of money transfers, and the "[r]epeated, deliberate use that is approved by the foreign bank on behalf and for the benefit of a customer[.]" *Rushaid*, 28 N.Y.3d at 326–27.

In its May 30, 2019 Opinion, this Court reviewed in detail the three key precedents of the Court of Appeals applying § 302(a)(1) to correspondent bank accounts. *See Vasquez I*, 2019 WL 2327810, at *9–12. A brief review of these decisions—*Amigo Foods*, *Licci*, and *Rushaid*—is useful again here in framing the specific jurisdiction analysis.

In *Amigo Foods*, the Court of Appeals, after jurisdictional discovery, affirmed that the maintenance of a correspondent account in New York by a Maine bank, Aroostook Trust Company, did not satisfy § 302(a)(1). *Amigo Foods Corp. v. Marine Midland Bank-N.Y.* ("*Amigo Foods III*"), 46 N.Y.2d 855 (1979). The dispute arose from the plaintiff's contract to buy potatoes, with payment to be made through Aroostook. The plaintiff obtained a letter of credit from Marine Midland Bank, which delivered the letter to a New York bank where Aroostook maintained a small correspondent account. When the potato grower refused to accept payment, the plaintiff sued Aroostook in New York state court, alleging that it had wrongfully failed to deliver payment. Aroostook moved to dismiss for lack of personal jurisdiction. After jurisdictional discovery, the First Department granted that motion, finding that Marine Midland Bank—not Aroostook—had unilaterally chosen, for reasons of speed, to deposit the funds into the New York correspondent account. *Amigo Foods Corp. v. Marine Midland Bank-N.Y.* ("*Amigo Foods II*"), 402 N.Y.S.2d 406, 408 (1st Dep't 1978). The First Department held that

Aroostook had not purposely availed itself of the privilege of conducting business activities in New York; rather, the bank had "passively and unilaterally" been "made the recipient of funds which at its customer's direction it ha[d] declined." *See id.* As noted, the Court of Appeals affirmed. *Amigo Foods III*, 39 N.Y.2d 391.

In *Licci*, plaintiffs—Israeli citizens who had been victims of, or whose family members were killed by, rocket attacks by the terrorist organization Hizballah—sued Lebanese Canadian Bank ("LCB"), a bank headquartered in Beirut. *Licci II*, 20 N.Y.3d at 330. Plaintiffs alleged that LCB had used a New York correspondent bank account to funnel millions of dollars, through "dozens" of wire transfers, to the Shahid Foundation, the financial arm of Hizballah. *See id.* at 331–32. Unlike in *Amigo Foods*, the Court of Appeals—to whom the Second Circuit had certified the legal question—found this use of this correspondent account sufficient to support personal jurisdiction under § 302(a)(1). It held that "a foreign bank's repeated use of a correspondent account in New York on behalf of a client—in effect, a 'course of dealing'— show[s] purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Id.* at 339 (citation omitted). Critically, the Court of Appeals explained, LCB's use of the New York correspondent account had been no accident: "[T]he fact that LCB used a New York account 'dozens' of times indicates desirability and a lack of coincidence. Presumably, using the [New York correspondent bank] account was cheaper and easier for LCB than other options, and whatever financial and other benefits LCB enjoyed as a result allowed the bank to retain [the terrorist organization] as a customer." *Id.* at 340. Following the Court of Appeals' determination that personal jurisdiction was proper under the

New York long-arm statute, the Second Circuit held that subjecting LCB to personal jurisdiction

in New York also satisfied due process.  *See Licci III*, 732 F.3d at 170–74.

Most recently of these relevant cases, in *Rushaid*, the owner of a Saudi company sued

Pictet & Cie (a Swiss bank), a Pictet employee, and several of Pictet's general partners in New

York state court, alleging that they had participated, along with three of plaintiff's own

employees, in an illegal money laundering scheme.  *Rushaid*, 28 N.Y.3d at 320.  As part of the

scheme, plaintiff's employees directed venders to route illegal bribes and kickback payments to

New York correspondent accounts maintained by Pictet.  *See id.*; *see also id.* at 327–28.  Pictet

then credited the funds to a Geneva-based account of a "bogus" company, from which the funds

were transferred to the employees' accounts.  *Id.* at 320–21.  At least 12 such transfers had thus

been routed through the New York correspondent accounts, totaling more than $4 million.  *See*

*id.* at 322.  As in *Licci*, the Court of Appeals found that Pictet's contact with its New York

correspondent bank account had been purposeful under the first prong of § 302(a)(1), warranting

denial of Pictet's motion to dismiss.  *Id.* at 319, 322–23.  It found that Pictet "did not ignore or

reject the funds, as the defendant did in *Amigo Foods* . . . [but instead] . . . credited the funds in

that correspondent bank account to [the bogus company], an essential step in the

money-laundering scheme."  *Id.* at 327.  Central to the Court of Appeals' analysis was Pictet's

volitional role in the scheme:  That the plaintiff's employees, as opposed to Pictet, had directed

the vendors to deposit the money in New York accounts was "of no moment," because "what

matters is defendants' banking activity with the correspondent accounts, here, that the money

deposited in New York was credited in accordance with Pictet's money laundering."  *Id.*

at 327–38.

### B.      Application

Plaintiffs, drawing on *Licci* and *Rushaid*, argue that HSBC Hong Kong's use of the HSBC USA correspondent account supplies personal jurisdiction under § 302(a)(1).  Plaintiffs argue that HSBC Hong Kong's repeated facilitation of international wire transfers on WCM777's behalf constitutes a course of dealing, and that HSBC Hong Kong encouraged its customers to use the HSBC USA account.  Pl. Mem. at 6.  HSBC Hong Kong, drawing on *Amigo Foods*, counters that the evidence adduced in jurisdictional discovery shows no more than that it was a passive recipient of the wire transfers, initiated by plaintiffs and routed through its New York correspondent account to Hong Kong.  *See* Def. Mem. at 12–13; Def. Reply at 2–4.

At the threshold, the Court considers which of HSBC Hong Kong's New York contacts are properly considered in determining whether it transacted business in the state.  HSBC Hong Kong contends that the only relevant wire transfers are those involving the named plaintiffs.  *See* Def. Mem. at 14.  Plaintiffs argue that transactions involving all members of the putative class—which, as pled, consists of all individuals who invested in WCM777 and had money transferred through the HSBC USA correspondent account between June 2013 and May 2014, AC ¶ 55—may be considered.  *See* Pl. Mem. at 6–7.  On this methodological point, HSBC Hong Kong is correct.

"In an action brought as a class action, personal jurisdiction is based on a defendant's contacts with the forum state and actions giving rise to the named plaintiffs' causes of action. Contacts with unnamed class members may not be used as a jurisdictional basis, especially before a class has been certified."  *Beach v. Citigroup Alternative Invs. LLC*, No. 12 Civ. 7717 (PKC), 2014 WL 904650, at *6 (S.D.N.Y. Mar. 7, 2014) (citing *Selman v. Harvard Med. Sch.*, 494 F. Supp. 603, 613 n.6 (S.D.N.Y. 1908)); *see also Chufen Chen v. Dunkin' Brands, Inc.*, No. 17 Civ. 3808 (CBA), 2018 WL 9346682, at *5 (E.D.N.Y. Sept. 17, 2018) ("[E]ach named

plaintiff in a purported class action must show that in-state contacts specific to their claim give

rise to specific jurisdiction over an out-of-state defendant."), *aff'd*, 954 F.3d 492 (2d Cir. 2020);

*Chernus v. Logitech, Inc.*, No. 17 Civ. 673 (FLW), 2018 WL 1981481, at *3

(D.N.J. Apr. 27, 2018) (collecting cases).  Section 302(a)(1) thus requires that the named

plaintiffs' "cause[s] of action arise from the very transaction or transactions which are relied

upon to provide the contact with the forum."  *Rushaid*, 28 N.Y.3d at 323 n.4 (citation omitted).

       Here, HSBC Hong Kong's New York contacts that give rise to plaintiffs' claims consist

only of the uses of the correspondent account that effectuated Garcia's and Vasquez's transfers

to WCM777.  There are three such transfers involving that account and a named plaintiff—each

to (not from) HSBC Hong Kong: Garcia's October 11 and 15, 2013 transfers, which totaled

$4,000, and Vasquez's October 21, 2013 transfer of $100,000.  Calabrese Decl. ¶¶ 4–6; *see also*

Garcia Decl. ¶ 4 (explaining she sent the wires on October 10 and 15, 2013); Vasquez Decl. ¶ 3.[7]

Because neither Garcia nor Vasquez thereafter received any funds from the WCM777 HSBC

Hong Kong account, *see* Calabrese Decl. ¶ 7, Garcia and Vasquez's injuries are fairly said to

stem from these three transfers.

       But that is not so regarding uses of the correspondent account involving other persons,

such as absent members of the putative class.  Plaintiffs allege that other persons used the

correspondent account to transfer money to WCM777 (plaintiffs posit that there were some

---

[7] HSBC Hong Kong argues that the Court may not consider the Vasquez and Garcia declarations, because each plaintiff breached 28 U.S.C. § 1746 by providing an electronic rather than an actual signature, because Vasquez failed to state "that the foregoing is true and correct," and because Garcia declared only that her statements were made "under penalty of perjury under the laws of the State of California," not "under the laws of the United States of America."  *See* Dkt. 130. Notwithstanding these deficiencies, the Court finds substantial compliance with § 1746, as is necessary to consider the declarations.  *See Batista v. United States*, 792 F. App'x 134, 135 (2d Cir. 2020) (citing *LaBoeuf, Lamb, Greene & MacRae, LLP v. Worsham*, 185 F.3d 61, 65–66 (2d Cir. 1999)).

2,500 transfers, totaling more than $19 million) and that WCM777 sent money from its HSBC Hong Kong account to other persons via the correspondent account (plaintiffs posit that there were 24 such transfers, totaling nearly $6 million). But these transactions do not give rise to *plaintiffs*' claims, and Garcia and Vasquez therefore cannot rely on them to support jurisdiction over HSBC Hong Kong in the case they have brought. *See Beach*, 2014 WL 904650, at *6. Rather, because the same contacts must give rise both to jurisdiction *and* to plaintiffs' claims, *see Rushaid*, 28 N.Y.3d at 323 n.4, the Court considers only Garcia and Vasquez's three transfers to HSBC Hong Kong using the correspondent account in evaluating personal jurisdiction under § 302(a)(1). *See Cmty. Fin. Grp., Inc. v. Stanbic Bank Ltd.*, No. 14 Civ. 5216 (DLC), 2015 WL 4164763, at *4 (acknowledging prior transfer through defendant bank's correspondent account, but relying, for purposes of § 302(a)(1), only on the one claim-related transaction, and finding no jurisdiction).

In arguing that the Court can instead consider all persons' incoming and outgoing transfers through the HSBC USA correspondent account, plaintiffs rely primarily on *Licci*. *See* Pl. Mem. at 6. The Court of Appeals there examined LCB's contacts with its New York correspondent account, notwithstanding that the plaintiffs had not had any financial transactions using that account. *See Licci II*, 20 N.Y.3d at 338–341. But *Licci* is easily distinguished. That case involved claims of personal injury from terrorist attacks, and each transaction routed through LCB's correspondent account to Hizballah—regardless of whose money was involved— provided more support for terrorist activities, increasing the harm to victims of Hizballah's rocket attacks, which included plaintiffs. As such, each transaction using the account fairly

contributed to, and gave rise to, plaintiffs' cause of action.[8]  In contrast, here, Garcia and Vasquez do not claim to have been harmed by the passage of other people's money through the correspondent account.  Their claims turn solely on the funds that they were induced to transfer to the allegedly fraudulent WCM777.

Confining its focus on the plaintiffs' three transfers, the Court considers whether these support exercise of specific jurisdiction under § 302(a)(1).

In the *Amigo Foods-Licci-Rushaid* trilogy, the Court of Appeals' analysis began with the recognition that the "mere maintenance" of a New York correspondent account is insufficient to give rise to personal jurisdiction.  *Licci II*, 20 N.Y.3d at 337–38 (agreeing with Second Circuit's summary of law, including that "the 'mere maintenance' of a correspondent bank account in New York does not suffice to establish personal jurisdiction there" (citation omitted)); *Amigo Foods Corp. v. Marine Midland Bank* ("*Amigo Foods I*"), 39 N.Y.2d 391, 396 (1976) ("[S]tanding by itself, a correspondent bank relationship, without any other indicia or evidence to explain its essence, may not form the basis for long-arm jurisdiction under CPLR 302[(a)(1)].");  *see also Licci III*, 732 F.3d at 171 ("[W]e by no means suggest that a foreign defendant's 'mere maintenance' of a correspondent account in the United States is sufficient to support the constitutional exercise of personal jurisdiction over the account-holder in connection with any controversy.").  The decisive issue of whether a defendant's use of a New York correspondent account was purposeful, it held, "necessarily requires examination of the particular facts in each

---

[8] Courts in such cases have commonly held that the use of correspondent accounts to fund terrorism supports finding personal jurisdiction.  *See, e.g.*, *Licci III*, 732 F.3d at 168–69; *Averbach v. Cairo Amman Bank*, No. 19 Civ. 04 (GHW) (KHP), 2020 WL 486860, at *7 (S.D.N.Y. Jan. 21, 2020), *report and recommendation adopted sub nom. Averbach ex rel. Averbach v. Cairo Amman Bank*, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020); *Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 22–23 (E.D.N.Y. 2016).

case." *Licci II*, 20 N.Y.3d at 338.  This "objective inquiry" into whether the facts demonstrated

the defendant's "purposeful availment" of the New York account, the Court of Appeals held,

"requires a court to closely examine the defendant's contacts for their quality." *Id.*  In particular,

in conducting this inquiry, the Court of Appeals has considered the (1) frequency and

(2) deliberateness of defendants' contacts.  *See Rushaid*, 28 N.Y.3d at 327; *see also Licci III*,

732 F.3d at 168 (noting Court of Appeals' focus on "the frequency and deliberate nature of

LCB's use of its correspondent account").

      As to the frequency of the HSBC USA correspondent account transactions, there were, as

noted, three relevant here, through which HSBC Hong Kong received a total of $104,000 from

the plaintiffs.  Where there has been repeated use of such an account, purposeful availment may

be inferred from sheer volume.  *See Licci II*, 20 N.Y.3d at 340 (routing a total of several million

dollars through LCB correspondent account to Shahid "'dozens' of times indicates desirability

and a lack of coincidence"); *see also, e.g.*, *Rushaid*, 28 N.Y.3d at 281 (transfer to Pictet

correspondent accounts at least 12 times for $4 million in illicit, laundered funds sufficient for

personal jurisdiction); *NIKE, Inc. v. Wu*, 349 F. Supp. 3d 346, 356 (S.D.N.Y. 2018) (transfer of

sales proceeds from alleged trademark infringement through correspondent accounts "on

hundreds of occasions to the tune of millions of dollars" sufficient for personal jurisdiction);

*Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 95–96 (S.D.N.Y. 2015) (transfer of gains

from alleged counterfeit sales "nearly a dozen times" through correspondent account, in

conjunction with establishment of New York office and marketing, sufficient to support personal

jurisdiction).  The three transactions at issue here are too sparse, however, to warrant such an

inference.  *See, e.g.*, *Cmty. Fin. Grp.*, 2015 WL 4164763, at *4 (single wire transfer of fraudulent

funds through defendant bank's correspondent account, where not initiated by bank, insufficient to support personal jurisdiction).

As to deliberateness, courts in cases involving correspondent accounts have found certain facts indicative of purposeful availment, including: (1) the defendant bank's level of control over the transfers, (2) the defendant bank's marketing of the correspondent account or encouragement of others to use it, (3) the necessity of the correspondent account to the alleged scheme, and (4) other conduct by which the bank projected itself into the New York market.  None of these indicators of purposeful availment, however, are present here.

**Level of control**:  A defendant bank's level of control over the transactions may bear importantly on whether there is specific jurisdiction.  In the decision affirmed in *Amigo Foods*, the First Department, for example, found that the defendant's unilateral, passive receipt of funds was insufficient to support jurisdiction.  *See Amigo Foods II*, 402 N.Y.S.2d at 408.  Since *Amigo Foods*, other courts have discounted the use of a correspondent account that is "essentially adventitious—i.e., [that] was not even [defendant's] doing"—as not reflecting a deliberate act. *See Official Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 66 (S.D.N.Y. 2016) (quoting *Licci II*, 20 N.Y.3d at 338); *see also id.* at 69, 71 (finding personal jurisdiction where defendant bank set terms of each transaction and designated correspondent account to receive funds, but noting that "[h]ad the record demonstrated that [plaintiff], as opposed to the Banks, selected the U.S. dollar and the New York accounts to effectuate the [transfers], the Banks' contacts with the United States would have been adventitious, and jurisdiction would not have lied"); *Cmty. Fin. Grp.*, 2015 WL 4164763, at *4 (finding no personal jurisdiction where there was no "established course of dealing," and the transfer at issue was "not even [defendant bank's] doing"); *In re Banco Santander Sec.-Optimal Litig.*,

732 F. Supp. 2d 1305, 1320–21 (S.D. Fla. 2010) (finding no personal jurisdiction under New York long-arm statute where third-party intermediary bank, as opposed to defendant bank, designated correspondent bank to receive funds associated with Madoff Ponzi scheme), *aff'd sub nom. Inversiones Mar Octava Limitada v. Banco Santander S.A.*, 439 F. App'x 840 (11th Cir. 2011).[9]

Here, there is no evidence that HSBC Hong Kong directed the funds to be deposited or controlled the route of the plaintiffs' funds through the correspondent account.  Quite to the contrary, plaintiffs attest that they merely wired funds to WCM777's HSBC Hong Kong account. *See* Vasquez Decl. ¶ 3; Garcia ¶¶ 3–4.  And the declaration of George Rajah, an HSBC USA employee, explains that only the originator of the funds or his or her bank can dictate the route that transferred funds take, and that for the HSBC USA correspondent account, HSBC Hong Kong "has no control over the bank-to-bank route taken by a wire transfer sent by a non-HSBC customer to an account at HSBC in Hong Kong."  Rajah Decl. ¶¶ 6–8.  As a result, on the record adduced in jurisdictional discovery, HSBC Hong Kong's role in the three transactions presents as that of a passive recipient, not as an entity actively involved or exercising control.

*Marketing and encouragement*:  Courts also inquire whether the defendant bank encouraged or promoted the use of the correspondent account.  *See Gucci*, 135 F. Supp. 3d at 95

---

[9] To be sure, for specific jurisdiction, it is not required that the defendant have directed that funds be routed through a correspondent account.  *See Rushaid*, 28 N.Y.3d at 328 ("Our cases do not require that the foreign bank itself direct the deposits, only that the bank affirmatively act on them."); *see also Nike*, 349 F. Supp. 3d at 355 ("New York's long-arm statute clearly does not require, as a condition precedent to personal jurisdiction, that foreign banks direct the payment of funds into their correspondent accounts.").  The case law reflects a continuum of control between direction to use the correspondent account, which favors specific jurisdiction, and solely passive involvement, which does not.  *See Gucci*, 135 F. Supp. 3d at 95 (distinguishing cases where bank had "no New York operations" and "passively received money via a New York correspondent account").

(defendant bank encouraged clients to use correspondent account frequently for wire transfers to China).  Plaintiffs assert that HSBC Hong Kong encouraged its customers to utilize the HSBC USA account for U.S. dollar transactions.  *See* Pl. Mem. at 4, 6–7.  As evidentiary support for this argument, plaintiffs point to three exhibits, attached to the Ramos Declaration.  These are: (1) HSBC's "Standard Settlement Instructions," Dkt. 123-9 (Ramos Decl., Ex. 9) ("Settlement Instructions"); (2) HSBC's "Customer Information Sheet for Inward Payments to Hong Kong," Dkt. 123-10 (Ramos Decl., Ex. 10) ("Customer Info. Sheet"); and (3) HSBC's "International Payments and Cash Management" page, Dkt. 123-11 (Ramos Decl., Ex. 11) ("Int'l Payments").  Plaintiffs claim that HSBC Hong Kong provided clients with these documents and by them instructed clients "to the maximum extent possible to direct incoming U.S. Dollar payments" through the HSBC USA correspondent account.  Pl. Mem. at 4; *see also id.* at 6 (citing these exhibits as proof that HSBC Hong Kong "forcefully directed its clients and financial institutions that inward payments be routed through the HSBC USA account").

Alas for plaintiffs, whatever probative value the Settlement Instructions, Customer Information Sheet, and International Payments page conceivably might have had in supporting a claim that HSBC Hong Kong affirmatively promoted the use of the HSBC USA correspondent account in New York, these three documents come to the Court entirely unauthenticated.  They are thus inadmissible.  And therefore, as HSBC argues, they may not be considered as support for plaintiffs' claim of specific jurisdiction.  *See* Dkt. 132 ("Ramos Decl. Objs.") at 3.

Notably, plaintiffs do not claim to have obtained these documents in discovery from HSBC Hong Kong, or from any other HSBC entity, or to have been furnished with them by an HSBC entity during the events at issue.  Instead, the documents appear to have come to light through Internet research by plaintiffs' counsel Ramos, whose declaration in opposition to the

motion to dismiss indicates that he downloaded these exhibits from an HSBC website and/or from the "Wayback Machine" archive, links to which his declaration supplies. *See* Ramos Decl. ¶¶ 12–14; *see also* Dkt. 124-1 (Ramos Decl., Ex. 12) ("Rajah Dep.") at 38, 41. Counsel's retrieval of these documents from these websites does not, however, itself authenticate these documents as official records of HSBC, let alone as materials used by HSBC during the time of, or in connection with, the transactions at issue. *See, e.g.*, *Philpot v. Kos Media LLC*, No. 16 Civ. 1523 (AT) (BCM), 2017 WL 2270248, at *3 n.7 (S.D.N.Y. Apr. 21, 2017) (finding undated printout from defendant's website not authenticated), *report and recommendation adopted*, 2017 WL 2269531 (S.D.N.Y. May 23, 2017); *Novak v. Tucows, Inc.*, No. 06 Civ. 1909 (JFB), 2007 WL 922306, at *5 (E.D.N.Y. Mar. 26, 2007) (finding web pages archived through Wayback Machine not authenticated, because they are "only as valid as the third-party donating the page decides to make it"), *aff'd*, 30 F. App'x 204 (2d Cir. 2009). And Ramos's declaration does not fill this void. It establishes only the fact that the records were accessible on the websites at issue at the time he accessed them. But it cannot validate the documents as authentic corporate records, let alone explain the documents' function or period of usage, or explicate the meaning of the terms thereon.[10]

---

[10] An attorney's affidavit of course "can be used, in connection with a summary judgment motion, to place documents produced in discovery before the Court.'" *Pace v. Air & Liquid Sys. Corp.*, 171 F. Supp. 3d 254, 272 (S.D.N.Y. 2016) (quoting *Harrison-Hoge Indus., Inc. v. Panther Martin S.R.L.*, No. 05 Civ. 2851 (JFB), 2008 WL 905892, at *27 (E.D.N.Y. Mar. 31, 2008) (collecting cases)). But Ramos's declaration goes far beyond that ministerial function of chronicling excerpts from an adversary's document production. Rather, as he acknowledged in describing the documents during a defense deposition, he personally downloaded them from the Internet. *See* Rajah Dep. at 38 (Ramos: "I'm going to mark as next in order something that I had downloaded from HSBC Net saying 'Standard Settlement Instructions.'"); *id.* at 41 (Ramos: "I'll represent to you that I got [the Customer Information Sheet] off the HSBC Hong Kong website.").

Plaintiffs propose to cure this problem by citing deposition testimony from Rajah, an HSBC USA employee whom plaintiffs' counsel, Ramos, questioned about the Settlement Instructions and Customer Information Sheet (although not the International Payments Page). *See* Rajah Dep. at 38–42.  But Rajah's testimony, too, is inadequate to authenticate these records. He stated that he was unfamiliar with either document, and that he could only speculate as to their use and meaning.  *See* Rajah Dep. at 35 (Ramos: "Does HSBC Hong Kong have standing settlement instructions?"  Rajah: "So I'm not aware of that, whether they have standing settlement instructions.  But given they have a correspondent banking relationship, okay, you know, my—my view is they would have standing settlement instructions."); *id.* at 40 (Ramos: "So does it appear that your—your educated guess was correct and that HSBC Hong Kong does have a set of standard settlement instructions?  You may not be able to answer it just based on this printout."  Rajah: "Yeah, I'm just kind of looking at the printout and all the information here. But this is—this is—you know, the standing settlement instruction is—is the guidance document."); *id.* at 41–42 (Ramos: "Have you seen that document [the Customer Information Sheet] before?"  Rajah: "No." . . . Ramos: "[I]s it fair to interpret that document as instructions from HSBC Hong Kong to its own customers to have payments sent to it in Hong Kong that are in various currencies, in this case U.S. dollars, sent through HSBC USA?"  Rajah: "So I haven't seen this document before . . . .  And based on my experience, this is more guidance to your customers to receive funds into their account.").

The Court is therefore constrained to disregard the Settlement Instructions, the Customer Information Sheet, and the International Payment page, as unauthenticated and inadmissible.  In so ruling, the Court acknowledges that aspects of these writings, if authenticated and explained by a personally knowledgeable witness, potentially could have supported plaintiffs' theory that

HSBC Hong Kong affirmatively encouraged customers to use the New York correspondent account.[11]  Had plaintiffs wished to attempt to use such materials in support of their claim of specific jurisdiction, they were at liberty in jurisdictional discovery to attempt to authenticate these, whether through targeted document requests, requests for admission, testimony from a competent witness, or other discovery tools.  Plaintiffs, however, did not adduce any such evidence.

As to the factor of marketing and promotion, plaintiffs, finally, have submitted an expert declaration from a Robert Almanas, who claims experience with financial sector correspondent accounts.  *See* Almanas Decl.  Plaintiffs, however, do not cite this declaration anywhere in their opposition.  The Court is at liberty on that ground alone not to consider it.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials[.]"); *see also Williams v. City of New York*, No. 10 Civ. 2676 (JG), 2012 WL 511533, at *3 n.3 (E.D.N.Y. Feb. 15, 2012) (disregarding evidence not cited in defendants' brief or Rule 56.1 statement on motion for summary

---

[11] It is far from clear, however, that these documents, if properly authenticated and explicated by a witness with personal knowledgeable, would have assisted plaintiffs' cause.  The Settlement Instructions and the International Payment page do not refer to the HSBC USA correspondent account at all.  The Customer Information Sheet has the most probative potential.  It instructs HSBC Hong Kong customers that "[i]f your bankers cannot send their payment instructions to us direct, please instruct them to make arrangements with any of #Group Offices/Correspondent Banks to send their payment instruction to us . . . with *the following details*."  Customer Info. Sheet at 1 (emphasis in original).  But it too is elusive: the ensuing "following details" do not refer to correspondent accounts, although the following page does identify the major correspondent account for U.S. dollars as the HSBC USA account. *See id.* at 2.

judgment).[12]  In any event, Almanas's report falls short of the mark.  Almanas opines that, based

on the Customer Information Sheet, HSBC Hong Kong has expressed a preference for customers

to route their payments to the HSBC USA correspondent account, and that customers using the

HSBC Hong Kong settlement instructions would send their payments to that account.  *See*

Almanas Decl. ¶¶ 28, 43 (citing Customer Info. Sheet).  But Almanas is patently unqualified to

opine on processes internal to HSBC Hong Kong, with which he has neither lay nor expert

familiarity, or on the inferences to be drawn from an unauthenticated document downloaded off

the Internet by counsel.  Furthermore, the record is devoid of evidence that the Customer

Information Sheet or Settlement Instructions were provided to WCM777 or put to use in any way

in connection with the 2013 transactions at issue.

 *Necessity*:  Courts have also examined how necessary or integral the correspondent

account's use was to the alleged scheme.  In *Rushaid*, for example, the Court of Appeals found

the wiring of money through the New York correspondent account to have been "an essential

step" in a money-laundering scheme.  *See* 28 N.Y.3d at 327.  It found that the defendant bank,

Pictet, had "orchestrated the money laundering and that the New York account was integral to

the scheme."  *Id.* at 328.  Pictet's choice of a New York bank, over others, to play this role made

its "New York connection 'volitional.'"  *Id.*

---

[12] HSBC Hong Kong objects to Almanas's report for a range of other reasons.  *See* Dkt. 131.  In addition to objections keyed to specific opinions, HSBC Hong Kong seeks exclusion because (1) the report does not comply with § 1746 (as it is signed on the front page, not the last, and states that it was "signed under penalty of perjury" without also averring that "the foregoing is true and correct"); (2) the report is not reliable, as Almanas did not review any evidence related to the plaintiffs' three wire transfers in this case; and (3) Almanas lacks expertise with correspondent accounts, Hong Kong banks, or Ponzi schemes.  *Id.* at 2–3.  The Court has no occasion to rule on each of these claimed shortcomings and instead disposes of Almanas's opinions solely for the reasons referred to in text.

The use of the New York correspondent account here appears less integral. HSBC Hong Kong has presented uncontested evidence that it enables transfers to it in U.S. dollars by multiple means. For example, it can receive U.S. dollar payments through either of its correspondent accounts in the United States or after clearance with a variety of different banks, including Citibank, JP Morgan Chase Bank, and Bank of America, in Hong Kong.[13] *See* Yiu Decl. ¶ 15; Rajah Decl. ¶ 11. As such, while the correspondent account happened to have been used for the three transactions at issue, it does not appear to have been necessary to the Ponzi scheme's success. *See Hau Yin To v. HSBC Holdings, PLC*, No. 15 Civ. 3590 (LTS), 2017 WL 816136, at *7 n.6 (S.D.N.Y. Mar. 1, 2017) (distinguishing *Rushaid*, where defendant bank was alleged to have increased flow of funds into Madoff Ponzi scheme, because "[t]he wiring of funds through New York . . . was passive, rather than 'integral' to the alleged Ponzi scheme"), *aff'd*, 700 F. App'x 66, 67–68 (2d Cir. 2017) (also distinguishing *Rushaid*).[14]

***Other projections by the bank into New York***:  Finally, courts are more likely to infer purposeful availment from a defendant bank's use of a correspondent account where the bank otherwise projected itself into the New York market. Although these "additional activities in the state" are not necessary for a finding of purposeful availment, *see Rushaid*, 28 N.Y.3d at 325, they are relevant in assessing whether defendant's contacts were deliberate. Such activities may include maintenance of a branch or employees in New York. *See, e.g.*, *Strauss*, 175 F. Supp. 3d

---

[13] Garcia sent her transfers from JP Morgan Chase Bank in California, and Vasquez sent his from U.S. Bank National Association in California. Calabrese Decl. ¶¶ 4–6.

[14] Where it was not necessary to use a correspondent account to carry out a criminal scheme, courts also look for other indicators of deliberateness, such as that the correspondent account was "cheaper and easier for [the bank] than other options[.]" *Licci II*, 20 N.Y.3d at 340. Plaintiffs have not adduced evidence that such is so here, or that alternative options (*e.g.*, clearance of U.S. dollar transactions in Hong Kong) were cheaper or easier for HSBC Hong Kong.

at 19–20 (personal jurisdiction where five transfers of $205,000 to support alleged terrorism were routed through defendant's New York branch, which was "staffed with employees and licensed to operate under New York banking laws" and "routinely" used to conduct business in New York); *Gucci*, 135 F. Supp. 3d at 95 (personal jurisdiction where "foreign bank deliberately thrust[] itself into the New York financial market by establishing a New York office and a correspondent account with a New York bank to repeatedly facilitate the transfer of money").

Plaintiffs have not pointed to any such additional New York activities on HSBC Hong Kong's part.  It is undisputed that the bank lacks branches, employees, or property in the United States, and there is no evidence that it solicits business or advertises here.  *See* Yiu Decl. ¶¶ 6–11.  HSBC Hong Kong instead mainly serves customers in the Asia-Pacific region.  *Id.* ¶ 17.  All HSBC Hong Kong customer accounts are maintained outside the United States.  *Id.* ¶¶ 4–5.  Its sole New York contacts consist of correspondent accounts with HSBC USA and Bank of America that help to process interbank transfers from U.S. banks to HSBC Hong Kong. *See id.* ¶ 13.[15]

Although these four oft-considered indicators do not favor finding purposeful availment, one allegation by plaintiffs, if factually substantiated, would make this case of the passive receipt by a correspondent account of funds across a minimal number of transactions a closer question than in *Amigo Foods*:  The Complaint alleges that on October 2, 2013, before the three transfers to the WCM777 account, HSBC USA notified HSBC Hong Kong of allegations that WCM777

---

[15] Relatedly, the affiliate relationship between HSBC Hong Kong and HSBC USA is of no moment in this personal jurisdiction analysis.  In *To*, the Circuit addressed a correspondent bank relationship between HSBC USA and foreign HSBC entities.  It held that "the mere maintenance of correspondent bank accounts at an *affiliate* bank in New York" did not give rise to personal jurisdiction.  *To*, 700 F. App'x at 67 (emphasis added).  Further, HSBC Hong Kong has confirmed that it is an independent banking entity that maintains its own customer database, separate and apart from that of HSBC USA.  *See* Yiu Decl. ¶ 18.

was a Ponzi scheme.  *See* AC ¶ 41.  Plaintiffs have not presented admissible evidence

substantiating this factual allegation.[16]  The Court would be at liberty to disregard this claim as

unsupported.  *See Melnick*, 346 F. Supp. 2d at 503 n.21 ("Surely, resolving all doubts in

plaintiff's favor is not the same as blindly crediting all allegations regardless of their factual

support.  Any rule requiring such blindness would ignore the basic notion that a motion to

dismiss pursuant to Rule 12(b)(2) based on lack of personal jurisdiction is inherently a matter

requiring resolution of factual issues outside the pleadings." (internal quotation marks, brackets,

and citation omitted)).  Nevertheless, noting that defendants have not contested this point, the

Court will assume *arguendo* that HSBC Hong Kong's alleged notice of the nature of WCM777

at the time the correspondent account was used to transfer money to WCM777 is factually

substantiated.

     Without more, however, the fact of HSBC Hong Kong's notice of an allegation of illegal

activity on the part of WCM777 does not make HSBC Hong Kong's receipt of three transfers to

WCM777 via the HSBC USA correspondent account purposeful.  *Cf. Lopez v. Shopify, Inc.*,

No. 16 Civ. 9761 (VEC) (AJP), 2017 WL 2229868, at *9 (S.D.N.Y. May 23, 2017) (defendant's

notice of illegal activity did not subject it to personal jurisdiction in New York, for purposes of

---

[16] The closest plaintiffs come is an exhibit attached to the Ramos Declaration, which contains emails between WCM777 and HSBC Hong Kong.  *See* Dkt. 124-11 (Ramos Decl., Ex. 22) ("WCM777 Emails").  These emails, like the Almanas Declaration, were neither cited nor relied upon by plaintiffs in their legal memorandum, and therefore are not required to be considered.  In any event, the emails do no more than (1) reveal inquiries from HSBC Hong Kong to WCM777 about various transactions and (2) contain a December 5, 2013 notice stating, without elaboration, that HSBC USA had returned a payment to WCM777 "per internal compliance decision."  *See, e.g.*, WCM777 Emails at 9, 34, 73.  However, the emails do not go further.  They do not communicate to HSBC Hong Kong the finding, or even the allegation, that WCM777 is a Ponzi scheme.  The emails are further problematic in that plaintiffs' counsel indicates that he received them not in discovery but from a "Krista Freitag" of the "Federal Receiver."  *See* Ramos Decl. ¶ 25.  Were these emails determinative of the issue at hand, substantial questions of authentication and admissibility would thus again arise.

§ 302(a)(3) (citing *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Hous. Metroplex, P.A.*, 623 F.3d 440, 447 (7th Cir. 2010)), *report and recommendation adopted*, 2018 WL 481891 (S.D.N.Y. Jan. 17, 2018).  That is because the allegation does not make HSBC Hong Kong's ensuing failure to block the three transfers willful, as opposed to inadvertent or inattentive.  There is no allegation that HSBC Hong Kong deliberately disregarded the notice or deliberately permitted the transfers to occur in the face of the red flags regarding WCM777.  And the notice does not outweigh the weighty factors pointing against a finding of purposeful availment, including, as noted, HSBC Hong Kong's limited use of the correspondent accounts in connection with plaintiffs' claims; the passive role of HSBC Hong Kong, which did nothing to encourage use of that account; and the lack of any other New York contacts on HSBC Hong Kong's part.[17]

The Court therefore holds that HSBC Hong Kong's use of a New York-based correspondent account in connection with plaintiffs' three transfers was not an act of purposeful availment sufficient to subject it to specific personal jurisdiction in New York under § 302(a)(1).  This finding is in line with other reported cases involving Ponzi schemes in which courts have

---

[17] Almanas's expert declaration, again not cited or relied upon by plaintiffs, does not change this analysis.  He assumes that HSBC USA notified HSBC Hong Kong of WCM777's status as a potential Ponzi scheme in October 2013, and from there opines that such notice could have warranted an investigation, and, if necessary, the freezing of the HSBC USA account.  Almanas Decl. ¶¶ 46–50.  He also offers his interpretation of the unauthenticated emails between WCM777 and HSBC Hong Kong, faulting HSBC for not taking proactive action, as he contends would have been a best practice.  *See id.* ¶¶ 57–59, 61–63.  Almanas's pontification on these points, however, is not an appropriate subject for an expert opinion, particularly given the scant and largely unauthenticated materials on which he relies.  Further, Almanas does not bring any reliable methodology to this venture.  Instead, his opinions are substantially based on conjecture about the extent and meaning of limited communications among WCM777, HSBC USA, and HSBC Hong Kong.  *See United States v. Meija*, 545 F.3d 179, 197 (2d Cir. 2008) ("[T]he expert must form his own opinions by 'applying his extensive experience and reliable methodology to inadmissible materials.'  Otherwise, the expert is simply 'repeating hearsay evidence without applying any expertise whatsoever,' a practice that allows the [party] 'to circumvent the rules prohibiting hearsay.'" (quoting *United States v. Dukagjini*, 326 F.3d 45, 59 (2d Cir. 2003)).

rejected claims of specific jurisdiction based, in part, on a bank defendant's use of an in-state correspondent account. *See To*, 700 F. App'x at 67 (holding that plaintiffs, investors in the Madoff Ponzi scheme, had "not alleged the kind of intentional and repeated use of correspondent accounts that amounts to a transaction of business" by the defendant banks for Madoff "feeder funds"); *SPV OSUS Ltd. v. UBS AG*, 114 F. Supp. 3d 161, 166, 169–70 (S.D.N.Y. 2015) (same, rejecting personal jurisdiction claim where one bank defendant for Madoff "feeder fund" had a New York correspondent account), *aff'd*, 882 F.3d 333, 345 (2d Cir. 2018) ("At bottom, the contacts alleged by [plaintiff] between the [bank defendants], the forum and the litigation amount to a handful of communications and transfers of funds.  Those limited contacts are insufficient to allow the exercise of personal jurisdiction over [defendants]."); *In re Banco Santander Sec.-Optimal Litig.*, 732 F. Supp. 2d at 1324 (finding no personal jurisdiction where intermediary bank, not defendant bank, designated the New York correspondent account to receive funds related to the Madoff scheme).  Because plaintiffs cannot satisfy the first prong of § 302(a)(1), the Court has no occasion to consider the remainder of the statutory analysis or the constitutional due process analysis.

## CONCLUSION

For the foregoing reasons, the Court dismisses the claims against HSBC Hong Kong, without prejudice, for lack of jurisdiction under Rule 12(b)(2).  Given this dismissal, the Court does not consider the arguments made by HSBC Hong Kong in its earlier-filed Rule 12(b)(6) motion.  The Clerk of Court is respectfully directed to terminate the motion pending at docket 113 and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 10, 2020
New York, New York